UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

**UNITED STATES OF AMERICA**                :

    - v -                                  :        **D E C L A R A T I O N**

**JULIAN HEICKLEN,**                        :        **10 Cr. 1154 (KMW)**

                                          :

- - - - - - - - - - - - - - - - - x

    I, **Sabrina P. Shroff, Esq.,** hereby declare under the penalties of perjury, pursuant to 28 U.S.C. § 1746, that:

    1.   I am an attorney associated with Federal Defenders of New York, Inc., stand-by counsel to <u>pro se</u> defendant Julian Heicklen. I make this Declaration in support of Mr. Heicklen's motions: (1) to dismiss the Indictment (a) on First and Fifth Amendment grounds, (b) because it is duplicitous and (c) because it fails to state an offense; (2) for an order directing the government to file a bill of particulars, and; (3) for a jury trial.

    2. The statements contained in this Declaration are based on my review of discovery materials provided by the Government and on my information and belief.

**The Indictment**

    3. Mr. Heicklen is charged in a single-count Indictment, which is on file with the Court, with violating 18 U.S.C. § 1504. The Indictment alleges that, between October 2009 and May 2010, he

       attempted to influence the actions and decisions of a
       grand and petit juror of a court of the United States, to

- 1 -

wit, the United States District Court for the Southern District of New York, upon an issue and matter pending before such juror, and before a jury of which he was a member, and pertaining to his duties, by writing and sending to him a written communication in relation to such issue or matter, to wit, HEICKLEN distributed pamphlets urging jury nullification immediately in front of an entrance to the United States District Court for the Southern District of New York, located at 500 Pearl Street, New York, New York.

4. Notably, the Indictment does not allege that Mr. Heicklen gave jury nullification information to a sitting grand or petit juror.

**Factual Background**

5. Included in discovery are two writings that the government alleges are among the "pamphlets" that Mr. Heicklen distributed at some point during the charged period.

6. The first such "pamphlet," a copy of which is attached hereto as Exhibit A, is a one-page printed document that provides:

> The judge will instruct the jury that it must uphold the law as he gives it. He will be lying. The jury must judge the law as well as the facts.
>
> Juries were instituted to protect citizens from the tyranny of government. It is not the duty of the jury to uphold the law. It is the jury's duty to see that justice is done.

Exhibit A, capitalization omitted.

7. The second such "pamphlet," a copy of which is attached hereto as Exhibit B, is a printed document entitled "A Primer for Prospective Jurors," and is attributed to the Fully Informed Jury Association/American Jury Institute ("FIJA," or "the Association")

- 2 -

of Helena, Montana (the "FIJA leaflet").

8. The FIJA leaflet indicates that the Association's "goal" is to "restore the true function of the jury" and "inform all Americans of their authority and responsibilities as jurors."

9. Characterizing itself as a "job description" for jurors, the FIJA leaflet poses, and answers, fourteen rhetorical questions about jury service.

10. The first question is "Must I respond to a summons for jury service?"

11. The FIJA leaflet answers "Legally, yes." It goes on to "encourage[]" recipients of summonses to appear, even if there is little risk of ill consequences for failing to, because "if more people knew how much good they could do by serving on a jury, and how much power they have to do that good," more would "happily respond to summonses."

12. The next question is: "Must I answer all the questions asked of me on a juror questionnaire or during the selection process...?"

13. To this, the FIJA leaflet first indicates that prospective jurors have the right to answer potentially embarrassing questions in private, but that if the judge directs a response, the juror must give one.  It goes on to point out that a prospective juror might be asked whether he will "follow the law as given, even if you disagree with it?" or "have you read any material on the topic

- 3 -

of jury nullification."  If so, he will face a "moral choice" about how to answer.

14. The third question is "Who asks these kinds of questions and why?"

15. The FIJA leaflet indicates that such questions are most likely to be asked by prosecutors or judges, in order to weed out those prospective jurors who "are aware that the jury has a political role," and that this makes it "easier for the government to get convictions." This answer describes the jury selection process as a "battlefield in the endless struggle between citizens who want to enjoy, exercise and preserve their individual rights, and a government bent on increasing its control over the citizenry." The FIJA leaflet advises that, under the Constitution, "the people are the master, and the government is the servant."

16. Fourth is "Once on a jury, must I use the law as given by the judge, even if I think it's a bad law, or wrongly applied?"

17. The answer is "No. You are free to vote on the verdict according to your conscience. You may not increase the charges, but may choose to vote to acquit, even when the evidence proves that the defendant 'did it,' if your conscience so dictates." This answer suggests asking the judge for information about any "reduced charges" of which "you might ... be willing to find the defendant guilty" if the juror thinks that the "charges are too high." These "same options apply" if the juror learns that the "evidence, though

- 4 -

true, was gathered in a way that violated the rights of the accused," thinks the government is "making an example out of the defendant," or "feel[s] that [he] was not allowed access to some of the facts of the case, or that victimless crimes should not be punished." A juror has the "power to render a conscientious verdict" based on "any .. reason you believe that justice will not be served by finding the defendant guilty or liable as charged."

18. The fifth question and answer together explain that the above is "what is meant by 'jury nullification.'" This occurs when "jurors unanimously agree that despite clear evidence showing the defendant acted as accused, conscience requires them to bring in a verdict of not guilty, or guilty only of lesser charges, (or in a civil case not to award all the damages claimed)." The answer points out that the "power to 'do the right thing' and bring in a conscientious verdict'" is the "very backbone of the jury system," and that the power dates back to the Magna Carta. Jurors do not "owe" the government or private plaintiff a verdict if they "really don't believe any harm was done," particularly since "prosecutors 'multiply charges'" and defendants can be sentenced on acquitted conduct. "Just keep in mind that many people sue for no reason, or for very poor reasons, and sometimes the government prosecutes completely innocent, harmless people. As a juror, you have the power to stop such abuses."

19. Question six asks "What about the oath I had to take to

'follow the law' as given by the judge?"

20. The answer reminds that jurors "cannot be punished" for "following your conscience instead of th[at] oath" because "[w]hat you and the other jurors decide to do behind the closed doors of the deliberation room is your business."  This answer concludes by calling for "caution," since the Second Circuit has held that a juror might be removed for cause if believed to be "'incapable' of being impartial." Nevertheless, jurors have the right to "discuss and judge the law and its application with the other jurors before deciding on a verdict," and that there are several components to the concept of "reasonable doubt," including that "the defense is not being allowed to introduce important evidence or that you don't believe the witnesses, including police and informants."

21. The seventh question is "If no one on the jury agrees with me, do I eventually have to give in and vote for the verdict they want?"

22. The answer is "No. You can 'hang' the jury with your vote if you feel it is the right thing to do." But, if the jury hangs, the "prosecutor or other plaintiff could always call for another trial."  Nevertheless, a "series of hung juries in similar kinds of cases sends a valuable message to lawmakers that the public has mixed feelings about the law" and could result in the revision or repeal of laws that do not "express[] the will of the people." The FIJA leaflet gives examples of this: fugitive slave laws, laws

barring workers from striking, and laws "which prohibited the manufacture and sale of alcohol."

23. Question number eight asks "should I share this brochure with my fellow jurors?"

24. In answer, the FIJA leaflet warns, "Doing so may be risky." Although the information it contains is "well researched and as accurate as we could make it, and even though every American should learn what it has to say, you may find yourself in trouble with the judge if you share it with fellow jurors." There have been numerous court decisions holding that there is no legal requirement that jurors be told "about their nullification power," but it is "not yet established in law whether" jurors are prohibited from informing other jurors "about their veto power."

25. This leads to the question "Can I even talk about 'jury rights' with fellow jurors?"

26. The answer is "Certainly. You can talk about anything you want to during your deliberations," including "the role of the jury, its history, the rights and powers of jurors." But jurors might be treading "thin ice" if they "attempt to document [this] discussion with written materials, including this brochure." This, "if nothing else," could be a violation of the "usual instruction" not to "refer to any 'outside' materials when deliberating."

27. Question ten wonders what "exactly" "America's founders" said on the subject.

28. The FIJA leaflet answers with quotations from Thomas Jefferson, John Adams and John Jay to the effect that "citizen juries would be the best protection against damage to our unalienable rights." Many of the "rights and freedoms ... treasured" by the founders were "identified and established by courageous juries" that "refused to enforce what they felt were unjust laws restricting what they saw as 'natural rights.'"

29. Question eleven asks for "some examples" of this, and the leaflet gives two. First the "landmark ... 1670 trial of William Penn. Our rights to freedom of speech, religion, and peaceable assembly were established when a London jury refused to convict him for violating the Conventicle Act, which made Anglicanism the official religion of England." Moreover, in "1735, in New York Colony, John Peter Zenger's acquittal by jury established freedom of the press."

30. Question twelve asks "what happened between those days and the present?" The answer blames the "interests" of "big business[es]" that lost "influence and profits" due to "juries which refused to enforce the laws those interests had spent a lot of money lobbying the government to pass." Eventually, in the late 1800's, "men with ties to these groups came to constitute a majority of the membership" of the Supreme Court, which went on to hold that judges should "try to keep the power of nullification secret from juries." But this power "exists, secret or not," and

the "'fully informed jury' movement is underway to tell you the secret the courts will not. ... [T]he secret is merely this: you, the juror, are the most powerful person in the courtroom because you alone have the last say on both the law and the evidence." The leaflet "urges [jurors] to use your awesome power wisely, to promote liberty and justice, and to guide the democratic process."

31. The answers to the final two questions give contact information for the Association and ask for a tax-deductible contribution.

**These Facts Raise Both First and Fifth Amendment Issues**

32. As detailed in Point I of the accompanying Memorandum of Law, the Indictment should be dismissed. Point I demonstrates that the statute that charges Mr. Heicklen is overbroad, in violation of the First Amendment. Alternatively, Point I argues that the statute is void for vagueness, in violation of the First Amendment and the Fifth Amendment's Due Process Clause.

**The Need for a Bill of Particulars**

33. The Indictment against Mr. Heicklen is imprecise, in that it alleges that he "distributed pamphlets urging jury nullification" outside the Southern District courthouse during an eight-month period but it does not identify any specific dates, times or places.

34. In addition, it fails to specify whether the individuals to whom Mr. Heicklen "distributed pamphlets" were sitting grand or

petit jurors - the only individuals covered by the statute - or others.

35. Finally, although two "pamphlets" are included in the government's discovery disclosure, the Indictment does not indicate whether Mr. Heicklen is charged with giving out those materials or others during each distribution.

36. In a court appearance earlier this year, stand-by counsel pointed out the need for more detailed information about the allegations against Mr. Heicklen. Counsel followed this up with two written requests to the prosecutor.

37. The first, a letter dated July 27, 2011, asked for particular information about the dates, times and places where the government alleged that Mr. Heicklen engaged in criminal conduct. That letter is attached hereto as Exhibit C.

38. The second, a letter dated August 19, 2011, asked for particular information about the persons to whom Mr. Heicklen is alleged to have distributed literature and the exact contents of that literature. That letter is attached hereto as Exhibit D.

39. To date, the government has not responded to either letter.

40. Accordingly, as detailed in Point IV of the accompanying Memorandum of Law, the Court should direct the government to file a bill of particulars.

**Demand for Jury Trial**

41. For the reasons detailed in Point V of the accompanying Memorandum of Law, the Court both can and should grant Mr. Heicklen a jury trial.

**WHEREFORE**, it is respectfully requested that this Court enter an order (1) dismissing the Indictment against Mr. Heicklen or, in the alternative, (2) directing the government to file a bill of particulars, and (3) granting Mr. Heicklen a jury trial.

Dated:    New York, New York
          August 24, 2011

```
_____/s/_____
```
**SABRINA P. SHROFF, ESQ**.
Stand-by Counsel to <u>Pro Se</u>
Defendant    Julian    Heicklen