UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

       - v -                        :

**JULIAN HEICKLEN,**                     :                    **10 CR 1154 (KMW)**

           Defendant.               :

- - - - - - - - - - - - - - - - - x


### STAND-BY COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF PRO SE DEFENDANT'S MOTIONS: (1) TO DISMISS THE INDICTMENT ON THE GROUNDS THAT IT (A) VIOLATES THE FIRST AND FIFTH AMENDMENTS, (B) IS DUPLICITOUS, AND (C) FAILS TO STATE AN OFFENSE; (2) FOR A BILL OF PARTICULARS AND; (3) FOR A JURY TRIAL


                        FEDERAL DEFENDERS OF NEW YORK, INC.
                        Stand-By Counsel for <u>Pro Se </u>Defendant
                        **JULIAN HEICKLEN**
                        52 Duane Street - 10th Floor
                        New York, New York  10007
                        Tel.: (212) 417-8736


**SABRINA P. SHROFF, ESQ.**
**STEVEN M. STATSINGER, ESQ.**
  Of Counsel

TO: **PREET BHARARA, ESQ.**
      United States Attorney
      Southern District Of New York
      One St. Andrew's Plaza
      New York, New York  10007
      Attn:, Rebecca Mermelstein, Esq.
          Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

UNITED STATES OF AMERICA,            :

          v.                         :      **10 CR 1154 (KMW)**

**JULIAN HEICKLEN**      ,           :

          Defendant.     :

----------------------------------X

### STAND-BY COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF PRO SE DEFENDANT'S MOTIONS: (1) TO DISMISS THE INDICTMENT ON THE GROUNDS THAT IT (A) VIOLATES THE FIRST AND FIFTH AMENDMENTS, (B) IS DUPLICITOUS, AND (C) FAILS TO STATE AN OFFENSE; (2) FOR A BILL OF PARTICULARS, AND; (3) FOR A JURY TRIAL

### PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted by stand-by counsel, Federal Defenders of New York, Inc., on behalf of pro se defendant Julian Heicklen's motions (1) to dismiss the Indictment on the grounds that it (a) violates the First and Fifth Amendments, (b) is duplicitous, and (c) fails to state an offense; (2) for a bill of particulars and; (3) for a jury trial.

### STATEMENT OF FACTS

**The Indictment**

Mr. Heicklen is charged in a single-count Indictment with violating 18 U.S.C. § 1504. The Indictment alleges that, between October 2009 and May 2010, he

> attempted to influence the actions and decisions of a
> grand and petit juror of a court of the United States, to
> wit, the United States District Court for the Southern

1

District of New York, upon an issue and matter pending
before such juror, and before a jury of which he was a
member, and pertaining to his duties, by writing and
sending to him a written communication in relation to
such issue or matter, to wit, HEICKLEN distributed
pamphlets urging jury nullification immediately in front
of an entrance to the United States District Court for
the Southern District of New York, located at 500 Pearl
Street, New York, New York.

Notably, the Indictment does not allege that Mr. Heicklen
gave jury nullification information to a sitting grand or petit
juror.

**Factual Background**

Included in discovery are two writings that the government
alleges are among the "pamphlets" that Mr. Heicklen distributed at
some point during the charged period.

The first "pamphlet" is a one-page printed document that
provides:

The judge will instruct the jury that it must uphold the
law as he gives it. He will be lying. The jury must judge
the law as well as the facts.

Juries were instituted to protect citizens from the
tyranny of government. It is not the duty of the jury to
uphold the law. It is the jury's duty to see that justice
is done.

The second "pamphlet" is a printed document entitled "A Primer
for Prospective Jurors," and is attributed to the Fully Informed
Jury Association/American Jury Institute ("FIJA," or "the
Association") of Helena, Montana (the "FIJA leaflet").

The FIJA leaflet indicates that the Association's "goal" is to
"restore the true function of the jury" and "inform all Americans

2

of their authority and responsibilities as jurors."

Characterizing itself as a "job description" for jurors, the FIJA leaflet poses, and answers, fourteen rhetorical questions about jury service.

The first question is "Must I respond to a summons for jury service?"

The FIJA leaflet answers "Legally, yes." It goes on to "encourage[]" recipients of summonses to appear, even if there is little risk of ill consequences for failing to, because "if more people knew how much good they could do by serving on a jury, and how much power they have to do that good," more would "happily respond to summonses."

The next question is: "Must I answer all the questions asked of me on a juror questionnaire or during the selection process...?"

To this, the FIJA leaflet first indicates that prospective jurors have the right to answer potentially embarrassing questions in private, but that if the judge directs a response, the juror must give one.  It goes on to point out that a prospective juror might be asked whether he will "follow the law as given, even if you disagree with it?" or "have you read any material on the topic of jury nullification."  If so, he will face a "moral choice" about how to answer.

The third question is "Who asks these kinds of questions and why?"

The FIJA leaflet indicates that such questions are most likely to be asked by prosecutors or judges, in order to weed out those prospective jurors who "are aware that the jury has a political role," and that this makes it "easier for the government to get convictions." This answer describes the jury selection process as a "battlefield in the endless struggle between citizens who want to enjoy, exercise and preserve their individual rights, and a government bent on increasing its control over the citizenry." The FIJA leaflet advises that, under the Constitution, "the people are the master, and the government is the servant."

Fourth is "Once on a jury, must I use the law as given by the judge, even if I think it's a bad law, or wrongly applied?"

The answer is "No. You are free to vote on the verdict according to your conscience. You may not increase the charges, but may choose to vote to acquit, even when the evidence proves that the defendant 'did it,' if your conscience so dictates." This answer suggests asking the judge for information about any "reduced charges" of which "you might ... be willing to find the defendant guilty" if the juror thinks that the "charges are too high." These "same options apply" if the juror learns that the "evidence, though true, was gathered in a way that violated the rights of the accused," thinks the government is "making an example out of the defendant," or "feel[s] that [he] was not allowed access to some of the facts of the case, or that victimless crimes should not be punished." A juror has the "power to render a conscientious

verdict" based on "any .. reason you belive that justice will not be served by finding the defendant guilty or liable as charged."

The fifth question and answer together explain that the above is "what is meant by 'jury nullification.'" This occurs when "jurors unanimously agree that despite clear evidence showing the defendant acted as accused, conscience requires them to bring in a verdict of not guilty, or guilty only of lesser charges, (or in a civil case not to award all the damages claimed)." The answer points out that the "power to 'do the right thing' and bring in a conscientious verdict'" is the "very backbone of the jury system," and that the power dates back to the Magna Carta. Jurors do not "owe" the government or private plaintiff a verdict if they "really don't believe any harm was done," particularly since "prosecutors 'multiply charges'" and defendants can be sentenced on acquitted conduct. "Just keep in mind that many people sue for no reason, or for very poor reasons, and sometimes the government prosecutes completely innocent, harmless people. As a juror, you have the power to stop such abuses."

Question six asks "What about the oath I had to take to 'follow the law' as given by the judge?"

The answer reminds that jurors "cannot be punished" for "following your conscience instead of th[at] oath" because "[w]hat you and the other jurors decide to do behind the closed doors of the deliberation room is your business." This answer concludes by calling for "caution," since the Second Circuit has held that a

5

juror might be removed for cause if believed to be "'incapable' of being impartial." Nevertheless, jurors have the right to "discuss and judge the law and its application with the other jurors before deciding on a verdict," and that there are several components to the concept of "reasonable doubt," including that "the defense is not being allowed to introduce important evidence or that you don't believe the witnesses, including police and informants."

The seventh question is "If no one on the jury agrees with me, do I eventually have to give in and vote for the verdict they want?"

The answer is "No. You can 'hang' the jury with your vote if you feel it is the right thing to do." But, if the jury hangs, the "prosecutor or other plaintiff could always call for another trial." Nevertheless, a "series of hung juries in similar kinds of cases sends a valuable message to lawmakers that the public has mixed feelings about the law" and could result in the revision or repeal of laws that do not "express[] the will of the people." The FIJA leaflet gives examples of this: fugitive slave laws, laws barring workers from striking, and laws "which prohibited the manufacture and sale of alcohol."

Question number eight asks "should I share this brochure with my fellow jurors?"

In answer, the FIJA leaflet warns, "Doing so may be risky." Although the information it contains is "well researched and as accurate as we could make it, and even though every American should

6

learn what it has to say, you may find yourself in trouble with the judge if you share it with fellow jurors." There have been numerous court decisions holding that there is no legal requirement that jurors be told "about their nullification power," but it is "not yet established in law whether" jurors are prohibited from informing other jurors "about their veto power."

This leads to the question "Can I even talk about 'jury rights' with fellow jurors?"

The answer is "Certainly. You can talk about anything you want to during your deliberations," including "the role of the jury, its history, the rights and powers of jurors." But jurors might be treading "thin ice" if they "attempt to document [this] discussion with written materials, including this brochure." This, "if nothing else," could be a violation of the "usual instruction" not to "refer to any 'outside' materials when deliberating."

Question ten wonders what "exactly" "America's founders" said on the subject.

The FIJA leaflet answers with quotations from Thomas Jefferson, John Adams and John Jay to the effect that "citizen juries would be the best protection against damage to our unalienable rights." Many of the "rights and freedoms ... treasured" by the founders were "identified and established by courageous juries" that "refused to enforce what they felt were unjust laws restricting what they saw as 'natural rights.'"

Question eleven asks for "some examples" of this, and the

leaflet gives two. First the "landmark ... 1670 trial of William Penn. Our rights to freedom of speech, religion, and peaceable assembly were established when a London jury refused to convict him for violating the Conventicle Act, which made Anglicanism the official religion of England." Moreover, in "1735, in New York Colony, John Peter Zenger's acquittal by jury established freedom of the press."

Question twelve asks "what happened between those days and the present?" The answer blames the "interests" of "big business[es]" that lost "influence and profits" due to "juries which refused to enforce the laws those interests had spent a lot of money lobbying the government to pass." Eventually, in the late 1800's, "men with ties to these groups came to constitute a majority of the membership" of the Supreme Court, which went on to hold that judges should "try to keep the power of nullification secret from juries." But this power "exists, secret or not," and the "'fully informed jury' movement is underway to tell you the secret the courts will not. ... [T]he secret is merely this: you, the juror, are the most powerful person in the courtroom because you alone have the last say on both the law and the evidence." The leaflet "urges [jurors] to use your awesome power wisely, to promote liberty and justice, and to guide the democratic process."

The answers to the final two questions give contact information for the Association, and ask for a tax-deductible

8

contribution.

**The Defense Requests Additional Discovery**

The Indictment against Mr. Heicklen does not identify any specific dates, times or places on which he is alleged to have distributed pamphlets, fails to specify whether the individuals to whom he did so were sitting grand or petit jurors or others, and does not give information about the content of those pamphlets. Accordingly, stand-by counsel has repeatedly sought more detailed information about the allegations against Mr. Heicklen, first in a court appearance and then in two written requests. To date, the government has not responded to these requests.

**ARGUMENT**

**POINT I**

**18 U.S.C. § 1504 IS UNCONSTITUTIONAL, BOTH ON ITS FACE AND AS APPLIED TO MR. HEICKLEN.**

In this extraordinary case, the government charges Mr. Heicklen in an Indictment with a criminal offense for pure speech - the dissemination of materials discussing jury nullification - but not directed at any particular case or proceeding. The prosecution is fatally flawed, however. The statute that it invokes is clearly overbroad, in violation of the First Amendment or if, not, it is void for vagueness under the Fifth Amendment's Due Process Clause.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const., amend. I. A statute that "makes criminal a form of pure speech, must be

interpreted with the commands of the First Amendment clearly in mind." Watts v. United States, 394 U.S. 705, 707 (1969) (per curiam) (construing a statute prohibiting threatening to kill or inflict bodily harm on the president).

## A. Overbreadth

### 1. 18 U.S.C. § 1504 Is Overbroad, in Violation of the First Amendment.

A law is unconstitutionally overbroad if it "punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep." Virginia v. Hicks, 539 U.S. 113, 118-19 (2003) (internal quotation marks omitted). A finding of overbreadth invalidates all enforcement of a challenged law, unless it can be saved by a limiting construction. Id. at 119.  Mindful that such relief is "strong medicine," the law rigorously enforces the burden on the challenging party to demonstrate a "substantial" infringement of speech. United States v. Williams, 553 U.S. 285, 292 (2008).

The "first step" in an overbreadth analysis is to construe the challenged statute. Id. at 293. The statue here, 18 U.S.C. § 1504, provides:

> Whoever attempts to influence the action or decision of any grand or petit juror of any court of the United States upon any issue or matter pending before such juror, or before the jury of which he is a member, or pertaining to his duties, by writing or sending to him any written communication, in relation to such issue or matter, shall be fined under this title or imprisoned not more than six months, or both.

> Nothing in this section shall be construed to prohibit the communication of a request to appear before the grand jury.

While no court has given a detailed analysis of this section, the crime it makes out appears to have the following five elements:

1. An attempt to influence the action or decision;

2. Of any grand or petit juror of any federal court;

3. Upon any issue or matter pending before such juror, or the jury upon which he is a member, or pertaining to his duties;

4. By writing or sending to him any written communication;

5. In relation to such issue or matter.

Of particular concern under the First Amendment are the third and fourth elements, which, read together, make it a crime to merely <u>write</u> something that is intended to influence a juror with respect to the juror's "duties," even if the writing is not directed at the outcome of a particular case, and even where it is not communicated to a sitting juror.[1]

There can be no doubt that the First Amendment generally forbids criminal prosecutions for "leafleting ... without permission." <u>Hicks</u>, 593 U.S. at 122 (suggesting that Virginia statute that prohibits this would be overbroad). <u>See also</u> <u>Flower v. United States</u>, 407 U.S. 197, 198-99 (1972) (per curiam) (reversing conviction for leafleting on a street within a military base). It

---

[1] Although not pertinent to the overbreadth analysis, it would seem that this is exactly what the government is alleging that Mr. Heicklen did.

is impossible to read elements three and four of § 1504 as <u>not</u> prohibiting leaflets, or other lawful writings about jurors' duties. Under those elements, merely creating such legitimate writings as an editorial or a news or scholarly article that discusses a juror's power to nullify could be prosecuted as a federal crime.

And such writings are quite common. A recent Westlaw search revealed fifty-five scholarly articles with the phrase "jury nullification" in the title. There is also a popular 2009 book by former federal prosecutor Paul Butler, <u>Let's Get Free</u>, The New Press 2009, that dedicates an entire chapter, entitled "Jury Duty: Power to the People," to jury nullification. That chapter powerfully advocates that the power be used. Since Butler's chapter is absolutely a "writing" that is "[a]n attempt to attempt to influence the action or decision" of any "petit juror" who might read it, Butler is clearly liable under the plain language of § 1504.

The "hallmark of the protection of free speech is to allow 'free trade in ideas' even ideas that the overwhelming majority of people might find distasteful or discomforting." <u>Virginia v. Black</u>, 538 U.S. 343, 358 (2003). The government is forbidden from prosecuting individuals merely because they advocate for a function that the government deems threatening to its interests. Section 1504 therefore violates the First Amendment.

## 2. The Statute Is Unconstitutional As Applied to Mr. Heicklen's Conduct

Even if not facially overbroad, 18 U.S.C. § 1504 is unconstitutional as applied to Mr. Heicklen's conduct.

The Supreme Court has recognized that the government may regulate some types of speech consistent with the Constitution. See, e.g., Chaplinsky v. New Hampshire, 315 U.S. 568, 571-572 (1942)("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem.") These include: words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace," Chaplinsky v. New Hampshire, 315 U.S. 368, 572 (1942); "fighting words" - "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction," Cohen v. California, 403 U.S. 15, 20 (1971); "true threats," Watts, 394 U.S. at 707; and "advocacy of law violation ... where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (per curiam) (voiding Ohio statute that prohibited advocating, or publishing advocacy, about the propriety of violence as a means of accomplishing industrial or political reform, or assembling to do so because it "punish[ed] pure advocacy").

But none of these categories saves 18 U.S.C. § 1504 as applied

13

to Mr. Heicklen's conduct. His distribution of "pamphlets urging jury nullification" cannot be characterized as inciting an immediate breach of the peace, nor does his message constitute fighting words or a "true threat."  And, while it was certainly "advocacy," it was lawful advocacy, and not "advocacy of law violation."  His conduct was not directed to "inciting or producing imminent lawless action" at all, and certainly did not risk a likelihood of "incit[ing] or producing such action." Brandenburg, 395 U.S. 447.

As an initial matter, it cannot be emphasized strongly enough that advocating for jury nullification is not in any way advocating for a "law violation," since jury nullification is lawful. It is not criminal, and is a power of American citizens with deep and important origins in this nation's history. And the Second Circuit has never held otherwise. See, e.g., Steckler v. United States, 7 F.2d 59, 60 (2d Cir. 1925) (Hand, J.) (characterizing a verdict likely arrived at because jurors were "disposed through lenity" - that is, nullification - as valid).

At its worst, a juror's disposition to nullify might be viewed as a form of potential bias sufficient to result in his removal, United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) (concluding that nullification is "[un]desirable," and thus that judges ought to prevent it when they can by dismissing jurors they suspect might be inclined to nullify), but that is a far cry from

14

rendering it the type of activity contemplated by the Supreme Court's cases upholding the prosecution of advocacy of criminal "lawlessness" that poses an imminent threat to the public order.[2]

Thomas itself recognizes this, noting that the term

> "nullification" can cover a number of distinct, though related, phenomena, encompassing in one word conduct that takes place fo a variety of different reasons; jurors may nullify, for example, because of the identity of a party, a disapprobation of the particular prosecution at issue, or a more general opposition to the applicable criminal law or laws. We recognize, too, that nullification may at times manifest itself as a form of civil disobedience that some may regard as tolerable.

Id. at 614, emphasis added.

In fact, Thomas fully acknowledges that there have been criminal prosecutions that history has come to appreciate as just applications of jury nullification - criminal libel and prosecutions under the fugitive-slave laws. Id. (citing with approval Dougherty, which notes (1) that the "pages of history shine" with just examples of juries exercising this "prerogative", 473 F.2d at 1130, and (2) the "existence of an unreviewable and unreversible power in the jury, to acquit in disregard of the instructions on the law given by the trial judge [that] has for many years co-existed with legal practice and precedent upholding instructions to the jury that they are required to follow the

---

[2] To the contrary, in the Anglo-American judicial system, jurors have been immune from criminal punishment for "corrupt or incorrect" verdicts since 1670. United States v. Dougherty, 473 F.3d 1113, 1130 (D.C. Cir. 1972).

instructions of the court on all matters of law," 472 F.2d at 1131). In the end, Thomas agrees that juries have a legitimate "power" to nullify, even if it is not a "right or something that a judge should encourage or permit." 116 F.3d at 315.

In light of this history, it is simply inconceivable that Mr. Heicklen's efforts to inform the public of this universally acknowledged power could be deemed "advocacy of law violation" at all, Brandenburg, 395 at 447, let alone advocacy directed to "inciting or producing imminent lawless action," that would risk a likelihood of "incit[ing] or producing such action." Id.

All that can truly be said about Mr. Heicklen's advocacy for jury nullification is that it is a message that the government wishes to silence. But it is precisely for this reason that the application of § 1504 is unconstitutional - the government's enforcement of the statute against Mr. Heicklen targets, not just to the content of Mr. Heicklen's communications, but the particular point of view they espouse. See, e.g., Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001) (government is not permitted to restrict speech "on the basis of viewpoint").[3]

Nor is this case at all like the one reported decision explicitly rejecting a First Amendment challenge to a government effort to silence an advocate for jury nullification.

---

[3] It seems fairly obvious that the government would never prosecute someone for disseminating information advising against jury nullification.

16

In Braun v. Baldwin, 346 F.3d 761, 763 (7th Cir. 2003), a Seventh Circuit panel rejected a plaintiff's claim, brought as a § 1983 action, that his ejection from a courthouse lobby,[4] where he was distributing juror nullification pamphlets, violated the First Amendment. But that decision turned on the fact that the conduct occurred inside the courthouse: "the lobby of the courthouse is not a traditional public forum or a designated public forum, not a place open to the public for the presentation of views." Id. The court expressly distinguished this from "the streets outside," which are "open to scathing criticism of what happens inside the courthouse." Id. at 764. And the Supreme Court agrees. United States v. Grace, 461 U.S. 171 (1983). In Grace, the Court held both that sidewalks in general and those surrounding its own courthouse were "public forums" for the purposes of the First Amendment. 461 U.S. at 179-80.

This alone distinguishes Mr. Heicklen's case from Braun. Mr. Heicklen is charged with distributing jury nullification leaflets outside the Southern District courthouse, a public forum, not inside of it. But there are other important differences, as well. The government simply cannot deny that it is targeting Mr. Heicklen expressly for to the content of his message, and for no other reason. In Braun, the record is not nearly so clear on this point.

---

[4] He was arrested for disorderly conduct, but never charged. 346 F.3d at 762-63.

The record there was limited to that raised in summary judgment motions, and the appellate court expressed considerable doubt that the plaintiff's exclusion from the courthouse was based on the content of his message at all. 346 F.3d at 763. He and his companion were being extremely disruptive in the courthouse lobby, and the sheriff's deputy who expelled him "may not even have known that Braun was present to assist ... in advocating jury nullification." Id.

Accordingly, for these reasons, 18 U.S.C. § 1504 is unconstitutional as applied to Mr. Heicklen's conduct.

**B. The Statute is Void for Vagueness**

Even if not unconstitutionally overbroad, § 1504 is void for vagueness, both on its face and as applied to Mr. Heicklen.

1. It is Void on its Face

A criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1982). Of principal concern in vagueness review is "the requirement that a legislature establish minimal guidelines to govern law enforcement." Smith v. Goquen, 415 U.S. 566, 574 (1974).

Under this standard, § 1504 is void for vagueness. Its generic proscription of "writings" that might influence a juror is completely standardless, and "vests virtually complete discretion in the hands of the police to determine whether the suspect has"

violated it. Kolender, 461 U.S. at 358. Giving "full discretion" to a government agent to determine whether a writing might improperly influence a juror improperly and necessarily "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." Id. at 359, alteration, internal quotation marks and citations omitted. Simply put, it is a recipe for selective enforcement.

Mr. Heicklen's case illustrates that selectivity beautifully. A writing advising against the supposed "lawlessness" of jury nullification, or one seeking "justice" for a crime victim, and hence the conviction of a particular defendant, poses just as much risk of affecting a juror's duties as the writings distributed here. The only difference is that those writings might make it easier, rather than harder, for the government to obtain a guilty verdict. But the government never would - and certainly never has - prosecuted someone under § 1504 for disseminating a message like that.

Section 1504 "readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, [and] results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." Thornhill v. Alabama, 310 U.S. 88, 97-98 (1940). It is accordingly void for vagueness.

2. It is Void as Applied to Mr. Heicklen's Conduct

Even if not void for vagueness on its face, for largely the

above reasons, the statue should be deemed void as applied to Mr. Heicklen, since his conduct was not "clearly proscribed" by the statute. <u>Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 495 (1982).

## C. Conclusion

As is always true with a government's effort to silence a lawful message, the prosecution of Mr. Heicklen arises from an unseemly mix of cruelty and folly. This prosecution is cruel because it seeks to imprison a man for disseminating a lawful message about a subject in which he has an honest and deeply held belief, and who is not trying to influence the outcome of any particular case. And it is foolish because it will never have the effects that the government seeks - silencing public debate over the desirability of jury nullification and preventing those inclined to nullify from doing so. To the contrary, this prosecution will only draw more attention to the issue - in fact, it already has - and will surely convert more to the cause than poor Mr. Heicklen ever could on his own.

In the end, the government has inadvisedly chosen the sword, forgetting that the pen is mightier. It invokes the heavy hand of a criminal prosecution, while ignoring the traditional, fairest, and most effective counter to speech with which it disagrees - more speech. <u>See, e.g.</u>, <u>Linmark Assocs. v. Willingboro Twp.</u>, 431 U.S. 85, 97 (1977) (the traditional First Amendment remedy is "more speech, not enforced silence"). If the government truly believes

that there is an urgent need to counsel the public against jury nullification, it should make that point directly, by producing its own literature on the subject. Members of the public would then be free to look at both sides of the issue and to decide who makes the better case.

In sum, for all these reasons, the Indictment in this case - plainly unconstitutional on multiple levels - should be dismissed.

### POINT II

**THE INDICTMENT SHOULD BE DISMISSED AS DUPLICITOUS, SINCE IT PREJUDICIALLY ALLEGES MULTIPLE VIOLATIONS OF A SINGLE STATUTE IN A SINGLE COUNT.**

The Indictment in this case alleges that, from October of 2009 through May of 2010, an eight-month period, Mr. Heicklen violated 18 U.S.C. § 1504 by "distribut[ing] pamphlets urging jury nullification" outside the Southern District courthouse. But since - if distributing such information is a crime at all, but see Point I, ante, and Point III, post - each single act of distribution would constitute a single violation of the statute, the Indictment is duplicitous and should be dismissed.

Fed. R. Crim. P. 8(a) requires that there be a "separate count" for each offense. United States v. Sturdivant, 244 F.3d 71, 71 (2d Cir. 2001). An indictment can be duplicitous, in violation of Rule 8(a), if it joins two or more distinct crimes in a single count. United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980). The policy considerations underlying the prohibition against duplicitous indictments are of singular importance - they include:

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.

<u>United States v. Margiotta</u>, 646 F.2d 729, 733 (2d Cir. 1981). Thus, if an indictment that contains several allegations that could be charged as separate offenses "risks unfairness to the defendant" by implicating one or more of these concerns, it should be dismissed. <u>Id.</u>

Here, the Indictment against Mr. Heicklen meets both of the criteria for duplicitousness - it alleges multiple, distinct communications with jurors in a single count, and risks prejudicing Mr. Heicklen. Each such communication should accordingly have been charged separately. <u>Cf.</u> <u>United States v. Bagdasarian</u>, ___ F.3d ___, 2011 WL 2803585 at *2 (9th Cir. July 19, 2011) (defendant made two purportedly threatening statements to President Obama on the same day, and was charged in two counts - one for each threat).

The first component of duplicitousness could not be more obvious.  Section 1504 makes it a crime to send "any written communication" to a grand or petit juror in an effort to influence the juror's "action or decision." Since the <u>actus reus</u> of this offense is the sending of a written communication, each such communication constitutes a separate violation. Here, where the Indictment coveres multiple individual communications over an eight-month period, it improperly alleges distinct crimes in a

single count. See, e.g. Bins v. United States, 331 F.2d 390, 392-93
(5th Cir. 1994) (counts alleging filing of multiple false documents
with federal agency were duplicitous). This is so even though the
Second Circuit is not in complete agreement with the reasoning of
Bins. In the Second Circuit, a single count permissibly charges
acts that could be charged as separate counts if those acts "could
be charged as part of a single continuing scheme." United States v.
Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989).

But that exception, which the court has strictly limited to
ongoing conspiracies or schemes to defraud, clearly does not fit
the facts here. For example, in Tutino, the defendants were
involved in an "ongoing and continuous drug conspiracy," such that
it was not improper to aggregate individual sales that "were part
of [the] single continuing scheme" in one count. Id. Similarly, in
Margiotta, 646 F.2d at 733, the court upheld the inclusion of
multiple mailings in a single mail fraud count because "the essence
of [the] crime [wa]s carrying out a single scheme to defraud." See
also United States v. Aracri, 968 F.2d 1512, 1519 (2d Cir. 1992)
(conspiracy indictment that alleged a scheme to defraud the United
States for a single purpose,  albeit by different means, was not
duplicitous).

Mr. Heicklen's case is nothing at all like Tutino, Margiotta
or Aracri. The charged conduct is the distribution of individual
leaflets to distinct individuals on different days over an eight-
month period. This is obviously not a conspiracy, but nor is it an

an ongoing scheme to defraud. In fact, it cannot legitimately be characterized as a "scheme" at all. The core of a "scheme" is an organized, continuous and structured stream of activity in pursuit of a single criminal end. See, e.g., Blacks Law Dictionary, 9th ed. 2009 (a "scheme" is, inter alia, a "systemic plan; a connected or orderly arrangement, esp. of related concepts"). But the conduct attributed to Mr. Heicklen involves random, discreet acts of distributing information on different dates to different, unconnected people who were, even if jurors, hearing unconnected cases. And the goal of those acts can hardly be characterized as the pursuit of a singular criminal end, in the manner of a conspiracy or scheme to defraud. Mr. Heicklen disseminated information with no specific goal and no way of knowing whether any of its recipients would, or even could, act on it. This conduct is accordingly much more like the conduct in Bins than the conduct that the court discussed in Tutino, Margiotta and Aracri.

Accordingly, for these reasons, the Indictment against Mr. Heicklen improperly alleges multiple violations of the same statute in a single count.

As for the prejudice prong, it is also apparent that Mr. Heicklen risks grave prejudice from the unfair structure of this count. Indeed, many of the risks identified in Margiotta and Sturdivant are present here.

First, a trial on this Indictment, which covers an eight month period, would create "uncertainty of whether a general verdict of

guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another." Margiotta, 646 F.2d at 733. There is every reason to believe that a fact-finder might conclude that Mr. Heicklen did not violate the statute on some dates during the charged period - perhaps because he was distributing information to the public in general and not, as required by the statute, sitting jurors - but that he did so on others. This would indeed require the fact-finder to render a "general verdict of guilty" but ignore its "finding of not guilty" as to some individual distributions.

A second form of prejudice evident here is a lack of notice. Cf. Sturdivant, 244 F.3d at 77 (no prejudicial lack of notice where other court filings revealed the particular dates and transactions referred to in a potentially duplicitous indictment). As of this writing, there is nothing in any filing, or any other document available to the defense, that would identify such crucial information as: the particular dates, times and places where Mr. Heicklen is accused communicating with jurors; whether the jurors were grand jurors or petit jurors; the nature of the cases upon which they sat; the exact wording of the materials he distributed; and the particular matter or matters that Mr. Heicklen attempted to influence.[5]

This makes preparing a defense particularly difficult, as the exact contours of Mr. Heicklen's defense will depend on the precise circumstances of each charged event. For example, the general

---

[5] See Point IV, post, arguing that the Court should order the government to file a bill of particulars.

25

wording of the Indictment would suggest that there were some occasions where Mr. Heicklen offered jury nullification pamphlets but did not actually distribute them, and other occasions where he actually gave them out. Mr. Heicklen would likely mount different defenses to these distinct allegations. Similarly, the general wording of the Indictment suggests that, even where there was an actual distribution of nullification materials, they went to different categories of individuals. Again, Mr. Heicklen's defense would likely be different depending on whether he is alleged to have given pamphlets to prospective grand jurors, prospective petit jurors, sitting grand jurors, sitting petit jurors, or others.

The confusing nature of the Indictment also raises double jeopardy concerns that might not be alleviated by the "estoppel" rule of Sturdivant. 244 F.3d at 77-78. There, the potentially duplicitous indictment clearly covered only two readily identifiable transactions. But here, the Indictment covers potentially numerous events over an eight-month period. It is so much broader than the indictment in Sturdivant that, unlike there, there likely will be a way for the government to attempt to retry Mr. Heicklen on at least some individual communications that it believes occurred during that period, even if he is acquitted on the instant Indictment.

Finally, Mr. Heicklen demands a jury trial. See Point V, post. If the Court grants that request, then the unanimity concerns identified in Margiotta will be present as well. Given the broad

sweep of the Indictment, it will be impossible to discern whether the jury was in unanimous agreement as to any of the many individual crimes included in the single count. 646 F.2d at 733.

Accordingly, for all the foregoing reasons, the Court should dismiss the Indictment against Mr. Heicklen as duplicitous.

<u>**POINT III**</u>

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE AN OFFENSE.**

Mr. Heicklen is charged with violating 18 U.S.C. § 1504 by "distribut[ing] pamphlets urging jury nullification, immediately in front of an entrance to" the Southern District Courthouse.  But, since this conduct does not violation the statue, the Indictment should be dismissed.

Fed. R. Crim. P. 7(c)(1) requires that an indictment contain the "essential facts constituting the offense charged," while Fed. R. Crim. P. 12(b)(3)(B) authorizes a motion to dismiss in cases where "the indictment ... fails to ... state an offense." The statute under which Mr. Heicklen is charged requires the government to prove beyond a reasonable doubt the following five elements:

1. An attempt to influence the action or decision;

2. Of any grand or petit juror of any federal court;

3. Upon any issue or matter pending before such juror, or the jury upon which he is a member, or pertaining to his duties;

4. By writing or sending to him any written communication;

5. In relation to such issue or matter.

18 U.S.C. § 1504.

Here, the Indictment fails to allege at least three of these elements. It does not allege that Mr. Heicklen wrote to or sent a written communication to a sitting grand or petit juror (Element 2),[6] only that he distributed information near the courthouse. Compare United States v. Ogle, 613 F.2d 233, 235 n.1 (10th Cir. 1979) (indictment specifically alleged that defendant gave a pamphlet to a sitting juror). Nor does it identify the issue, matter or duty about which any such communication was an effort to influence (Element 3). More generally, the Indictment does not allege any particular "action or decision" (Element 1) that the communication was an effort to influence. See id. (indictment also identified the particular criminal action that the defendant was attempting to influence).

Accordingly, the Indictment should be dismissed. See, e.g., United States v. Graham, 585 F. Supp. 2d 1144, 1147-48 (D.S.D. 2008) (dismissing indictment that did not allege that the defendant was an Indian, an element of the charged offense under 18 U.S.C. § 1152); United States v. Alkaabi, 223 F. Supp. 2d 583, 590-91 (D.N.J. 2002)(dismissing indictment where facts alleged did not support the "property" element of the mail fraud statute); United States v. Brownfield, 130 F. Supp. 2d 1177 (C.D. Cal. 2001)(dismissing indictment that did not allege facts that would satisfy the "person" element of a threatening communications

---

[6] Point I, ante, argues that § 1504 criminalizes writings that are not given to jurors, and that it is unconstitutional for that reason. This argument presumes that the Court has concluded that the statute only covers communications to jurors.

statute, 18 U.S.C. § 876).

## POINT IV

**THE COURT SHOULD ORDER THE GOVERNMENT TO FILE A BILL OF PARTICULARS.**

The Indictment against Mr. Heicklen is exceptionally vague. It identifies an eight-month period in which he supposedly attempted to communicate with jurors, but does not provide sufficient information about that allegation for him to properly prepare his defense. The Court should accordingly direct that the government file a bill of particulars.[7]

Fed. R. Crim. P. 7(f) provides that a district court has the discretion to "direct the government to file a bill of particulars." A court should grant bill of particulars where the indictment contains "not a shred of detail," so that the defendant can be "apprised of the conduct that he was alleged to have undertaken" and can prepare his defense. United States v. Barnes, 158 F.3d 662, 665 (2d Cir. 1998). Thus, for example, in a case alleging a bribery scheme, the district court granted two motions for bills of particulars identifying the specific benefits that the defendant was alleged to have received. United States v. Ganim, 510 F.3d 134, 141 (2d Cir. 2007) (Sotomayor, J.), aff'g 225 F. Supp. 2d 145, 148 (D. Conn. 2002). On the other hand, a court need not grant a bill of particulars where "the information sought by the

---

[7] In accordance with Local Rule 16.1, this office has written two letters to the government asking for more particularized information about the allegations against Mr. Heicklen. As of this writing, the government has not responded.

defendant is provided in the indictment or some other acceptable alternate form." Id.

Here, the bare-bones nature of the Indictment necessitates a bill of particulars so that Mr. Heicklen can prepare for and avoid surprise at trial and "interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Davidoff, 845 F.2d 1511, 1154 (2d Cir. 1988). All Mr. Heicklen knows from the Indictment is the eight-month time period within which he is alleged to have communicated with jurors, and the nature of the communications alleged: "pamphlets urging jury nullification." This is woefully insufficient.

In order to avoid surprise at trial, prepare his defense and respond to a second prosecution, Mr. Heicklen needs to be notified of:

1. The dates, times and places upon which he is alleged to have communicated with jurors;

2. The exact contents of each such communication;

3. Whether the recipients of his communications were members of the public, court staff, law enforcement agents, prospective jurors or sitting jurors, and if the latter, whether they were grand or petit jurors;

4. The nature of the particular cases that any sitting jurors were hearing, including whether the cases were criminal or civil and, if criminal, the particular charge;

5. Whether, if, Mr. Heicklen communicated with a member of grand

jury, it voted to indict, and, if he communicated with a member of a petit jury, it voted to convict, acquit, or could not reach a verdict, and;

6. For each recipient of a communication, the precise nature of the "issue," "matter," or "duties" that Mr. Heicklen is alleged to have attempted to influence.

Because this detailed information is critical to Mr. Heicklen's defense, the Court should order the government to file a bill of particulars.

### POINT V

**THE COURT SHOULD GRANT MR. HEICKLEN A JURY TRIAL.**

Given the extraordinary nature of the instant prosecution, Mr. Heicklen respectfully seeks a jury trial.

Mr. Heicklen is charged with violating 18 U.S.C. § 1504, which is a "petty" - as opposed to a "serious" - offense; it carries a maximum possible penalty of six months' imprisonment and a fine. Accordingly, a jury trial is not required under either the Sixth Amendment or Fed. R. Crim. P. 23(a). Lewis v. United States, 518 U.S. 322, 326 (1996) (jury trial only required for serious offenses - those punishable by more than six months' imprisonment); Baldwin v. New York, 399 U.S. 66. 69-71 (1970) (same).[8] However, there is certainly nothing in the constitution, Rule 23 or any act of Congress that forbids a jury trial in petty offense cases.

---

[8] This would be true regardless of the number of counts. Lewis, 518 U.S. at 330.

Accordingly, it is within the court's discretion to grant one. United States v. Greenpeace, Inc., 314 F. Supp. 2d 1252, 1263 (S.D. Fla. 2004) (granting jury trial on a petty offense); United States v. Beard, 313 F. Supp. 844, 845-46 (D. Minn. 1970) (court had discretion to conduct jury trial in petty offense case, since Congress had not forbidden it); United States v. Bishop, 261 F. Supp. 969, 976 (N.D. Cal. 1966) (finding that defendants were "entitled" to a jury trial, even on a petty offense, because Congress had not "provided otherwise"). See also Ross v. Bernhard, 396 U.S. 531, 550 (1970) (Stewart, J., dissenting) ("Nothing in the Constitution ... precludes the judge from granting a jury trial as a matter of discretion."); Smith v. United States, 128 F.2d 990, 991 (5th Cir. 1942) (concluding that courts have the discretion to conduct jury trials on petty offenses).

And here, there are compelling reasons for the Court to exercise this discretion. First, the government has already taken steps to treat this case as one that does not involve a petty offense by obtaining a grand jury indictment, when it could just as lawfully have proceeded by misdemeanor information. See Fed. R. Crim. P. 7(a)(2), 58(b)(1). The Grand Jury Clause - "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," U.S. Const. amend. V - only requires a grand jury indictment in a federal case where the defendant is charged with a felony. See Ex Parte Wilson, 114 U.S. 417, 427 (1885); United States v. Moreland, 258 U.S. 433,

437 (1922) (crime punishable by incarceration in a penitentiary must be charged in a grand jury indictment); 18 U.S.C. § 4083 (only a felony sentence can be served in a penitentiary). The government, having elected to treat the offense as serious for the purposes of the Fifth Amendment, should be estopped from asserting that it is petty for the purposes of the Sixth.

In addition, and more fundamentally, the truly oppressive nature of this prosecution literally cries out for the community involvement that can only be achieved by a trial by jury.   Mr. Heicklen is being prosecuted because he believes in a concept - jury nullification - that the government has deemed so threatening to its interests that it seeks to wield its vast powers to suppress it.   It is hard to imagine a situation more ripe for jury involvement than this.  See, e.g., McKeiver v. Pennsylvania, 403 U.S. 528, 554-55 (1971) ("trial by jury allows an accused to protect himself against possible oppression by what is in essence an appeal to the community conscience, as embodied in the jury that hears his case") (Brennan, J., concurring and dissenting).

Finally, the same factors the animated the court's exercise of discretion in Greenpeace, 314 F. Supp. 2d at 1263-64, are present, and likewise warrant a jury trial, here. There, the court first characterized the prosecution as "to put it mildly, unusual" and concluded that the case "would benefit from a jury's collective decision-making." Mr. Heicklen's case is also "unusual" - he is not accused of tampering with any particular jury but only with

33

disseminating truthful information about jurors' powers. And the benefit to a jury verdict is even more obvious here - it makes perfect sense for a jury to determine whether the disseminatino of general information about jury nullification constitutes jury tampering. Who would know better?

The court in <u>Greenpeace</u> also noted that the statute under which the defendants was charged was little used. <u>Id.</u> at 1264. This is also true here; stand-by counsel has located only four reported cases that discuss violations of violation 18 U.S.C. § 1504 or its predecessor section, and all relate to its application to grand jurors, not petit jurors. <u>See</u>  <u>See</u> <u>Duke v. United States</u>, 90 F.2d 840, 841 (4th Cir.) (per curiam) (defendant handed letter to grand jury foreman attempting to influence outcome), <u>aff'd</u>, 301 U.S. 492 (1937); <u>In re New Haven Grand Jury</u>, 604 F. Supp. 453, 455-56 (D. Conn. 1985) (Cabranes, J.) (grand jury); <u>United States v. Smyth</u>, 104 F. Supp. 283, 299 (S. D. Cal. 1952) (describing purpose of § 1504 with respect to grand jurors); <u>United States v. Bittinger</u>, 24 F. Cas. 1149 (W.D. Mo. 1876) (grand jury witness).

Third, <u>Greenpeace</u> noted the "rar[ity]" of the case: the "prosecution of an advocacy organization for conduct having to do with the exposition of the organization's message." <u>Id.</u>  Mr. Heicklen's case is highly similar. While he is not himself an advocacy organization, he is charged with distributing printed materials prepared by one and, as in <u>Greenpeace</u>, the charged conduct is directly related to "the exposition of the

organization's message." Id.  Fourth, the case against Greenpeace was not a "run-of-the-mill misdemeanor case," id., given its political implications. Again, the same is true here. There have been press reports in national publications discussing the oppressive nature of this prosecution;  one of them likens Mr. Heicklen to "the seventeenth century pamphleteers whose obstinate insistence on rights and fair process belongs to the animating background of the American Revolution." Scott Horton, The Obstinate Dr. Heicklen, Harper's Magazine, February 2011, available at www.harpers.org/archive/2011/02/hbc-90008006. And, fifth, as already noted above, the filing of a grand jury indictment where none was necessary further demonstrates the "unique nature of the case." Greenpeace, 314 F. Supp. 2d at 1265.

Accordingly, since the Court can conduct a jury trial in a petty offense case, it should do so here.

## CONCLUSION

For the reasons advanced in Points I, II and III, the Indictment against Mr. Heicklen should be dismissed. For those advanced in Point IV, the Court should order the government to file a bill of particulars. And for those advanced in Point V, the Court should grant Mr. Heicklen a jury trial.

Dated:     New York, New York
           August 24, 2011


                         Respectfully submitted,
                         Federal Defenders of New York, Inc.


            By:   _____/s/_____
                  **Sabrina P. Shroff, Esq.**
                  **Steven M. Statsinger, Esq.**
                  Federal Defender Division
                  Stand-By Counsel for
                  Pro Se Defendant
                  **JULIAN HEICKLEN**
                  52 Duane Street - 10th Floor
                  New York NY 10007
                  Tel.: (212) 417-8736