UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES,                          :
                                        :
         v.                             :        10 Cr. 1154 (KMW)
                                        :
JULIAN HEICKLEN,                        :
                                        :
                  Defendant.            :
------------------------------------------------------------x


## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTIONS


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America


REBECCA MERMELSTEIN
Assistant United States Attorney

         - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   I. Section 1504 is Constitutional As Applied to Heicklen . . . . . . . . . . . . . . . . . . . 5

      A.   A Jury Does Not Have the Right to Nullify . . . . . . . . . . . . . . . . . . . . . . . 5

      B.   Attempts to Advocate Jury Nullification to Jurors Are Not Constitutionally
         Protected Speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          i.   *Speech Concerning Judicial Proceedings, Including Speech
              Targeting Jurors, is Not Entitled to First Amendment Protections* . 9

          ii.   *Defendant's Conduct is Not Entitled to First Amendment Protection
              Without Regard to Whether it Occurred in a Public or Non-Public
              Forum* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         iii.   *The 500 Pearl Street Plaza is Not a Public Forum* . . . . . . . . . . . . 16

   II. Section 1504 is Not Void for Vagueness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.   Section 1504 is Sufficiently Definite So That Ordinary People Can
         Understand What Conduct is Prohibited . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.   Section 1504 Does Not Encourage Arbitrary and Discriminatory
         Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      C.   The Defendant Was Not Selectively Prosecuted . . . . . . . . . . . . . . . . . . . 23

   III.  Section 1504 Is Not Overbroad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   IV.  The Indictment is Not Duplicitous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   V.  The Indictment Properly States an Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   VI.  The Defendant is Not Entitled to a Bill of Particulars . . . . . . . . . . . . . . . . . . 34

   VII. The Defendant is Not Entitled to a Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . 37

i

A.    The Court Does Not Have the Discretion to Grant a Jury Trial . . . . . . . . 38

B.    Even if the Court Had Discretion to Order a Jury Trial It Should Not Do So
      Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## PRELIMINARY STATEMENT

Pro se defendant, Julian Heicklen, moves by and through his stand-by counsel, to dismiss an Indictment charging him with one count of jury tampering in violation of Title 18, United States Code, Section 1504, on the basis of his distribution of pamphlets advocating jury nullification in front of the federal courthouse at 500 Pearl Street, New York, New York.  He argues that (i) the statute is unconstitutional because it violates the First and Fifth Amendments; (ii) the statute is void for vagueness; (iii) the statute is overbroad; (iv) the Indictment is duplicative; and (v) the Indictment fails to state an offense.  Heicklen also demands a bill of particulars and a jury trial.

## BACKGROUND

There is little, if any, dispute about the factual background of this matter.  On at least eight dates[1] between October 2009 and May 2010, the defendant stood on federal property – a small plaza in front of the Pearl Street entrance to the federal courthouse at 500 Pearl Street, New York, New York (the "500 Pearl Street Plaza") -- carrying a sign reading "Jury Info," and distributing pamphlets from the Fully Informed Jury Association ("FIJA").  The pamphlet, attached hereto as Exhibit A, is directed to jurors, and states, in substance, that a juror may decide to acquit, even if he or she believes a defendant to be guilty, if the juror disagrees with the law, believes that the evidence, "was gathered in a way that violated the rights of the accused," "believe[s] that the government is just trying to flex its muscle by making an example out of the defendant," or if "for any other reason [the juror] believes that justice will not be served by finding the defendant guilty."  The pamphlet strongly suggests that jurors lie to judges in order to avoid being excused

---

[1] October 19, 2009, October 26, 2009, November 2, 2009, November 16, 2009, November 25, 2009, April 12, 2010, April 19, 2010, and May 25, 2010.

from a panel or removed from an empaneled jury. For example, the pamphlet explains that jurors must think carefully about how to answer questions like "will you follow the law as given, even if you disagree with it," or "[h]ave you read any material on the topic of jury nullification?" The pamphlet analogizes the juror's considerations in answering these questions to "the dilemma faced by German citizens when Hitler's secret police demanded to know if they were hiding a Jew in their house" and warns that giving "answers that are likely to get you excused" may prevent a juror from "do[ing] your part to see that justice is served." The pamphlet directs readers to "keep in mind that your primary obligation is to serve justice, which may in some instances mean deciding not to provide information which will cost you your chance to serve." The pamphlet also warns jurors that if once empaneled, they make known their intent to nullify, they may be removed from the jury, but advises that so long as a juror "express[es] 'reasonable doubt' that the evidence proves the prosecution's case, it cannot be established that you intended to acquit 'no matter what.'" The pamphlet further coaches jurors who wish to surreptitiously nullify that they could claim to "think the defense is not being allowed to introduce important evidence or that you don't believe the witnesses, including police and informants."

On one of these occasions, the defendant spoke to a woman he believed to be an empaneled juror, but who was in fact, an undercover agent. On May 25, 2010, Heicklen handed a FIJA pamphlet to an undercover agent and engaged in the following conversation:

> Heicklen: Would you like jury information? Find out what you [inaudible]
>
> Agent: I'm a juror, I got picked yesterday.
>
> Heicklen: Oh good, that'll be good for you to know. Take it home and read this. Thank you very much.
>
> Agent: What's nullification?

Heicklen: The jury has the right to judge the law as well as the facts. The judge will tell you otherwise, but there are several Supreme Court decisions which said that that was true. In other words, if you think the law is unjust you can find a person innocent. In fact, that's how we got freedom of religion. William Penn was the first guy, he was a Quaker in England and he used to practice his religion openly and that was a crime in England, in the Church of England, he was tried, the jurors found him -- the judge instructed the jurors to find him guilty – the jurors found him not guilty, then the judge locked the jurors up for three weeks till a higher court let them go. William Penn of course left England and came to the United States and founded the state of Pennsylvania which was only one of two colonies that had freedom of religion. In this country, the first case was a guy named John Peter Zenger who published a newspaper and he criticized the Governor of New York - this was before we were the United States, we were the colonies. It was a crime to criticize any of the King's appointees and he was tried and the jury acquitted him and that's how we got freedom of the press. So you serve a very important function. I'm not telling you to find anybody not guilty, there should be a reason for it. But, if there is a law you think is wrong then you should do that. And you will be in very good company. Our very first Supreme Court Justice, Chief Justice John Jay instructed the jury that they had that right, and several justices since. The most recent one I know of was Byron White, who was appointed by Kennedy, but there are many others. And in fact, it's in here, and you can get a lot of information, there is a website, if you are interested in more, and as a juror . . . And in fact, I just got a summons to serve on a jury, not in this court, in the court where I live. And I'm coming equipped. In the end, it's the citizens of the country who are the only ones who can protect democracy and this is the mechanism by which they can do it. In this case, instead of having to worry about 300 million other people and a lot of legislators you [inaudible] it only takes one juror to disagree to hang the jury. If you are one you are Queen. You are a Queen for this trial.

Agent: Ok.

Heicklen: Take advantage of it

Agent: Ok. Thank you.

Heicklen's actions at 500 Pearl Street were part of a larger effort to reach jurors with his jury nullification message. Since at least 2009, Heicklen has regularly passed out FIJA pamphlets in front of a variety of courthouses, including the federal courthouses in Philadelphia,

3

Pennsylvania; Albany, New York; Manhattan, New York; White Plains, New York; Hartford, Connecticut; Springfield, Massachusetts; Concord, New Hampshire; Tampa, Florida; Alexandria, Virginia; and Boston, Massachusetts.  According to schedules posted on Heicklen's blogs, he distributes FIJA literature almost exclusively at courthouse locations.  Indeed, according to an entry by Heicklen on the "Blog of Bile" website, Heicklen was once asked by a law enforcement agent to move because Heicklen was in front of a courthouse; Heicklen responded, "I knew that. That is why I was there."  Gov. Ex. B., Heicklen Discovery at 402 (emphasis added).  Heicklen has also made clear that his purpose in distributing FIJA pamphlets in front of courthouses is to cause jury nullification.  Thus, for example, in an entry on the "Tyrranyfighters" website, Heicklen wrote, "jury nullification has born fruit in a recent case in Missoula, Montana due to the jurors' indications during voir dire that they would not convict a defendant of the entirely victimless act of possession of 1/16th of an ounce of marijuana."  Gov. Ex. C., Heicklen Discovery at 355.

On November 18, 2010, a Grand Jury in this district returned a one count Indictment charging Heicklen with violating Title 18, United States Code, Section 1504.  Section 1504 provides that:

> Whoever attempts to influence the action or decision of any grand or petit juror of any court of the United States upon any issue or matter pending before such juror, or before the jury of which he is a member, or pertaining to his duties, by writing or sending to him any written communication, in relation to such issue or matter, shall be fined under this title or imprisoned not more than six months, or both. Nothing in this section shall be construed to prohibit the communication of a request to appear before the grand jury.

On August 24, 2011, defendant's standby counsel filed the present motion.

**ARGUMENT**

**I.  Section 1504 is Constitutional As Applied to Heicklen**

     A.     A Jury Does Not Have the Right to Nullify

     The defendant argues that his advocacy of jury nullification in front of a federal courthouse is constitutionally protected speech for which he cannot be prosecuted.  The defendant acknowledges that the Government is empowered to criminalize or regulate certain forms of speech, including "advocacy of law violation . . . where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action," Brandenberg v. Ohio, 395 U.S. 444, 447 (1969), but argues that his speech does not advocate a violation of the law because he is advocating a lawful activity.  Def. Br. at 14 ("[A]dvocating for jury nullification is not in any way advocating for a 'law violation' since jury nullification is lawful.  It is not criminal.").  The defendant is wrong.  First, advocacy of a constitutional action may be criminalized, even where the action itself may not because it is constitutionally protected.  See, e.g., United States. v. Cintolo, 818 F.2d 980 (1st Cir. 1987) ("The Second Circuit flatly rejected the hypothesis that advising a witness to do that which he possessed a constitutional right to do could not be criminalized) (citing United States v. Cioffi, 493 F.2d 1111 (2d Cir. 1974)); United States v. Gotti, 459 F.3d 296, 343 (2d Cir. 2006) (defendant could be convicted of witness tampering for "suggesting" that a witness invoke the witness's constitutional Fifth Amendment right in the grand jury); United States v. Peterson, 385 F.2d 127 (2d Cir. 2004) (defendant who sent letters to his co-defendant reminding her of, among other things, her right to remain silent, could be convicted of obstruction of justice).

     In any event, the defendant is also incorrect in his view that he has the right to tell jurors to

lie to a judge in order to be seated on a jury, to disobey a judge's legal instructions, and to vote to

acquit even if the juror believes the defendant to be guilty. Jury nullification has, of course, been a

reality of the Anglo-American legal systems since before the formation of the United States. But,

the defendant mistakes the jury's <u>ability</u> to nullify, with its <u>right</u> to do so. For more than a century,

the position of federal courts towards the role of the jury has been clear; that while juries are

charged with determining the "facts as they find them to be from the evidence," it is their duty "to

take the law from the court." <u>Sparf</u> v. <u>United States</u>, 156 U.S. 51, 102 (1895).

      Thus, while courts in this Circuit have acknowledged the jury's ability to nullify, courts

have also uniformly held that jury nullification is improper because it "is, by definition, a violation

of a juror's oath to apply the law as instructed by the court." <u>United States</u> v. <u>Thomas</u>, 116 F.3d

606, 614 (2d Cir. 1997). The Second Circuit has "categorically rejected the idea that, in a society

committed to the rule of law, jury nullification is desirable or that courts may permit it to occur

when it is within their authority to prevent." <u>Id.</u>

> A jury has no more '<u>right</u>' to find a 'guilty' defendant 'not guilty' than it has to find
> a 'not guilty' defendant "guilty," and the fact that the former cannot be corrected by
> a court, while the latter can be, does not create a right out of the power to misapply
> the law. Such verdicts are lawless, a denial of due process and constitute an
> exercise of erroneously seized power.

<u>United States</u> v. <u>Washington</u>, 705 F.2d 489, 494 (D.C.Cir. 1983) (emphasis in the original); <u>United</u>

<u>States</u> v. <u>Carr</u>, 424 F.3d 213, 220 (2d Cir. 2005) ("the federal courts have long noted the de facto

<u>power</u> of a jury to render general verdicts 'in the teeth of both law and facts,' but "courts have

consistently recognized that jurors have no <u>right</u> to nullify")(citations omitted)(emphasis in the

original). As Judge Learned Hand explained, "[w]e interpret the acquittal as no more than [the

jury's] assumption of a power which they had no right to exercise, but to which they were disposed

6

through lenity." <u>Steckler</u> v. <u>United States</u>, 7 F.2d 59, 60 (2d Cir. 1920). Thus, trial courts do not

instruct juries about their nullification power, defense lawyers may not argue for nullification, and

a juror whose intent is to nullify the applicable law is properly removed from the jury. <u>Thomas</u>,

116 F.3d at 614.

Courts have acknowledged that there are rare cases in which nullification by a jury

produced a result we now consider just. Thus, for example, in <u>United States</u> v. <u>Dougherty</u>, the DC

Circuit acknowledged "the 18[th] century acquittal of Peter Zenger of seditious libel . . . and the 19[th]

century acquittals in prosecutions under the fugitive slave law" as cases in which the jury nullified

and in doing so, reached a just result. 473 F.2d 1113, 1130 (DC Cir. 1972). But jury nullification

has much more frequently been used to the opposite effect, permitting an individual citizen or

citizens to frustrate justice because of their own views and prejudices. "[M]ore recent history

presents numerous and notorious examples of juror nullifying-cases that reveal the destructive

potential of a practice Professor Randall Kennedy of Harvard Law School has rightly termed a

'sabatoge of justice.'" <u>Thomas</u>, 116 F.3d at 616. Thus, for example, the trial of Klansman Byron

De La Beckwith in Mississippi for the murder of Medgar Evers, the NAACP field secretary,

resulted in two hung juries, presumptively as a result of nullification. <u>Id.</u> Similarly, in 1955, two

white men, who murdered a 14-year-old African American, Emmett Till, for flirting with a white

woman, were acquitted by a Mississippi jury. <u>Id.</u> The two men later confessed. <u>Id.</u>

The existence of jury trials, and the possibility of nullification, introduces a "slack into the

enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions."

<u>United States ex. Rel McCann v. Adams</u>, 126 F.2d 774, 776 (2d Cir. 1942). But "approval of [the

jury's] existence as a necessary counter to casehardened judges and arbitrary prosecutors, does not

establish as an imperative that the jury must be informed . . . of that power." <u>Dougherty</u>, 473 F.2d at 1136 (citations and quotations omitted).  Indeed, a system which permitted "individuals to make their own determinations . . . as a matter of conscience [as to which laws they will obey or] disobey is to invite chaos.  No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable.  Toleration of such conduct would not be democratic . . . but inevitably anarchic.  <u>Id.</u> at 1133-1134; <u>United States</u> v. <u>Ogle</u>, 613 F.2d 233 (10th Cir. 1980) ("To empower each individual to decide whether the particular law is worthy or runs againt the individual's private beliefs would necessarily produce a lawless society and chaos.  Quite apart from the . . . invalidity of such a system, it has no practical social value . . . carried to its logical conclusion it is anarchy and revolution.").

B.    <u>Attempts to Advocate Jury Nullification to Jurors Are Not Constitutionally Protected Speech</u>

The defendant further argues that if jury nullification is itself unlawful, he nonetheless has a First Amendment right to advocate that jurors engage in jury nullification and that they lie to a judge in order to protect their right to do so.  While conceding that he would have no First Amendment right to advocate jury nullification within a courthouse, the defendant claims that his actions carry First Amendment protections because they occur in what he claims is a public forum.  As discussed below, however, the defendant's advocacy of jury nullification, directed as it is to jurors, would be both criminal and without Constitutional protections no matter where it occurred.  In any event, the location in which the defendant advocates jury nullification – the 500 Pearl Street Plaza – is not a public forum.  Accordingly, even if the defendant were correct that the First Amendment analysis in this case was dependent on the nature of the forum in which his actions

8

took place, his behavior would nonetheless be unprotected by the First Amendment.

          i.      *Speech Concerning Judicial Proceedings, Including Speech Targeting Jurors, is Not Entitled to First Amendment Protections*

"[T]he unconditional phrasing of the First Amendment was not intended to protect every utterance." Roth v. United States, 354 U.S. 476, 483 (1957). Some speech is simply not entitled to constitutional protections. See e.g., id. (obscenity not entitled to First Amendment protections) Beauharnais v. People of State of Ill., 343 U.S. 250, 256 (1952) ("libelous" speech not entitled to constitutional protections); Chaplinsky v. State of New Hampshire, 315 U.S. 568 (1942) (fighting words not protected by the First Amendment). Communications directed to jurors, made outside the auspices of formal court proceedings, and with the intent to influence the jurors' decisions on a matter before them, fall into this category of unprotected speech.

As the Supreme Court has explained, "[a] State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." Cox v. Louisiana, 379 U.S. 559, 562 (1965). This is because, "the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy." Id. In Cox, the Supreme Court upheld the constitutionality of a Louisiana statute that prohibited picketing or parading near a courthouse with, among other things, the intent to influence a juror. In doing so, the Court declined to apply the then applicable "clear and present danger" analysis. The Court explained that,

> "[e]ven assuming the applicability of a general clear and present danger test, it is
> one thing to conclude that the mere publication of newspaper editorial or a telegram
> to the Secretary of Labor, however critical of a court, presents no clear and present
> danger to the administration of justice and quite another thing to conclude that
> crowds such as this, demonstrating before a courthouse may not be prohibited by a
> legislative determination based on experience that such conduct inherently threatens
> the judicial process."

Id. at 566.  In so holding, the Court noted that the case before it concerned "not free speech alone, but [] expression mixed with particular conduct."  Id. at 564.

In Turney v. Pugh, 400 F. 3d 1197 (9th Cir. 2005), the Ninth Circuit extended Cox's reasoning to a case with facts remarkably similar to those found here.  In Turney, prior to selection of a trial jury, the defendant approached three individuals who wore buttons identifying them as part of the jury venire.  The defendant told the prospective jurors to call a toll free number at FIJA, the same organization that publishes the pamphlets Heicklen distributes.  Callers who dialed the toll free number heard a recording stating that jurors need not follow the judge's instruction on the law.  One of the three prospective jurors called the number, was selected for the jury, and during deliberations switched his vote to acquittal on the grounds that he could vote as he pleased.  Thereafter, the defendant was charged under Alaska's jury tampering statute, which like the federal statute at issue here, "criminalize[d] knowingly communicating with a juror, directly or indirectly, with the intent to influence the outcome of a specific case."  Id. at 1201.

In upholding the Alaska statute, the Ninth Circuit noted that it was considering "[t]he perennially difficult issue of the proper balance between two of our society's most treasured guarantees: the fair administration of justice . . . and the right to freedom of expression."  Id.  The Court reviewed extensive Supreme Court precedent concerning "the protections for speech concerning judicial proceedings" and summarized the current state of the "clear and present danger" test as requiring "as a general rule, [that] speech concerning judicial proceedings may be restricted only if it 'is directed to inciting or producing' a threat to the administration of justice that is both 'imminent' and 'likely' to materialize."  Id. at 1201-1202.  Noting, however, that "speech to jurors about pending cases presents a special problem because of its grave implications for

10

defendants' right to a fair trial and the public's interest in fair and impartial justice," the Court

analyzed the Supreme Court's precedent specifically concerning speech to jurors.  The Ninth

Circuit noted, for example, that during a trial, any private communication with a juror outside of

the formal court proceeding is deemed presumptively prejudicial.  Id. at 1202 (citing, Remmer v.

United States, 347 U.S. 227 (1954)).  Turney also noted the heightened concerns implicated by

activities surrounding pending criminal trials, which in Sheppard v. Maxwell, led the Supreme

Court to grant habeas relief to a defendant whose trial had occurred in a "carnival atmosphere"

because "[t]he theory of our [legal] system is that the conclusions to be reached in a case will be

induced only by evidence and argument in open court, and not by any outside influence."  384 U.S.

333, 351 (1966).  Finally, Turney noted that in Wood v. Georgia, the Supreme Court, while

protecting a sherriff's open criticism of an ongoing grand jury investigation under the First

Amendment, emphasized that a crucial factor in its decision was that there was no "judicial

proceeding pending in a sense that prejudice might result to one litigant or the other by ill-

considered misconduct aimed at influencing the outcome of a trial" and concluded that it "need not

pause . . . to consider the variant factors that would be present in a case involving a petit jury."

370 U.S. 375, 389 (1972).

   At the conclusion of its review of Supreme Court precedent, the Turney court found that:

   the First Amendment, while generally quite protective of speech concerning judicial
   proceedings, does not shield the narrow but significant category of communications
   to jurors made outside of the auspices of the official proceeding and aimed at
   improperly influencing the outcome of a particular case.  What Alaska's jury
   tampering statute covers in the main, then, is speech that is not protected by the
   First Amendment.

400 F.3d at 1203.

State v. Springer-Ertl, 610 N.W.2d 768 (Sup. Ct. S.D. 2000), is also instructive.  In that case, as a result of publicity, a murder trial was moved to Martin, a small town of approximately 1,100 people.  Two weeks before the trial was set to begin, the defendant's mother drove to Martin, rented a hotel room, and plastered the town with posters stating that her son had passed a polygraph test, which the court would not permit into evidence, and asking that the people of South Dakota not permit such persecution.  The mother did not place posters in her own home town or in the town where the homicide had occurred.  The mother was charged and convicted under a South Dakota statute which forbid the attempt "to influence a juror, or any person summoned or drawn as a juror."  SDCL 22-11-16.  She appealed, arguing that the jury which heard her case should have been instructed on the First Amendment.

While the majority did believe the mother's speech triggered a First Amendment analysis, it ultimately concluded that a jury could find her guilty on the facts of that case, and remanded with an instruction that the jury be given a First Amendment instruction to explain that "the statute would not include situations where a person intends to inform the public or express a public opinion, regardless of whether jurors . . . may be among the public" and that the defendant was guilty only if "the defendant knowingly targeted prospective jurors in particular."  In so concluding, the majority opinion weighed its view that "South Dakota [] holds an interest of the 'highest order' in maintaining the integrity and fairness of its judicial proceedings," that "[i]mpartial jurors form the bedrock of our system" and that "[t]hose who illegally attempt to influence jurors may not immunize themselves by claiming a right to speak freely to anyone on any subject," against its concern that the fact that "a future juror might somehow hear or read of someone's public statement cannot feasibly constitute the precisely tailored restriction necessary to

12

justify punishing speech otherwise protected by the First Amendment." 610 N.W. 2d at 776.

Justice Sabers, concurring that the statute was constitutional, but dissenting from the majority's

analysis, went one step further and explained that the "First Amendment is not at issue" in the

consideration of a content-neutral statute which prohibited only those communications made with

the specific intent to influence jurors. Id. at 778. Justice Sabers also explained that the intent

requirement rendered the case at issue wholly distinguishable from, for example, an editorial about

a pending case published in a newspaper and directed to the general public, which he agreed would

receive constitutional protection. Under either analysis, Heicklen should be found guilty here.

Heicklen's consistent choice of location in front of a federal courthouse, his carrying of a sign

targeting jurors, his distribution of pamphlets directed to jurors, his statements concerning jury

nullification on his blogs, and the content of his conversation with an individual he believed to be

a juror, all demonstrate Heicklen's intent to target prospective jurors in particular. Accordingly,

his speech is not protected by the First Amendment.

In addition, a number of courts, although they did not explicitly address the First

Amendment, have upheld the constitutionality or applicability of statutes criminalizing attempts to

influence jurors. See e.g., Ogle, 613 F.2d 233 (upholding the conviction of a defendant under 18

U.S.C. § 1503 for attempting to provide a juror with a handbook advocating jury nullification and

refusing to permit the defendant to explain his theory of jury nullification to the jury hearing his

case); State of Montana v. Holland, 1995 Mont. Dist. LEXIS 929, No. CR-95-53, (Twenty First

District Court, November 29, 1995) (denying defendant's motion to dismiss charges that he

violated a Montana statute prohibiting an attempt to influence, among other people, a juror, with

regard to a judicial proceeding, where defendant was alleged to have mailed letters advocating jury nullification to prospective members of his jury ).

        ii.     *Defendant's Conduct is Not Entitled to First Amendment Protection Without Regard to Whether it Occurred in a Public or Non-Public Forum*

The defendant fails to address the well-reasoned opinions of <u>Turney</u> and <u>Springer-Ertl</u>, or to acknowledge that <u>there is not a single court opinion</u> finding unconstitutional either Section 1504, or the substantially similar state statutes. Instead, the defendant argues that although his jury nullification advocacy could be banned within a non-public forum, such as a courthouse, it carries First Amendment protections when it occurs in a public forum. In so arguing, the defendant relies principally on the Seventh Circuit's decision in <u>Braun</u>, which he incorrectly identifies as "the one reported decision explicitly rejecting a First Amendment challenge to a government effort to silence an advocate for jury nullification." Def. Br. at 16. According to the defendant, <u>Braun</u> stands for the proposition that speech may be regulated inside a courthouse lobby because it is not a public forum, but that "the streets outside," are to be "open to scathing criticism of what happens inside the courthouse." Def. Br. at 17, citing <u>Braun</u>, 346 F.3d 761, 764 (7th Cir. 2003). However, as described in further detail below, because <u>Braun</u> was limited to an analysis of a non-public forum, it did not reach the question of in what circumstances jury nullification advocacy may be prohibited in a public forum. Moreover, because the 500 Pearl Street Plaza is not a public forum, under <u>Braun</u>, the defendant's advocacy of jury nullification is not entitled to any First Amendment protections.

In <u>Braun</u>, the Seventh Circuit rejected the plaintiff's claim in a § 1983 suit that he had a First Amendment right to distribute pamphlets advocating jury nullification in the lobby of the Milwaukee County courthouse. 346 F.3d at 761. In that case, the plaintiff accompanied and took

14

photographs of a companion who was dressed in judicial robes, and who carried a sign that said, "Why do judges hide the truth?" Id. at 762. The plaintiff was arrested and removed from the courthouse under a content-neutral Milwaukee statute which provided that "no person shall engage in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct under circumstances in which such conduct tends to cause or provoke a disturbance." Id. at 764. The plaintiff brought a civil rights action, alleging that his First Amendment rights had been violated.

Because the incident at issue in that case was confined to the interior of the courthouse itself, the Braun court limited its consideration to whether a person has a First Amendment right to advocate jury nullification inside a courthouse or other non-public forum. While noting that on the facts of the specific case, it was not clear whether the plaintiff was ejected from the courthouse for advocating nullification or simply for being disruptive, the court emphatically held that the plaintiff "ha[d] no greater right than a criminal defendant's lawyer to tell jurors in the courthouse to disobey the judge's instructions." Id. at 764. The Braun court found the issue an easy one, explaining that "[t]he biggest surprise in this case is that the Milwaukee justice system tolerates [the plaintiff's] antics . . . [i]f it thinks the First Amendment requires this, it is mistaken." Id. at 764.

In addressing the limited issue of whether there is a First Amendment right to advocate jury nullification in a courthouse, the Braun court distinguished, for purposes of First Amendment analysis, the inside of a courthouse – a non public forum - from "the streets outside, which are open to scathing criticism of what happens inside the courthouse. Id. It is on this distinction that

the defendant hangs his hat – he argues that his advocacy of jury nullification is protected because it occurred in an allegedly public forum.

Assuming, arguendo, that the 500 Pearl Street Plaza is a public forum, Heicklen's activities are still not protected by the First Amendment. The defendant's reliance on Braun is misplaced. Because the court in Braun addressed only the advocacy of jury nullification in a courthouse, it did not fully address the issue of a First Amendment right to advocate jury nullification in a public forum. The court correctly noted that the inquiry would be different if the advocacy took place in a public forum. The court also found that a per se ban on the advocacy of jury nullification was permitted within the courthouse and correctly indicated that a per se ban on the advocacy of jury nullification would not be permissible in a public forum. But while Heicklen has a First Amendment right to advocate jury nullification in a public forum, he does not have the right, for the reasons explained above, to advocate jury nullification to jurors. Braun simply does not address the constitutional protections afforded to a defendant who advocates jury nullification to jurors within a public forum. Accordingly, if the 500 Pearl Street Plaza is deemed a public forum, Braun is not directly on point, and does not address the facts at issue here. The 500 Pearl Street Plaza, however, is a non-public forum. Accordingly, even under Braun, the First Amendment does not protect the defendant's behavior.

iii.    *The 500 Pearl Street Plaza is Not a Public Forum*

The Supreme Court has recognized three types of fora for First Amendment purposes, triggering varying levels of First Amendment protection: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439 (1985). Traditional public fora are

16

those places which "by long tradition . . . have been devoted to assembly and debate." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). Public streets and parks are the quintessential public fora. See Hague v. CIO, 307 U.S. 496 (1939). An important consideration when assessing whether a piece of property is a public forum is its physical setup. See United States v. Kokinda, 497 U.S. 720 (1990).

Relying on United States v. Grace, 461 U.S. 171 (1983), the defendant argues that the 500 Pearl Street Plaza is a public forum because the Supreme Court has held that sidewalks, even those surrounding courts, are public fora. More specifically, however, in Grace, the Supreme Court held that the sidewalks surrounding the perimeter of the Supreme Court property were public fora, but suggested that the Supreme Court "building, the plaza and surrounding promenade, lawn areas and steps," were not. Id. at 178. In the present case, the defendant distributes pamphlets in a small plaza directly in front of the Pearl Street entrance to 500 Pearl Street. That plaza is most similar to the Supreme Court's plaza and promenade, not to a general sidewalk. Because, like the Supreme Court Plaza, the 500 Pearl Street Plaza is clearly demarcated as separate and apart from the city and its sidewalks, it is not a public forum.

The Supreme Court has held that the fact that property is separated from acknowledged public areas may indicate that the property is a "special enclave," and thus not a public forum for First Amendment purposes. Int'l Soc. For Krishna Consciousness v. Lee, 505 U.S. 672, 680 (1992). The 500 Pearl Street Plaza is surrounded on all sides by concrete bollards, manned security booths and vehicle barriers, and 24 hour video surveillance. Such measures demarcate the 500 Pearl Street Plaza and notify users that its primary purpose is not as a park or a thoroughfare. The conclusion that the 500 Pearl Street Plaza is not a public forum for First Amendment purposes

17

is strongly supported by <u>Hotel Employees & Restaurant Union</u> v. <u>City of New York</u>, 311 F.3d 534

(2d Cir. 2002), in which the Second Circuit considered the First Amendment nature of the Jose

Robertson Plaza at Lincoln Center, a space owned by New York City, and managed by Lincoln

Center, Inc., a non-profit.  The Second Circuit described the Jose Robertson Plaza as an

> outdoor square . . . bounded by Avery Fisher Hall on the north, the Metropolitan
> Opera House on the west, the New York State Theater on the south, and Columbus
> Avenue on the east . . . A fountain is situated in the Plaza's center, and public
> access to the Plaza is unrestricted. While the Plaza opens onto Columbus Avenue
> and is reached by climbing a flight of stairs, public entranceways also connect to
> the Plaza from the sidewalks surrounding Lincoln Center, which facilitate access to
> the Plaza . . . and permit pedestrians to cross the Plaza en route to other destinations
> in the neighborhood.

<u>Id.</u> at 540.   Despite its seemingly public nature and its use as a gathering place and as a

thoroughfare, the Second Circuit concluded that the Jose Robertson Plaza was a non-public forum,

explaining that "[a]lthough the Plaza's design clearly invites passers-by to stroll through or linger,

the Plaza was not created primarily to operate as a public artery, nor to provide an open forum for

all forms of expression." <u>Id.</u> at 552.

     If the Jose Robertson Plaza is not a public forum, a small, enclosed plaza directly in front

of a courthouse is not either.  It is more substantially similar to the lobby of the courthouse itself,

or the plaza and promenade surrounding the Supreme Court.  Accordingly, the <u>Braun</u> decision,

which held that there is no First Amendment right to advocate jury nullification in a non-public

forum, supports the Government's position here.

## II.  Section 1504 is Not Void for Vagueness

     The defendant's assertion that Section 1504 is unconstitutionally vague on its face because

it gives "full discretion" to law enforcement to determine whether a "writing might improperly

influence a juror" is meritless. Def. Br. at 19.[2]  The defendant also argues that Section 1504 is

unconstitutionally vague because the defendant's activities pose just as much risk of influencing a

juror as the actions of a person who (i) advocated against jury nullification, or who (ii) advocated

the provision of justice to a crime victim.  Each of these arguments in unavailing.

A penal statute is not void for vagueness if it defines the offense (1) "with sufficient

definiteness that ordinary people can understand what conduct is prohibited" and (2) "in a manner

that does not encourage arbitrary and discriminatory enforcement." Skilling v. United States, 130

S. Ct. 2896, 2927-28 (2010) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)); United

States v. Gagliardi, 506 F.3d 140, 147 (2d Cir. 2007).  In Farrell v. Burke, 449 F.3d 470 (2d Cir.

2006), the Second Circuit explained the circumstances under which a court may entertain a claim

that a statute is too vague to be applied to anyone, not just the defendant.  Although "[c]ourts have

looked with disfavor on facial vagueness challenges to statutes that do not implicate fundamental

rights," when fundamental rights are implicated, "the rules are different." Id. at 495-496.  Thus,

"[t]he general rule disfavoring facial vagueness challenges does not apply in the First Amendment

context." Id. at 496.  But even where a statute implicates First Amendment protections, "[f]acial

vagueness challenges may go forward only if the challenged regulation reaches a substantial

amount of constitutionally protected conduct." Kolender, 461 U.S. at 358 n.8 (internal citation

---

[2] The defendant also argues, in passing, that if not facially void for vagueness, the statute is void for
vagueness as applied to Heicklen "for largely the same reasons" as it is facially void. Def. Br. at 20.  In support, the
defendant cites Hoffman Estates, 455 U.S. at 495, for the proposition that a statue is void as applied if a defendant's
conduct is not "clearly proscribed." Def. Br. at 20.  This argument has the inquiry backwards.  Outside the First
Amendment context, a court may uphold a statute against a particular defendant, even where the statute would be
void for vagueness in certain hypothetical situations, if the defendant's conduct was clearly proscribed by the statute.
In other words, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness."
Id. at 495, (citing Parker v. Levy, 417 U.S. 733, 756 (1974)).  Thus, a statute cannot survive a challenge that it is
facially void for vagueness but be successfully challenged on the grounds that is vague as applied.  Because, as
described above, the statute is not facially void for vagueness it is, per se, not void for vagueness as applied.

19

and quotation marks omitted); <u>See also</u> <u>Young</u> v. <u>American Mini Theatres, Inc.</u>, 427 U.S. 50, 60

(1976) (noting that a facial challenge for vagueness may go forward where "the statute's deterrent

effect on legitimate expression" is "both real and substantial")." <u>Id.</u> at 496-97.

A.    <u>Section 1504 is Sufficiently Definite So That Ordinary People Can Understand</u>
      <u>What Conduct is Prohibited</u>

By necessity, every statute has some ambiguity within it, but the void-for-vagueness

doctrine does not require "mathematical certainty." <u>See</u> <u>Grayned</u> v. <u>City of Rockford</u>, 408 U.S.

104 (1972). In fact, "some inherent vagueness is inevitable and thus permissible." <u>United States</u>

v. <u>Genovese</u>, 409 F. Supp. 2d 253, 357 (S.D.N.Y. 2005); <u>See also</u> <u>Rose</u> v. <u>Locke</u>, 423 U.S. 48, 49-

50 (1975) (void-for-vagueness doctrine does not "invalidate every statute which a reviewing court

believes could have some inherent vagueness").

Most successful void-for-vagueness challenges pertain to words in a statute that are so ill-

defined that an average person would not know exactly what was prohibited. <u>See</u> <u>Keyishian</u> v. <u>Bd.</u>

<u>of Regents</u>, 385 U.S. 589 (1967) (voiding law outlawing employees from uttering "seditious

words" because it was unclear what was meant by "seditious"); <u>Kolender</u>, 461 U.S. 352 (voiding

law that made it a crime to not provide "credible and reliable" identification when stopped by

police as it was unclear what "credible and reliable" identification was).

Here there is no challenge to the meaning or clarity of any word within the statute. Indeed,

the defendant does not assert that the language of Section 1504 renders it difficult for ordinary

people to understand what conduct is prohibited; nor does he allege that its language rendered him

unable to understand what conduct was prohibited. The language of Section 1504 is clear. It does

not contain unusual or ill-defined words. It clearly makes it a crime to "attempt to influence the

action or decision of any . . . juror . . . upon an issue or matter pending before such juror . . . or

20

pertaining to his duties . . . by writing or sending to him any written communication." Section 1504 thus prohibits only written attempts to communicate with jurors in order to influence the jurors with regard to a pending matter or with respect to the execution of their duties as jurors. The statute clearly does not, for example, prohibit (i) communications about pending matters if such communications are not targeted towards jurors; (ii) attempts to influence jurors about matters not pending before them, for example, the statute would not prohibit an attempt to convince a juror in a securities fraud case that marijuana ought to be legalized; or (iii) purely verbal communication. Because the language of Section 1504 does not render it difficult for an ordinary citizen to understand what conduct is prohibited, the statute is not impermissibly vague.

      B.    <u>Section 1504 Does Not Encourage Arbitrary and Discriminatory Enforcement</u>

      Rather than challenging the clarity of Section 1504 for ordinary citizens, the defendant alleges that it is vague because a prohibition against "'writings' that might influence a juror is completely standardless," and vests complete discretion with law enforcement to determine whether the statute has been violated. Def. Br. at 18.

      But, the Supreme Court, in considering a void-for-vagueness challenge, has clarified that statutes only need to provide "minimal guidelines to govern law enforcement," so as not to create a "standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." <u>Kolender</u>, 461 U.S. at 358. Importantly, the void-for-vagueness doctrine "does not ban <u>all</u> discretion on the part of police officers or prosecutors as 'effective law enforcement often requires the exercise of some police judgment.'" <u>Thibodeau</u> v. <u>Portoundo</u>, 486 F.3d 61, 69 (2d Cir. 2007).

A statute provides such "minimal guidelines" for law enforcement and thus is not void for vagueness if a court finds either: "(1) that a statute as a general matter provides sufficiently clear standards to minimize the risk of arbitrary enforcement or (2) that, even without such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement was not the result of the unfettered discretion that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." Id. at 67 (citing Farrell, 449 F.3d at 494). Courts have found that statutes do not provide clear guidance to law enforcement only when vague words in a statute give law enforcement unfettered discretion to interpret the statute from moment-to-moment. See, e.g., Kolender, 461 U.S. at 369 (noting that ill-defined loitering law "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat"); City of Chicago v. Morales, 527 U.S. 41, 60-61 (1999) (statute criminalizing "loitering with no apparent purpose" void-for-vagueness because definition of "apparent purpose" was left to law enforcement).

The defendant argues that Section 1504 is vague because "a writing advising against the supposed 'lawlessness' of jury nullification, or one seeking 'justice' for a crime victim" would be equally likely to risk influencing a juror, but that because such writings would assist the Government in obtaining a guilty verdict, law enforcement has never arrested individuals in one of those situations. Def. Br. at 19. An argument that the Government has not prosecuted individuals in circumstances which would clearly fall within the purview of the statute is not, however, an argument about the statute's vagueness. Here, the defendant provides two hypothetical situations that would fall within the statute's plain meaning, conclusorily asserts that the Government would not prosecute either of those cases, and argues that as a result the statute offers too much discretion

22

to law enforcement.  Defendant does not point to, and the Government is unaware of, any real-life

situations matching the defendant's hypothetical.  But even if the Government chose not to

prosecute such cases, the fact that the Government can exercise its prosecutorial discretion not to

prosecute a particular defendant does not render a statute unconstitutionally vague since the

Government can always exercise its prosecutorial discretion not to prosecute one who violates any

statute.

C.     The Defendant Was Not Selectively Prosecuted

The defendant's argument is, in reality, a claim that he is being selectively prosecuted.

But, "the conscious exercise of some selectivity in enforcement is not itself a federal constitutional

violation." Oyler v. Boyles, 368 U.S. 448, 456 (1962).  The standard for a defendant seeking to

establish that he was selectively prosecuted in violation of the constitution is a "demanding one."

United States v. Armstrong, 517 U.S. 456, 463 (1996).  In order to establish unconstitutional

selective prosecution, a defendant must demonstrate by "clear evidence" that the decision to

prosecute him "had a discriminatory effect and that it was motivated by a discriminatory purpose."

Id. at 465 (citations omitted).  Thus, a defendant must show:

> (1) that, while others similarly situated have not generally been proceeded against
> because of conduct of the type forming the basis of the charge against [the
> defendant], he has been singled out for prosecution, and
>
> (2) that the government's discriminatory selection of [the defendant] for prosecution
> has been invidious or in bad faith, i.e., based upon such impermissible
> considerations as race, religion, or the desire to prevent his exercise of
> constitutional rights.

United States v. Fares, 978 F.2d 52 (2d Cir. 1992).

In the present case, the defendant has not, and cannot, establish either prong.  With regard

to the first prong, the defendant would have to show that the Government "had knowledge of other

23

offenses that it did not prosecute." <u>United States</u> v. <u>Hommosany</u>, 208 F.3d 204 (2d Cir. 2000).
The defendant does not proffer even a single other offense that the Government failed to
prosecute. Nor does the defendant demonstrate that even if other prosecutable offenses exist, the
Government was aware of them. The provision of hypothetical situations that might constitute
such offenses, if they had occurred, is simply insufficient.

   The defendant also fails to satisfy the second prong. The defendant has not proffered, let
alone established, that the Government's prosecution of him is discriminatory or based on some
impermissible consideration. Though the defendant apparently believe he is being prosecuted in
an attempt to prevent the exercise of his constitutional rights, he is wrong. As described in detail
above, the defendant does not have a constitutional right to distribute jury nullification pamphlets
in front of 500 Pearl Street.

## III. Section 1504 Is Not Overbroad

   Defendant alleges that Section 1504 is overbroad because "it is impossible to read [it] . . .
as not prohibiting leaflets, or other lawful writing about jurors' duties" and because "merely
creating such legitimate writings as an editorial or a news or scholarly article that discusses a
juror's power to nullify could be prosecuted as a federal crime." Def. Br. at 12. Here, too, the
defendant is wrong. Section 1504 does not, and indeed, could not, criminalize the mere writing or
distribution of information, correct or otherwise, about a juror's duties, jury nullification, or about
the facts of a pending case. Section 1504's requirements that there be the <u>intent</u> to influence the
action or decision of a juror, and that the written communication be written or sent to a juror,
limits its scope to the types of cases described above, in which a defendant improperly provided, or
attempted to provide factual or legal information to jurors in an attempt to influence the decisions

of those jurors.  Accordingly, it does not infringe on constitutionally protected speech and is not overbroad.

"A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them.  All overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court."  Farrell, 449 F.3d at 498 (citations omitted).[3]

To be invalid, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973).  "As with facial vagueness challenges, we must consider not only conduct clearly prohibited by the regulation but also conduct that arguably falls within its ambiguous sweep."  Farrell, 449 F.3d at 499.  However, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'"  Virginia v. Hicks, 539 U.S. 113, 119 (2003) (quoting Broadrick, 413 U.S. at 615).  Therefore, the Supreme Court has "insisted that a law's application to protected speech be substantial, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the strong medicine of overbreadth invalidation."  Id. at 119-20 (quotations and citation omitted).

---

[3]     Although the failure of a facial vagueness challenge does not automatically preclude an overbreadth challenge, "the analysis of the merits of an overbreadth challenge is essentially the same as the analysis discussed above in the facial vagueness context."  Farrell, 449 F.3d at 499.

A number of the cases cited in Section I.B., <u>supra</u>, specifically address the exact overbreadth argument made by the defendant here. For example, in <u>Turney</u>, the Court specifically addressed the defendant's concerns about the possible criminalization of the "mass publication of political ideas[,] [f]or example . . . a person who takes out a newspaper or television advertisement supporting a particular outcome in a pending case (e.g. 'OJ was Framed!')." 400 F.3d at 1204. Advertisements or news or scholarly articles that are directed to the general or academic public are not prohibited by Section 1504, even though it is possible that such an advertisement or article could reach a juror and even if the author had the intent to influence a juror. This is because § 1504's intent requirement provides, like the statute at issue in <u>Turney</u>, an "implied scienter requirement [which] would prevent application of the statute to mass communications of this type, because the speaker would have to <u>know</u> [or reasonably should have known] that she or he was communicating with a juror. <u>Id.</u> at 1205.

Similarly, in <u>State</u> v. <u>Springer-Ertl</u>, the majority upheld a statute which criminalized "influenc[ing] a juror, or any person summoned or drawn as a juror," by "confin[ing] its scope to conduct designed to influence specifically jurors and persons summoned or drawn as jurors." 610 N.W. 2d at 777. "Consequently, the statute would not include situations where a person intends to inform the public or express a public opinion, regardless or whether jurors – drawn, summoned, or sworn, may be among the public." <u>Id.</u> The dissent went one step further, finding it unnecessary to so construe the statute, because the intent requirement sufficiently limited the statute's scope to avoid criminalizing, for example, editorials in the press. <u>Id.</u> at 779. In the present case, Section 1504 limits its reach only to communications directed toward jurors and would-be jurors for the

specific purpose of influencing them.  Accordingly, defendant's argument that the statute's overbreadth is substantial relative to its legitimate sweep fails.

**IV. The Indictment is Not Duplicitous**

The defendant argues that the Indictment should be dismissed as duplicitous because it alleges multiple, distinct communications with jurors in[] a single count" and thereby prejudices the defendant by (i) risking a non-unanimous jury verdict; (ii) raising double jeopardy concerns; and (iii) failing to provide him with sufficient notice of the facts the Government would present at trial.  None of these arguments in meritorious.  Def. Br.at 22, 24-27.

"An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001) (quoting United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980)).  Duplicitous pleading is not, however, presumptively invalid.  See United States v. Olmeda, 461 F.3d 271, 281 (2d Cir. 2006).  Indeed, the Second Circuit has long held that "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989).  In other words, "[a]s long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." Tutino, 883 F.2d at 1141.  When determining whether fraudulent conduct over a period of time constitutes a single scheme, courts focus the inquiry on the intent of the defendant.  United States v. Mastelotto, 717 F.2d 1238, 1245 (9th Cir. 1983), overruled on other grounds by United States v. Miller, 471 U.S. 130 (1985); Weiss v. United States, 122 F.2d 675, 680-81 (5th Cir. 1941).

Moreover, an indictment should not be dismissed as duplicitous unless the defendant can demonstrate prejudice.  Duplicitous counts may pose three types of potential prejudice: (1) a potential lack of notice of the crime charged and its maximum penalty; (2) the potential that a second trial on the same offense would not be barred by the Double Jeopardy Clause; and (3) the potential uncertainty with respect to the crime of which the jury convicted the defendant, and the attendant sentencing implications of the verdict.  See Sturdivant, 244 F.3d at 77.

As a preliminary matter, the charging of a number of specific incidents over the course of several months as a single count, represents the Government's view of the defendant's conduct as a single, ongoing scheme to advocate jury nullification to jurors.  As the defendant points out elsewhere, the Government does not allege that the defendant targeted a particular jury or a particular issue.  Rather, as part of a concerted, planned, and ongoing scheme, the defendant routinely appeared in the same location, the 500 Pearl Street Plaza, and distributed pamphlets in an attempt to reach jurors and to impact the cases pending before those jurors.  Because the "essence of the alleged wrong is a single scheme," the defendant is properly charged in a single count.  United States v. Margiotta, 646 F.2d 729, 733 (2d Cir. 1981).

The defendant's concern about the jury's unanimity is moot because he is not entitled to a jury trial.  Moreover, even if he were granted a jury trial, any concern about unanimity could be ameliorated by the Court's instructions to the jury or by a special interrogatory.  See, e.g., United States v. Sullivan, No. 02 Cr. 1144 (BSJ), 2004 WL 253316 at *5 (S.D.N.Y. Feb. 10, 2004); United States v. Klein, No. 03 Cr. 1471 (HB), 2004 WL 1191962 at *5 (S.D.N.Y. May 27, 2004). A special verdict would similarly ameliorate any double jeopardy concerns.  Even without a special verdict form, the defendant will be protected against any risk that he be tried again for the

28

same crime because, if the defendant is acquitted, the Government will be precluded from trying him again for distributing pamphlets in front of 500 Pearl Street on any of the dates listed in the letter provided to the defendant by the Government on September 23, 2011.

The defendant's claim that he has insufficient notice is also unavailing. The sole difference between the present Indictment and the indictment the defendant apparently seeks is that a multi-count indictment would charge the defendant in a separate count for each date on which he distributed pamphlets in front of 500 Pearl Street. The Government, however, has already indicated on which dates it believes Heicklen distributed pamphlets. In discovery produced on March 10, 2011, the Government provided, among other things, (i) excerpts of law enforcement reports which indicated that on certain specified dates Heicklen distributed pamphlets in front of 500 Pearl Street and that Heicklen made statements to law enforcement officers on those dates; (ii) photographs of items taken from Heicklen on certain specified dates and a copy of the pamphlet that he distributed on each of those occasions; (iii) an audio recording of the conversation that took place between Heicklen and an undercover agent on May 25, 2010; and (iv) Heicklen's own blog postings discussing his distribution of jury nullification pamphlets in front of 500 Pearl Street on certain specified dates. Accordingly, taken together, the discovery produced by the Government more than adequately provides the defendant with notice about the incidents the Government would prove at trial. Moreover, as noted above, by letter dated September 23, 2011, the Government provided Heicklen with a list of dates on which the Government believes Heicklen distributed jury nullification pamphlets in front of 500 Pearl Street. There can, therefore, be no question that the defendant has been provided with sufficient notice.

29

## V. The Indictment Properly States an Offense

The defendant claims that the Indictment against him should be dismissed because it fails to allege certain statutorily required elements.  The Indictment, however, tracks the statutory language of Section 1504 and alleges each element required by the statute.  Accordingly, the Indictment properly states and offense and should not be dismissed.

Federal Rule of Criminal Procedure 7(c) specifies that an indictment must (1) contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged," and (2) "give the official or customary citation of the statute . . . that the defendant is alleged to have violated."  "An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Hamling v. United States, 418 U.S. 87, 117 (1974).  As the Second Circuit has explained, "an indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him . . . state time and place in approximate terms."  United States v. Flaharty, 295 F.3d 182, 198 (2d Cir. 2002) (quotation and citation omitted); Hamling, 418 U.S. at 117 ("it is generally sufficient that an indictment set forth the offense in the words of the statute itself"); United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000)("we have consistently upheld indictments that 'do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'") (citing United States v. Walsh, 194 F.3d 37, 44 (2d Cir.1999)).

"An indictment, however, need not be perfect, and common sense and reason are more important than technicalities.  United States v. De La Pava, 268 F.3d 157, 162 (2d Cir. 2001).  An

"indictment should be read to include facts which are necessarily implied by the specific allegations made." Id. (Citations and quotations omitted). In any event, "an indictment need not specify the evidence that the Government intends to use to prove the charges contained therein." United States v. Schaefer, No. S1 07 Cr. 498, 2008 WL 2332369, * 3, (S.D.N.Y. June 2, 2008) (citing United States v. Alfonso, 143 F.3d 772 , 777(2d Cir. 1998)) ("unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial to satisfy [an element of the offense], the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment")). When an indictment delineates the elements of a charged offense, however concisely, the underlying concerns of proper pleading . . . may be further promoted by a bill of particulars." United States v. Adelson, 237 Fed. Appx. 713, 716 (2d Cir. 2007)(citations omitted).

The Indictment at issue here contained the following charge:

> From at least in or about October 2009 up to and including in or about May 2010, in the Southern District of New York, JULIAN HEICKLEN, the defendant, attempted to influence the actions and decisions of a grand and petit juror of a court of the United States, to wit, the United States District Court for the Southern District of New York, upon an issue and matter pending before such juror, and before a jury of which he was a member, and pertaining to his duties, by writing and sending to him a written communication in relation to such issue or matter, to wit, HEICKLEN distributed pamphlets urging jury nullification, immediately in front of an entrance to the United States District Court for the Southern District of New York, located at 500 Pearl Street, New York, NY.

The defendant describes the elements of Section 1504 as follows: (1) "An attempt to influence the action or decision;" (2) "Of any grand or petit juror of any federal court;" (3) "Upon any issue or matter pending before such juror, or the jury upon which he is a member; or pertaining to his duties;" (4) "By writing or sending to him any written communication;" (5) "In relation to such issue or matter." Def. Br. at 27.  A comparison of the elements set out by the defendant to the

31

language of the Indictment makes clear that the Indictment does indeed contain these elements. Because the Indictment tracks the language of the statute and provides an approximate time and place of the offense, it is facially valid.  Flaharty, 295 F.3d at 198.

The defendant is apparently dissatisfied with the specificity of the "to wit" clause in the Indictment and objects that the Indictment fails to allege "that Mr. Heicklen wrote to or sent a written communication to a sitting grand or petit juror," fails to "identify the issue, matter or duty about which any such communication was an effort to influence," and "does not allege any particular 'action or decision' that the communication was an effort to influence."  Def. Br. at 28. Such specificity is simply not required.  Indeed, even the "to wit" clause itself could be omitted. Its inclusion simply assists the defendant by further defining the charge.  See, e.g., United States v. Ashfaq, No. 08 Cr. 1240, 2009 WL 1787717, *3 (S.D.N.Y. June 23, 2009) (indictment was proper because it tracked statutory language and "'to wit' clauses . . . were sufficient to place [the defendant] on notice of the offenses with which he was charged; it was sufficient that indictment alleged fraud of more than $1,000 and it was not necessary for the indictment to specify the exact amount or nature of the amount obtained by the defendant); United States v. Diallo, No. 09 Cr. 858, 2009 WL 4277163, *2  (S.D.N.Y. Nov. 24, 2009)(where indictment for Hobbs Act robbery tracked statutory language it was not necessary for the "to wit" clause to include reference to or explanation of the interstate nexus; [t]he "'to wit' clauses [simply] further define[d] the charges"); United States v. Sullivan, No, S1 02 Cr 1144, 2004 WL 253316, *3 (S.D.N.Y. Feb. 10, 2004)(stating that, "[t]here is no precedent that requires that indictments identify each and every statement that the Government might argue at trial is false); United States v. Zandstra, No. 00 Cr. 209, 2000 WL 1368050, * 4 (S.D.N.Y. Sept. 20, 2000)(mail fraud indictment need not identify the

32

fraud victims, the dates of the relevant mailings, or the specific fraudulent statements). Even if the Court were to determine that additional factual allegations were necessary, the remedy would not be dismissal of the indictment. Rather, any alleged deficiency could be addressed through a bill of particulars. Unites States v. Adelson, 237 Fed. Appx. 713, 716 (2d Cir. 2007)(citations omitted).

In support of his argument, the defendant relies on three district court cases, none of them from this Circuit, and each of which presents a situation very different than the present case. In United States v. Graham, a South Dakota district court dismissed an indictment that neither tracked the statutory language nor contained a factual allegation that the defendant was an Indian (a jurisdictional requirement). 585 F.Supp. 2d 1144 (D.S.D. 2008). The Graham court found that mere citation to the relevant statute was insufficient. Because, however, the Indictment in the present case tracks the relevant statutory language, it is fully distinguishable from Graham. In United States v. Alkaabi, a New Jersey district court considered an indictment charging the defendants with mail fraud for having had an imposter take the Test of English as a Foreign Language ("TOEFL") on their behalf. 223 F.Supp. 2d 583 (D.N.J. 2002). The district court dismissed the indictment, finding that depriving the TOEFL administrators of their interest in the integrity of the company's testing process did not satisfy the property element of the mail fraud statute. The court held that, "a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." Id. at 587. That is, the New Jersey court found not that the Government had failed to include sufficient detail in its indictment, but that the statute did not in fact criminalize the conduct described by the Government because an element of the offense was not alleged. As discussed above, that is not true in this case. Finally, in United States v.

33

Brownfield, 130 F.Supp. 2d 1177 (C.D. Cal 2001), a California district court considered an indictment charging the defendant with making a threat by mail and dismissed the indictment because it found that a threat against the Federal Bureau of Investigation, as alleged in the indictment, was not a threat against a "person" as defined by the statute. Thus, the court in Brownsfield, like the court in Alkaabi, did not consider whether the indictment contained sufficient factual allegations, but rather, considered whether an element of the offense had been alleged. Because, in marked contrast to the three cases cited by the defendant, the Indictment here fully tracks the statutory language and alleged each of the elements of the crime charged, the Indictment should not be dismissed. Moreover, although, as described below, the Government does not believe a bill of particulars is necessary or appropriate, in the event the Court determines that the Indictment requires additional factual allegations, the appropriate course is not to dismiss the Indictment, but merely to order a bill of particulars.

## VI. The Defendant is Not Entitled to a Bill of Particulars

The defendant asks the Court to direct the Government to provide: (1) "[t]he dates, times and places upon which he is alleged to have communicated with jurors;" (2) "the exact contents of each such communication;" (3) "whether the recipients of his communications were members of the public, court staff, law enforcement agents, prospective jurors or sitting jurors, and if the latter, whether they were grand or petit jurors;" (4) "the nature of the particular case that any sitting jurors were hearing, including whether the cases were criminal or civil and, if criminal, the particular charge;" (5) "[w]hether, if Mr. Heicklen communicated with a member of the grand jury it voted to indict, and if he communicated with a petit jury, it voted to convict, acquit, or could not reach a verdict;" and (6) "[f]or each such recipient of a communication, the precise nature of the

34

'issue,' 'matter,' or 'duties' that Mr. Heicklen is alleged to have attempted to influence." Def. Br. at 30-31. The Court should deny this request because the Indictment, the discovery, and other information provided to the defendant by the Government more than adequately permits him to prepare for trial.

It is well established that the proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." Torres, 901 F.2d at 234 (internal quotation marks omitted).

If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as discovery or a criminal complaint, no bill of particulars is required. Bortnovsky, 820 F.2d at 574; United States v. Morales, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003). In other words, the defense cannot use a bill of particulars as a general investigative tool, United States v. Salazar, 485 F.2d 1272, 1277-78 (2d Cir. 1973), or as a device to compel disclosure of the Government's evidence prior to trial. Triana-Mateus, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir. 1974)). "The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed, [therefore] 'the Government is not required to provide information that would, in effect, give the defendant a

preview of the Government's case before trial.'" Id. at *5 (quoting United States v. Conley, No.

00 Cr. 0816 (DAB), 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002)).

Under the relevant legal standard, the Government is not required to (a) "particularize all of

its evidence," United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise

manner in which the crimes charged in the indictment were committed, see Torres, 901 F.3d at

233-34 (demands for "whens" and "wheres" and "by whoms" within charged conspiracy are

improper attempts at general pretrial discovery); or (c) provide the defendant with a preview of the

Government's case or legal theory.  United States v. Muyet, 945 F. Supp. 586, 598-599 (S.D.N.Y.

1996).  The ultimate test is whether the information sought is necessary, not whether it is helpful.

See United States v. Trippe, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); Conley, 2002 WL

252766, at *4.

As described in Section IV, infra, the Government has produced significant discovery in

this case, including, (i) photographs of items seized from the defendant on a number of specified

dates; (ii) a copy of the FIJA pamphlet seized from the defendant on a number of specified

occasions; (iii) copies of statements made by the defendant on the blogs

www.tyrannyfighters.com; www.blogofbile.com, and http://www.personal.psu.edu/jph13; (iv)

excerpts of law enforcement reports reflecting statements by the defendant to law enforcement on

a number of specified occasions; and (v) a recording of the defendant's conversation with an

undercover agent on May 25, 2011.  Taken together, this discovery provides the defendant with

ample notice of the specific acts of which he is accused.  Moreover, after receiving the defendant's

motion, the Government provided by letter to the defendant and defense counsel even more notice

of those acts -- a list of dates on which it believes the defendant distributed pamphlets in front of

500 Pearl Street.[4]  Accordingly, the defendant's first demand, for a list of dates, times and places where he is alleged to have communicated with jurors is now moot.  The Government has also already provided significant information regarding the defendant's second demand for the content of any such communications as it has provided both copies of the pamphlets distributed by the defendant and a recording of the defendant's communication with an undercover on one of those occasions.  The defendant's other requests for the identities of any person, juror or not, to whom the Government believes the defendant has spoken and for information about the cases, and outcomes of any cases pending before a juror to whom the defendant may have spoken is simply an attempt by the defendant to gain a preview of the Government's evidence.  Because, taken together, the materials already provided give the defendant ample information about the nature of the charge against him, ample opportunity to prepare his defense and leaves no possibility of unfair surprise, his request to obtain unauthorized discovery through a bill of particulars should be denied.

## VII. The Defendant is Not Entitled to a Jury Trial

The defendant argues that although he has no right to a jury trial,[5] the Court has the discretion to grant him a jury trial and should do so in this case, because of the "unusual" nature of his crime, the "little" used statute under which he is charged, and because the Government has, he

---

[4] The Government also indicated its willingness to discuss the defendant's other discovery requests for information concerning the individuals with whom Heicklen communicated, the subject of any case pending before those individuals (if they were jurors), and the outcomes of those cases, either directly with him or with his standby counsel, Ms. Shroff, but has not heard from the defendant or Ms. Shroff.

[5] It is undisputed that the defendant faces a maximum sentence of six months, 18 U.S.C. § 1504 (a person who violates § 1504 "shall be . . . imprisoned not more than six months"), and that, accordingly, he has no right to a jury trial. Duncan v. State of La., 391 U.S. 145, 159 (1968) (petty offenses are to be tried by a bench trial); District of Columbia v. Clawans, 300 U.S. 617 (1937) (same); Baldwin v. New York, 399 U.S. 66, 69 (1970) ("no offense can be deemed 'petty' for purposes of the right to trial by jury where imprisonment for more than six months is authorized.")

claims, allegedly de facto designated his crime as an unusually serious petty offense by choosing to indict him. In support of his argument in favor of the Court's power to exercise discretion, the defendant cites four cases, all decided prior to 1971, and a single 2004 opinion from the Southern District of California, which itself relied almost exclusively on the pre-1971 cases cited by the defendant here. The pre-1971 cases rely for their holdings on a now defunct statutory scheme and, as described in further detail below, have been rendered wholly moot by statutory changes since then. The 2004 Southern District of California opinion mistakenly relied on the pre-1971 cases in reaching its erroneous conclusion. In fact, as described in further detail below, the Court does not have the discretion to grant the defendant a jury trial and if the Court had that discretion, should not exercise it here.

A. The Court Does Not Have the Discretion to Grant a Jury Trial

Prior to 1971, courts had established that there was no constitutional right to a jury trial for crimes for which the penalty did not exceed six months, and that as a result, legislatures, including Congress, could direct that a defendant charged with such a crime not be given a jury trial. Clawans, 300 U.S. 617 (1937); Duncan, 391 U.S. at 159. While Clawans, its predecessors, and its pre-1971 progeny mandated that it was constitutional to try a petty offense without a jury, those cases did not decide whether, in the federal system, all petty offenses were to be tried without a jury. Thus, a number of courts considered the question of whether federal petty offenses were always to be tried without a jury, or whether petty offenses were to be tried with a jury, absent a specific directive from Congress. Some courts held that absent a specific directive from Congress, petty offenses were to be tried with a jury. See, e.g., Smith v. United States, 128 F.2d 990, 992 (5th Cir. 1942) (where "Congress has not conferred upon the district courts jurisdiction to try petty

38

criminal offenses without a jury . . . [the district court] erred in overruling the motion for trial by jury"); United States v. Great Eastern Lines, 89 F.Supp. 839, 840 (D.C.Va. 1950) ("Ordinarily a statement of an offense and its punishment in a statute, without more, means that a trial in the usual fashion shall be accorded to the prosecution and the accused in its enforcement. To hold otherwise the Court must say that the Congress, if it intends to permit a trial by jury, must affirmatively prescribe a jury trial whenever it creates a statutory offense which might be a petty offense. While the Congress may not withhold a jury for the trial of any offense for which the Constitution requires a jury, without doubt the Congress may confer upon the parties the right to a jury in the trial of a statutory offense for which the Constitution does not make a jury mandatory."); United States v. Bishop, 261 F.Supp 969, 972 (D.C. Cal. 1966) (considering "whether Congress has made any provision concerning the method of trial herein— more specifically whether Congress has spoken on the subject of the jury, non-jury method of trial in the District Court on an offense of the kind here involved" and determining based on the then statutory scheme, that Congress had not, and that as a result, petty offenses tried before a district court were to be tried before a jury"); United States v. Martinelli, 240 F.Supp. 365, 368 (N.D.Cal. 1965) (inferring from "legislative pattern [] that Congress intended that petty offenses should be tried like all other criminal offenses (jury trial) unless it otherwise provided"). At least one court held that absent a specific directive from Congress, it was at the discretion of the district court judge to determine whether petty offenses tried before the district court were to be jury trials. See United States v. Beard, 313 F.Supp 844, 845-846 (D.C. Minn. 1970) ("Since defendants have no constitutional right to a jury trial, and since Congress has not spoken on the subject, it would appear that the granting of a jury trial rests within the court's discretion."). Thus, prior to 1971,

39

absent a particular directive from Congress, petty offenses either were, or could be, tried before a district court judge by a jury. Prior to 1971, courts generally understood that with regard to general petty offenses, Congress had not spoken.

In 1971, Congress spoke. In 1971, pursuant to the Rules Enabling Act,[6] the Supreme Court promulgated The Rules of Procedure for the Trial of Minor Offenses before United States Magistrates ("1971 Magistrates Rules"). The 1971 Magistrates Rules distinguished between "petty offenses" and "minor offenses." "Petty offenses" were defined as offenses for which the punishment could not exceed six months, while "minor offenses" were defined as non-felony offenses for which the punishment could exceed six months. Rule 2 of the 1971 Magistrates Rules, provided, in pertinent part, that with regard to minor offenses, the magistrate had to inform the defendant "that he has a right to a trial before a judge of the district court and a jury." (emphasis added). In contrast, Rule 3 of the 1971 Magistrates Rules, provided, in pertinent part, that where a petty offense is tried before a magistrate judge, "[t]he trial shall be conducted as are trials of petty offenses in the district court by a district judge without a jury." (emphasis added). The deliberate differences between Rule 2 and 3 and the clear language used by Rule 3, made the impact of Rule 3 clear -- the trial of a petty offense in front of a magistrate judge was to be conducted the same way it would be conducted in front of district judge -- without a jury. The use of the word "shall" made it clear that a non-jury trial was mandatory, not merely permitted. See, e.g., Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 439 (1995)("we have repeatedly recognized the normally uncompromising directive that [the word 'shall'] carries.")(collecting cases); United States v.

---

[6] In the Rules Enabling Act, Congress has authorized "[t]he Supreme Court . . . to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals." 28 U.S.C. §2072.

Magassouba, 544 F. 3d 387, 404 (2d Cir. 2008)(where a "statute plainly states that a court "shall"

take a particular action, that action is "mandatory"); Black's Law Dictionary 1375 (6th ed. 1990)

("As used in statutes ... this word is generally imperative or mandatory"); But, see, e.g., National

Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 691 (2007) ("federal statute using

the word 'shall' will sometimes allow room for discretion")(citations omitted).

     Thus, even assuming that decisions such as Bishop and Beard were correct in their

holdings that federal petty offenses were to be tried by juries or that district judges had discretion

to grant jury trials to defendants charged with petty offenses,[7] Rule 3 mooted those holdings.  Rule

3 explicitly directed that petty offenses shall be tried without a jury.  This plain reading of Rule 3

is further supported by the decisions of the courts to consider the issue since the enactment of the

1971 Magistrates Rules, and which explicitly considered whether the Bishop lines of cases

continued to be good law.  The Fourth Circuit, for example, explained that in relying on Bishop,

Smith, Martinelli and Great Eastern Lines, the defendant had "fail[ed] to reckon with changes in

pertinent statutes and rules enacted since these decisions, including Rule 3, and explained that:

---

    [7] It is not at all clear that decisions such as Bishop and Beard were correct.  Those cases assumed that
Congress had not yet spoken on the issue of whether petty offenses were to be given jury trials.  As the Court
explained in United States v. Floyd, however, at the time Bishop was decided, there was:

> no basis for the assumption that Congress has been silent on this issue. By its very definition of
> "petty offense" in 18 U.S.C. § 1(3), it has manifested an intent that there be no jury trial. Since it
> was the rule at common law and under the uniform rulings of the Supreme Court that a petty
> offense was triable without a jury, it would be unrealistic to suppose that Congress was unaware of
> this most important characteristic of a petty offense in making this classification. The very purpose
> of classification is to attribute certain characteristics to the class. There is no reason for a
> subdivision of misdemeanors of minor gravity if such petty offenses are to be treated as are all
> other misdemeanors.

345 F.Supp. 283, 286 (D.C. Okl. 1972).

We believe that . . . Rule 3 of the Rules of Procedure for the Trial of Minor Offenses before Magistrates, demonstrate[s] the intent of both the Congress and the Supreme Court to provide for the trial of a petty offender without a jury when he elects to be tried in a district court. Indeed, one reason Mr. Justice Black and Mr. Justice Douglas dissented from the Supreme Court's adoption of Rule 3 was their belief that the Rule probably denied the right to a jury trial for petty offenses. 51 F.R.D. 206 (1971)

United States v. Merrick, 459 F.2d 644, 645-646 (4th Cir. 1972).  Similarly, in United States v.

Floyd, the Court explained that the:

argument [made in Bishop] is no longer valid. The Supreme Court, in a major departure from the former rules, has expressed itself on the requirement for a jury trial in the trial of petty offenses in the "Rules of Procedure for the Trial of Minor offenses before United States Magistrates" . . . [b]y the distinction between the minor offenses and petty offenses in the rules, it is evident that the Supreme Court conceived only a right of trial by jury for minor offenses.

345 F. Supp 283 (W.D. Oklahoma 1972).

In 1980, the 1971 Magistrates Rules were replaced by the Rules of Procedure for the Trial of Misdemeanors (the "1980 Magistrates Rules").  The 1980 Magistrates Rules have now been subsumed into the Federal Rules of Criminal Procedure and are codified in Rule 58.  Although the 1980 Magistrates Rules and Rule 58 each contain slightly different language than the 1971 Magistrates Rules, the legislative history makes clear that neither the 1980 Magistrates Rules nor Rule 58 intended to change the rule enunciated by the 1971 Magistrates Rules – petty offenses are to be tried without a jury and a court does not have the discretion to order otherwise.[8]

---

[8]  Rules 2 and 3 of the1971 Magistrates Rules were combined into Rule 2 of the 1980 Magistrates Rules. With regard to the combination of the previously separate rules, the Advisory Committee explained that,

[m]uch of what now appears in subdivision (b) [of Rule 2] was contained in rule 2(b) of the 1971 Magistrates Rules, a provision expressly covering only minor offenses other than petty offenses. The change reflects the judgment that the enumerated advice is important to all defendants, even those charged with petty offenses.

In the new combined 1980 Magistrates Rules, Rule 2(b)(6) provided that at the initial appearance the defendant was to be informed that, "unless the offense charged is a petty offense, [] he has a right to trial by jury before either a magistrate judge or a judge of the district court."  Thus, although the two rules were combined, the

(continued...)

Indeed, the few courts to consider the power of a judge to order a jury trial for a petty offense since rule 58(2) was adopted have generally found that a judge lacks that power. For example, in United States v. Donovan, the court considered the defendant's claim that even if his offenses were deemed petty he should be grated a jury trial because "such a trial would likely be fairer than a bench trial, since [the defendant] would be judged by his peers, and since the Government [would] likely call witnesses who are federal employees, as are the judges sitting in federal court." No. 04 Cr. 1346, 2005 WL 1322715, *3 (S.D.N.Y. May 2, 2005). Despite its view that the "policy arguments might be worthy of debate," the Donovan court held that "the governing Supreme Court decisions foreclose the notion that a defendant may have a jury trial in cases involving a petty offense." Id. Similarly in United States v. Watchman, the Court found that "a magistrate judge does not have any inherent or discretionary authority to grant a jury trial if that authority is not specifically found in the 'Constitution and laws of the United States.'" 2005 U.S. Dist. LEXIS 24788 at *7 (D. Ariz. Oct. 19, 2005).

---

[8](...continued)

fundamental rule did not change: petty offenses were not to be tried by a jury. A defendant charged with a petty offense need not be advised of his right to a jury trial because he has no such right and will not be provided with a jury trial, even at the discretion of the court. This understanding is supported by the Advisory Committee Notes for Rule 2 of the 1980 Magistrate Rules, which contain a detailed explanation of the changes implemented by the 1980 Magistrates Rule. For example, the Advisory Committee Notes specifically note the addition of the requirement that the defendant be advised of the statutory maximum penalty he might face. Notably, the Advisory Committee Notes nowhere mention any change with regard to the entitlement to a jury trial.

Finally, the 1980 Magistrates Rules have now been subsumed into the Federal Rules of Criminal Procedure and are codified in Rule 58, which provides, in pertinent part, that "[a]t the defendant's initial appearance on a petty offense or other misdemeanor charge, the magistrate judge must inform the defendant of . . . the right to a jury trial before either a magistrate judge or a district judge – unless the charge is a petty offense." (emphasis added). Thus, while stylistically different, Rule 58(2) is substantively the same as the old Rule 2 of the 1980 Magistrates Rules. Although a number of organizational and stylistic changes accompanied the shift from the 1971 Magistrates Rules to the 1980 Magistrates Rules to the Federal Rules of Criminal Procedure, the rule enunciated by the 1971 Magistrates Rules remains the law. Petty offenses may not be tried by a jury.

As described above, the defendant's reliance on Beard, Bishop and Smith, is misplaced because those decisions have been abrogated by changes in the statutory scheme. Accordingly, defendant's entire legal argument rests on United States v. Greenpeace, Inc., 314 F.Supp. 2d 1252, 1263 (S.D. Fla. 2004).[9]

In Greenpeace, the Greenpeace organization was charged with what the Court determined was an indisputably petty offense. The Florida district court judge, however, nonetheless granted Greenpeace a jury trial, finding, in reliance on Beard, Ross, and Smith, that he had the discretion to do so long as Congress had not ordered otherwise and determining that, "[a]s far as [the judge] could tell, there is no statute, rule, or precedent which prohibits a jury trial" for a petty offense. Id. at 1263. In so holding, the Greenpeace court simply overlooked both statute and precedent that prohibited a jury trial. Indeed, the Greenpeace court failed to cite Rule 58(b)(2), the 1971 Magistrates Rules, or the 1980 Magistrates Rules, or to cite, let alone to distinguish, the courts' decisions in Floyd and Merrick. Accordingly, for the reasons set forth above, Greenpeace was wrongly decided and, because it is neither binding nor persuasive, should not be relied on here.

   B.   Even if the Court Had Discretion to Order a Jury Trial It Should Not Do So Here

Even assuming, arguendo, that this Court possessed the discretion to order a jury trial for a petty offense, the Court should not do so here. The defendant uses the rationale of the court in Greenpeace as a set of determinate factors against which to measure his request for a jury trial. Greenpeace, a district court case from Florida, is, of course, not binding here. In any event, the

---

[9] Defendant also cites to Justice Stewart's dissent in Ross v. Berhard, 396 U.S. 531, 550 (1970). Here, too, defendant's reliance is misplaced. Justice Stewart's dissent is not relevant to this case for two reasons: First, his argument was not the argument adopted by the Court and the majority opinion, 41 years later, is still good law. Second, Ross concerns a specific issue involving derivative shareholder civil law suits, not a criminal case, as here.

present case differs significantly from that in <u>Greenpeace</u>, and accordingly, the <u>Greenpeace</u> reasoning is unpersuasive here.

In <u>Greenpeace</u>, the Court chose to exercise the discretion it mistakenly believed it possessed and ordered a jury trial because the case was "unusual, and would benefit from a jury's collective decision-making" and because (i) the Government "apparently [did] not view [the] case as typical" because it "chose to proceed by indictment;" (ii) the statute at issue had not been used in more than a century; and (iii) the indictment was a "rare . . . prosecution of an advocacy organization for conduct having to do with the exposition of the organization's message" and that such prosecution might "signal a change in DOJ policy." <u>Id.</u> at 1264. The court in <u>Greenpeace</u> acknowledged the Government's fear that "Greenpeace would attempt to obtain a not guilty verdict through nullification," and while implicitly assuming that an attempt to seek nullification would cut against permitting a jury trial, determined that based on the specifics of that case, "the government's fear [of nullification] was unfounded." <u>Id.</u> at 1265.

Even assuming that the <u>Greenpeace</u> court utilized the correct analysis, consideration of the present case under the <u>Greenpeace</u> factors demonstrates that Heicklen should not be granted a jury trial. First, the Government's choice to proceed by Indictment merely reflects its selection of one of the many charging instruments permitted under Federal Rule of Criminal Procedure 58(b)(1). ("[t]he trial of a misdemeanor may proceed on an <u>indictment</u>, information or complaint. The trial of a petty offense may also proceed on a citation or violation notice" (emphasis added). The decision to proceed by Indictment, therefore, does not indicate that the Government is treating the case as if it were a felony. Second, even assuming that the infrequency of prosecutions under a particular statute did, in fact, weigh in favor of a jury trial, Section 1504 is not infrequently used. In addition to the four cases discussing Section 1504 or its predecessor statute 18 U.S.C. § 243,

cited by the defendant,[10] at least five other reported decisions reference prosecutions under Section 1504.  See, e.g., United States v. Meador, 45 F.Supp.2d 1263 (N.D.Okla. 1999)(considering unrelated habeas appeal from defendant convicted under §1504); Margoles v. United States, 402 F.2d 450, 451 (7th Cir. 1968)(addressing the habeas petition (on an unrelated issue) of a defendant who had been convicted under §1504 for "communicating with jurors."); Glenn v. Ciccone, 370 F.2d 361 (8th Cir. 1966)(considering habeas petition (on an unrelated issue) of a defendant who was indicted for "tampering with petit jurors in violation of §1504); United States v. Powell, 2 A.F.T.R.2d. 5526 (assuming without deciding that former prosecutor and reporter who leaked information to a grand jury had violated §1504); Matter of Gerber, 221 A.D.2d 71 (N.Y.A.D. 1996)(considering the suspension of an attorney who had been convicted under §1504).  Moreover, as discussed above, there have been a number of prosecutions under similar state statutes.  See, e.g., Turney, 400 F. 3d at 1197 (prosecution under similar Alaska statute); Springer-Ertl, 610 N.W. 2d at 768 (prosecution under similar South Dakota statute); Holland, 1995 Mont. Dist. LEXIS at 929 (prosecution under similar Montana statute); Wood, 370 U.S. at 375 (considering contempt prosecution of a Sherriff for his criticism of a grand jury investigation).  There have also been a number of prosecutions under other federal statutes, for conduct substantially similar to that here.  See, e.g. Ogle, 613 F.2d 233 (defendant convicted under 18 U.S.C. § 1503 for attempting to provide a juror with a handbook advocating jury nullification);[11] Cammer v. United States, 223 F.2d 322 (D.C. Cir. 1955) (defendant found guilty

---

[10] Defendant incorrectly states that the four cases he cites are the only reported decisions.  Moreover, one of the cases, United States v. Bittinger, 24 F. Cas. 1149 (W.D.Mo. 1876), actually discusses violations of 18 U.S.C. §1503.

[11] Section 1503 provides, in relevant part, that:

(continued...)

46

of criminal contempt for sending letters and questionnaires to fifteen members of a grand jury).

Third, the present case involves the prosecution of an individual, not an advocacy organization,

and does not represent a departure from Department of Justice policy.  While the court in

Greenpeace was especially concerned about the prosecution of an advocacy group because of

allegations that the prosecution was a politically motivated retaliation against an organization that

had criticized the then president, no such allegation exists here.  Accordingly, the court's rationale

in Greenpeace is inapplicable here.

      Finally, the defendant argues that a jury is especially appropriate in this case because "it

makes perfect sense for a jury to determine whether the dissemination of general information about

jury nullification constituted jury tampering.  Who would know better?"  Def. Br. at 34.  To the

contrary, a jury is especially inappropriate in this case.  As is discussed in greater detail above, the

law in this Circuit is clear that a jury is not to be informed of its "power" to nullify, attorneys

cannot advocate nullification to the jury, and a juror who intends to nullify must be removed from

the jury venire or the jury itself.  The defendant has made plain his belief that each of these rules is

wrong and that juries should nullify.  It is entirely to be expected that he would urge a jury to do so

in a case against him.  Orders that he not do so would likely be unavailing, especially in light of his

previous disregard for court orders and his advocacy of the position that prospective jurors should

---

[11](...continued)

Whoever corruptly, or by threats or force, or by any threatening letter or communication,
endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court
of the United States, or officer who may be serving at any examination or other proceeding before
any United States magistrate judge or other committing magistrate, in the discharge of his duty, or
injures any such grand or petit juror in his person or property on account of any verdict or
indictment assented to by him, or on account of his being or having been such juror, or injures any
such officer, magistrate judge, or other committing magistrate in his person or property on account
of the performance of his official duties, or corruptly or by threats or force, or by any threatening
letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or
impede, the due administration of justice, shall be punished [as provided in subsection (b)].

conceal from judges their intent to nullify.  A jury trial in this case would very likely turn into yet

another attempt by the defendant to urge jurors to nullify, rather than a trial about whether the

defendant violated Section 1504.  Unlike in Greenpeace, where the Court found that "the

government's fear [of nullification was [unfounded] and [did] not call for exercising discretion

against a jury trial, the Government's concern about jury nullification in this case is well founded.

Accordingly, even if the Court had the power to grant Heicklen a jury trial, the Court should

decline to do so here.

## CONCLUSION

For the reasons stated above, the Government respectfully requests that the Court deny the

defendant's motion to dismiss, his motion for a jury trial and his demand for a bill of particulars.

Dated:          October 24, 2011
                White Plains, New York

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for United States of America


                            By:     /s/ Rebecca Mermelstein
                                    REBECCA MERMELSTEIN
                                    300 Quarropas Street
                                    White Plains, New York 10601
                                    Tel.: (914) 993-1946
                                    Fax: (914) 993-1980

48

<u>CERTIFICATE OF SERVICE</u>

   I, Rebecca Mermelstein, Assistant United States Attorney for the Southern District of New York, hereby certify that on October 24, 2011, I caused a copy of the foregoing The Government's Memorandum of Law in Opposition to Defendant's Motion to Dismiss to be served by federal express upon the following:

       JULIAN HEICKLEN
       734 Rutland Ave
       Teaneck, NJ 07666

       SABRINA SHROFF, Esq.
       Federal Defenders
       52 Duane Street, 10th Floor
       New York, NY 10007


Dated:   October 24, 2011
      White Plains, New York


            /s/ Rebecca Mermelstein
           REBECCA MERMELSTEIN
           Assistant United States Attorney

# EXHIBIT A

Heicklen22

THE JUDGE WILL INSTRUCT THE

JURY THAT IT MUST UPHOLD THE

LAW AS HE GIVES IT.

HE WILL BE LYING.

THE JURY MUST JUDGE THE LAW

AS WELL AS THE FACTS.


JURIES WERE INSTITUTED TO

PROTECT CITIZENS FROM THE

TYRANNY OF GOVERNMENT.

IT IS NOT THE DUTY OF THE JURY

TO UPHOLD THE LAW.

IT IS THE JURY'S DUTY TO SEE

THAT JUSTICE IS DONE.

# A PRIMER FOR PROSPECTIVE JURORS

Provided as a public service by FIJA/AJI, the Fully Informed Jury Association/American Jury Institute, whose goal is to restore the true function of the jury and inform all Americans of their authority and responsibilities as jurors.

This brochure will provide you with brief answers to some common but difficult questions about jury service.

Why read it? First, because jurors are always morally responsible for their verdict. Whoever takes on that responsibility has a right to full information, and it might be you.

Second, fully informed juries are important because, in addition to providing justice for the accused, trial jurors were expected by the framers of our Constitution to use their verdicts to check, balance and guide all three branches of government. Jurors still have that vital role to play, and still have the power to perform it, but this part of their job rarely is explained to them by the court.

Therefore, you should look at this brochure as a more complete "job description" for jurors than you are likely to get elsewhere. Many jurors who have read it have told us after the trial that it really helped them do a good job in the very stressful task of judging the actions of a fellow human being.

---

Can I even talk about "jury rights" with fellow jurors?

Certainly. You can talk about anything you want to during your deliberations. It is certainly appropriate to discuss the role of the jury, its history, the rights and powers of jurors, but you may be moving onto thin ice if you attempt to document your discussion with written materials, including this brochure. If such materials are involved, for voting you may find yourself in violation of the usual instruction by the judge not to refer to any "outside" materials when deliberating.

Back to America's founders. What exactly did they say?

Our third president, Thomas Jefferson, in 1789 wrote a letter to Thomas Paine, saying, "I consider trial by jury as the only anchor yet devised by man by which a government can be held to the principles of its constitution." [8]

Our second president, John Adams, in 1771 said about the trial juror, "It is not only his right, but his duty ... to find the verdict according to his own best understanding, judgment, and conscience, though in direct opposition to the direction of the court." 9]

John Jay, the first U.S. Supreme Court Chief Justice, in 1794 said that jurors have a right "to determine the law as well as the facts in controversy." 10]

From history and experience, the Founders were well aware that citizen juries would be the best protection against damage to our unalienable rights. That's why they insisted on trial by jury in the Declaration of Independence, Constitution, and Bill of Rights (trial by jury gets more mentions than any other right).

In fact, many of the rights and freedoms that they treasured, and that we still treasure today, first were protected by brave, peaceable assembly, free trade, property rights, freedom of the press) had been identified and established by courageous juries in the first place, both in England and the American colonies, where (sometimes at great cost to their own safety and liberty) jurors had refused to enforce what they felt were unjust laws restoring what they saw as "natural rights." Juries exist to protect fellow citizens from government tyranny.

Could you give some examples?

Perhaps the landmark case was the 1670 trial of William Penn. Our rights to freedom of speech, religion, and peaceable assembly were established when a London jury refused to convict him for violating the Conventicle Act, which made Anglicanism the official religion of England. Penn was apprehended delivering a Quaker sermon on a street corner, after the police had locked the doors to the meeting house. His jury could see no harm in what he did, and refused to convict even after being locked in the deliberation room without food, water, or toilet facilities for days, and told to find him guilty. Even then, they were fined for their verdict and those who didn't pay were jailed. But when the highest court in England released them, the rights they had

---

protected were on their way to becoming constitutional law--they appear today in our First Amendment.

In 1735, in New York Colony, John Peter Zenger's acquittal by jury established freedom of the press. He was accused of "seditious libel" for printing true stories and editorials about corruption in the colonial governor's office. The court told the jury "Truth is no defense"--but the jury told the court "Not guilty", even though there was plenty of evidence of Zenger's "guilt". The jury brought in a "conscientious verdict" in the face of a bad law.

So, what happened between those days and the present?

Certain highminded interests saw their influence and profits cut by juries which refused to enforce laws those interests had spent a lot of money lobbying the government to pass (especially the laws which made it illegal for workers to picket). When men with cases to change decided to construct a majority of the membership on our Supreme Court in the late 1800s, they made the decision which to this day allows judges to try to keep the power of nullification secret from juries. [11]

Though our government only rarely admits it [12], the power still exists, secret or not. That is why a "fully informed jury" movement is underway to tell you the secret the courts will not. It's a secret that lawyers, for fear of being punished by judges, dare not tell.

In summary, the secret is merely this: you, the juror, are the most powerful person in the courtroom because you alone have the last say on both the law and the evidence. If you acquit the defendant in a criminal case, that ends it. The defendant cannot be tried again for the same crime. This is the essential power that we citizens must have if we are to retain control over our government servants, so that no matter what actions the government makes illegal, it is we, not they, who can decide whether or not to apply the law.

FIJA/AJI urges you to use your awesome power wisely, to promote liberty and justice, and to guide the democratic process.

I have more questions. Does AJI/FIJA have more answers?

Yes. We'll mail a free Jury Power Information Kit ("JPIK") to you if you call 1-800-TEL-JURY and tell us where to send it. The JPIK has detailed information on what to do if you're called for jury service, or you're going to face a trial by jury, or want to know more about the history of the doctrine of jury nullification.

For a rich source of more information, please visit our web site at www.fija.org. These sites contain a huge list of readings, downloadable documents and masters. Also on the web sites are lists of contacts for the many independent state and localderal jury rights groups that have formed around the country, so if you want to get actively involved in educating fellow citizens about their rights and powers as jurors, you should be able to find someone fairly nearby who can help you get started.

---

If I can't get actively involved, what can I do?

We know many people are very busy. We can always put a contribution from you to good use, and remember that we are a 501 (c) 3 for tax purposes. And when you're done reading this brochure (and after the trial, if you're a juror), give it to a friend, coworker, or relative in case he or she needs to refer to it, or wants to call for a JPIK, or get in touch with FIJA headquarters, or find some local jury rights activists.

Thank you for taking the time to read this brochure. If you're ever fortunate enough to be empaneled on a jury, here's hoping that the information it contains helps you make a decision you can be proud of.

[8] Brandborg v. Lucas, 891 F.Supp.353 (E.D.Tex. 1995)
[9] U.S. v. Wison, U.S.,. J.T.S.Cr.833, 384 I.Ed.2d 544 (1997)
[10] U.S. v. Thomas, et al., 116 F.3d 606 (2nd Cir. 1997); U.S. App. Lexis 13853
Sparf and Hansen v. U.S., 156 U.S. 51 (1895)
[4] U.S. v. Dougherty, et al., 473 F.2d 1113, 1130 (1972)
[2] David C. Brody and Craig Rivera, "Examining the Dougherty 'All Knowing Assumption': Do Jurors Know About Their Power to Nullify", 33 Criminal Law Bulletin 151 (1997)
[11] U.S. v. Gaines, 1983, 461 U.S. 171, 177, 103 S. Ct. 1702, 1707, 76 L.Ed (1989)
[3] Julian P. Heicklen, The Papers of Thomas Jefferson, (New Jersey: Princeton University Press, 1950), vol. 15, p. 269
[9] C.F. Adams, ed., The Work of John Adams, (Boston: Little, Brown & Co., 1856), pp.253-5
[8] George Bradford, 3 Dallas 1, 4, U. S. (1794)
[11] Steven E. Barkan, "Jury Nullification in Political Trials", Social Problems 31, 1 (Oct. 1983), pp. 28-46.
[12] The U.S. Supreme Court periodically acknowledges the political function of the jury as in Duncan v. Louisiana, 391 U.S. 145,155 (1968), wherein Justice Byron R. Whitewrote, "A right to trial by jury is granted to criminal defendants in order to prevent oppression by the government."
[FIJA Publication:: Q & A, A Primer for Prospective Jurors]

This brochure distributed locally by:

To order reference item #: Q & A

AMERICAN JURY INSTITUTE
Safe and best a toe

P.O. Box 5570 • Helena, Montana 59604-5570 • USA
Voice: 406.442.7800 • Fax: 406.442.9332
Website: www.fija.org • E-mail: aji@fija.org
This brochure is not copyrighted and may be reproduced at will.

Printed August 2007
Q & A Primer

Heicklen24

# QUESTIONS AND ANSWERS

**Must I respond to a summons for jury service?**

Legally, yes. Moreover, FIJA encourages you to show up, even though most court jurisdictions have neither the personnel nor the money it would take to track down those who do not respond. FIJA believes that if more people knew how much good they could do by serving on a jury, and how much power they have to do that good, more of them would happily respond to summonses.

**Must I answer all the questions asked of me on a juror questionnaire, or during the selection process (voir dire)?**

It depends. Most jurisdictions will allow you to answer a question privately, in front of the judge and lawyers only, if you feel uncomfortable about answering it in front of everyone else in the courtroom. If you object to answering a question because you feel it is too personal, you should let the judge know.

In the federal 5th Circuit jurisdiction, because of a recent case[1], your objection will enable the judge to ask the attorney who posed the question to explain why it is relevant to jury selection in the case at hand, or else to withdraw the question.

The idea is to balance your right to privacy against the defendant's right to an impartial jury. So, at least in the 5th Circuit, unless the judge performs this sort of "balance" in response to your assertion of your right to privacy, sanctions cannot be used against you for refusing to answer.

If the judge decides that the question is relevant to jury selection, and it is ruled that you must answer, it is still up to you to decide how to answer this or any other question asked. This can be very important, especially if you have moral qualms about the consequences of telling the truth. (Think of the dilemma faced by German citizens when Hitler's secret police demanded to know if they were hiding a Jew in their house.)

A couple of especially hard questions for those who understand and appreciate the political role of the jury are: "Will you follow the law as given, even if you disagree with it", or "Have you read any material on the topic of jury nullification"?

Should you give answers that are likely to get you excused from serving, or say whatever it takes to be selected, so you can do your part to see that justice is served? It's your moral choice.

**Who asks these kinds of questions, and why?**

Questions like these are often asked by prosecutors, sometimes by judges, and are used to disqualify people from serving if they appear to understand their power as jurors, or are aware that the jury has a political role. This makes it easier for the government to get convictions, especially under laws of questionable value and spotty public support—precisely the kinds of laws that our nation's founders wanted juries to question.

The jury selection process has thus become a battlefield in the endless struggle between citizens who want to enjoy, exercise and preserve their individual rights, and a government bent on increasing its control over the citizenry. Purging juries of anyone who disagrees with the law is one way to maintain that control, but it violates the main principle of our Constitution—that the people are the master, and the government is the servant.

As jurors, keep in mind that your primary obligation is to serve justice—which may in some instances mean deciding not to provide information which will cost you your chance to serve, and therefore enable the legal professionals to stack the jury with people who don't know their rights.

**Once on a jury, must I use the law as given by the judge, even if I think it's a bad law, or wrongly applied?**

No. You are free to vote on the verdict according to your conscience. You may not increase the charges, but you may choose to vote to acquit, even when the evidence proves that the defendant "did it", if your conscience so dictates.

And if you think the charges are too high, you can ask the judge to tell you about any lesser charges of which you might, in good conscience, be willing to find the defendant guilty.

The same options apply if you learn that the evidence, though true, was gathered in a way that violated the rights of the accused, or if you believe that the government is just trying to flex its muscle by making an example out of the defendant or feel that you were not allowed access to some of the facts of the case, or that victimless crimes should not be punished or for any other reason you believe that justice will not be served by finding the defendant guilty or liable as charged. You have the power to render a conscientious verdict.

**Is this what is meant by "jury nullification"?**

Yes. When jurors unanimously agree that despite clear evidence showing the defendant acted as accused, conscience requires them to bring in a verdict of not guilty, or guilty only of lesser charges, (or, in a civil case not to award all the damages claimed), their action is known as "jury nullification", or an exercise of "jury veto power".

This power to "do the right thing" and bring in a conscientious verdict, even when the defendant is - by the letter of the law- guilty or liable, is the very backbone of our jury system. Since the Magna Carta, signed by King John in 1215, trial jurors in the English and American systems have had the power and responsibility to resort to conscience whenever they feel a strict application of the law would yield an unjust conviction, or judgment against, the defendant.

Relatedly, you should never feel that you "owe" it to the government or to a private plaintiff to find against the defendant on at least some charge (such as a lesser included offense, or reduced damages) when you really don't believe any have any reason. Remember that prosecutors "multiply charges" these days. This is especially important now that the Supreme Court has decided to allow judges to sentence a defendant "as if" he had committed the worst crime(s) on a list of charges against him, even if the jury acquits him of all but the least serious charges. [2]

Just keep in mind that many people sue for no reason, or for very poor reasons, and sometimes the government prosecutes completely innocent, harmless people. As a juror, you have the power to stop such abuses.

**What about the oath I had to take to "follow the law" as given by the judge?**

You cannot be punished for following your conscience instead of the oath you take or the instructions you are given as a juror. What you and the other jurors decide to do behind the closed doors of the deliberation room is your business.

The whole point of having a jury system is for a group of ordinary citizens to decide upon a verdict or damage award independent of outside influences, including government influence. If jurors could be punished for acting against the wishes of the court, our jury system would actually be tried by government. Part of your job is to think and act independently to keep that from happening.

But caution is called for: a recent U.S. Court of Appeals decision held that if you make known your intention to acquit the defendant regardless of the evidence against him, you may be removed from a jury as "incapable" of being impartial. [3] But this same decision may now protect your right to discuss and judge the law and its application with the other jurors before deciding on a verdict, as long as you also express "reasonable doubt" that the evidence proves the prosecution's case, it cannot be established that you intended to acquit "no matter what". Part of "reasonable doubt" can be that you think the defense is not being allowed to introduce important evidence or that you don't believe the witnesses, including police and informants.

**If no one on the jury agrees with me, do I eventually have to give in and vote for the verdict they want?**

No. You can "hang" the jury with your vote if you feel it is the right thing to do. No one can force you to change your mind, and there is no law or rule of court procedure that says a jury has to reach a verdict. When a jury decides it cannot agree on a verdict, the prosecutor or other plaintiff could always call for another trial.

A series of hung juries in similar kinds of cases sends a valuable message to lawmakers that the public has mixed feelings about the law. It tells legislators either to revise the law so that it expresses the will of the people, or to repeal it. Many a bad law has been changed or taken off the books because juries routinely hung when asked to apply it (Laws which make it a crime to help others escape, laws which did not allow working people to go on strike, and laws which prohibited the manufacture and sale of alcohol are a few examples.)

Although hung juries may be expensive to taxpayers, an embarrassing to the government, they remain a tried and true way for the people to say "no" to bad law, and to inject true public opinion into the democratic process, exactly as the nation's founders expected them to do.

**Should I share this brochure with my fellow jurors?**

Doing so may be risky. Even though the material in this brochure is well researched and as accurate as we could make it, and even though every American should learn what it has to say, you may find yourself in trouble with the judge if you share it with fellow jurors.

This is because, in 1895, the Supreme Court said that while jurors indeed have the power to judge both law and fact, a defendant could not appeal a conviction or get a new trial because the court had not told the jurors about their nullification power, or would not let the attorneys tell them. [4]

The D.C. Court of Appeals, in 1972, after first praising jury nullification as a check upon bad law, nonetheless supported and extended that Supreme Court decision by holding that jurors didn't "need" to be told about their nullification power since they probably already know about it by way of "communication from the total culture" meaning by reading books and magazines, watching TV and movies or engaging in conversation. [5]

In short, you are "assumed to know" that you can either be convicted if doing so would violate your conscience or sense of justice. However a recent study demonstrates that very few people are actually aware of their nullification power. [6] This finding strengthens our argument for telling you, right now: you probably do not "already know", and it's an excellent bet the court will not tell you!

In any event, these court rulings have enabled judges to prevent most participants in a trial from informing jurors of their veto power, and it's not established in law whether that includes jurors showing literature to other jurors. (Jury rights activists, such as the person from whom you probably received this brochure, are not participants in the trial, and generally stay outside the courthouse, handing out information to all who will take it, as an exercise of free speech in which the Supreme Court has described as a "free speech zone." [7])

# EXHIBIT B

At 9:30 am I left. I had distributed about 50 flyers. Everyone who accepted entered the courthouse.

## FIJA Demonstration in Washington, DC on August 24, 2010

I arrived at the U. S. District Courthouse at 333 Constitution Avenue NW in Washington, DC at 11:25 am. It was a chilly and overcast day. The front of the courthouse was set back in a courtyard away from the street, so that there was no pedestrian traffic. However there was an entrance at the side of the William B. Bryant Annex where everyone seemed to enter. In front of that entrance was a pedestrian sidewalk on federal property. I stood there.

At 11:29 am Court Security Officer Rodriguez asked me to move across the street. I declined. He told me that I was in front of a U. S. courthouse. I answered that: "I knew that. That is why I was there." He left.

At 11:31, his Supervising Officer Anderson took a pamphlet with my insert and told me that I had to move. I declined again. He left.

I continued to to distribute 42 pamphlets. The officers kept popping their heads out the door to see that I was not harassing anyone nor blocking the doorway.

At 12:13 pm, a person who took a pamphlet looked at it. then he asked me to autograph it, which I did. At 1:12 pm, I left.

## FIJA Demonstration in Newark, NJ on August 25, 2010

I arrived at the U. S. District Courthouse at 50 Walnut Street in Newark, NJ at 11:25 am on Wednesday, August 25, 2010, . It was an overcast and rainy day. I stood with my umbrella under a tree that provided some cover over the public sidewalk in front of the courthouse. The sidewalk was on federal property.

I distributed 4 American Jury Institute pamphlets entitled "A Primer for Prospective Jurors" with my insert when I was approached by Federal Protective Service Officers Kirsch and Jedra, who identified themselves. Soon they were joined by a third officer who did not identify himself. Officer Kirsch informed me that I could not distribute literature in front of the courthouse and asked me to move. I declined and said that I was allowed to distribute literature there. He said that I was on federal property and that it was not permitted. I informed him that I was a part owner of the property and had given myself permission.

Several more times he asked me to leave, but I did not respond. I just stared at him. Then he placed me under arrest and reached for my JURY INFO sign. I fell to the wet sidewalk and did not move a muscle or make another sound. The officers called the Emergency Medical Service Ambulance 1108. After several minutes it arrived, and I was placed on gurney and put into the ambulance. The police officers knew who I was and that I had been to many courthouses. They provided the ambulance personnel with my name, address, age, and social security number (which they must have obtained illegally, because I do not release that number except to medical persons and the IRS). The police kept my umbrella, tote bag, JURY INFO sign, clipboard, and 40 American Jury Institute pamphlets.

On the way to the hospital, the ambulance attendants took my blood pressure and tried to make me talk. First they told me that protesting against the government was futile and that I would be punished. Then they threatened me that they would stick needles into me. Finally one of the attendants rubbed by rib cage as hard as he could. This was extremely painful, and I moaned in pain.

When I got to the hospital, the procedure was repeated. One of the nurses said that she opposes the government also, but fighting was hopeless. That is why she bought a house in a different country. Also my sweater and shirt were removed. One of the officers then gave me three citations for Posting and Distributing Material 41 CFR 102-74.415(c), Conformsty (whatever that is) with signs and Directions 41 CFR 102-74.385, and Disturbances 41 CFR 102-74.390. Then he said that I no longer was under arrest. I immediately sat up, demanded my belongings, and said that I was leaving. I recovered my shirt, sweater, and baseball cap, but none of the property taken by the police. The hospital staff said the I could not leave until I had seen a doctor and signed out. I refused to do so. I stopped by the bathroom and left the hospital at 1:30 pm.

On the way back to the courthouse where my car was parked, I passed a demonstration at city hall protesting civil service layoffs. I did not necessarily agree with them, but I hate to pass up a urinal or a demonstration. Since all the demonstrators were black, I felt it necessary to integrate the demonstration and joined them.

### 7. Financial needs

Our FIJA outreach program has ballooned beyond my wildest expectations. One problem that this poses is financial. The costs are now exceeding our financial capabilities. You can help alleviate this problem by making donations to the following:

George Donnelly legal defense fund. George was arrested in Allentown and charged with misdemeanor assault, even though he was the victim of the assault. (Your federal government at work) He faces a possible extensive prison sentence. He is trying to raise $15,000 for anticipated legal fees to defend himself. Please send him a donation. Go to the web page below to make a donation through PayPal at http://donnelly.chipin.com/donnelly-legal-defense

Also the American Jury Institute (FIJA) expenses will be mounting. You can help by joining the American Jury Institute, or just making a donation. Its web page is at http://fija.org/support-fija/

Mike Benoit has written a book entitled "Sham and Shame of the Federal Income Tax." You can purchase it directly from him for five dollars. His E-mail address is in the header of this E-mail.

Warning: You should know that The Federal Protective Service, and possibly the FBI, is intercepting my e-mails. Another violation of our civil liberties. Be prudent if you write to me.

THE PRICE OF FREEDOM IS ETERNAL VIGILANCE

THE PRICE OF JUSTICE IS ETERNAL PUBLICITY

Yours in freedom—Julian

This entry was posted on Thursday, August 26th, 2010 at 5:19 am. You can follow any responses to this entry through the RSS 2.0 feed. You can leave a response, or trackback from your own site.

## Leave a Reply

☐ Notify me of followup comments via e-mail

[                    ] Name (required)

# EXHIBIT C

« Podcast: 2011-01-01      Podcast: 2011-01-08 »

Search    **SUBM**

# Progress Report: 2011-01-03

Hi Tyranny Fighters:

## 1. Publicity in the New York Post

The New York Post lead internet article of December 29, 2010, p. A6 had an article about my letter of December 19, 2010 to the U. S. District Court: Southern District of New York. It is posted at:

http://www.nypost.com/p/news/local/manhattan/libertarian_activist_defies_ju CMP

The New York Post is the sixth-largest newspaper in the U.S. by circulation. As of April, 2010, the Post's daily circulation was 525,004. Its editorial offices are located at 1211 Avenue of the Americas, in New York City, New York. It was founded by Alexander Hamilton and is the only surviving daily afternoon paper in New York City.

This could be a breakthrough moment in or movement if we can keep its attention. I urge each of you to write a letter to the Post. Garry Reed has already done so: http://www.examiner.com/libertarian-news-in-national/ny -post-treats-libertarian-activist-as-loony-pothead.

It makes no difference if you praise me, denigrate me, say that I have good intentions but am a nut, or say that I am a nut but sometimes do something good. The New York Post does not care. All it wants to do is increase circulation. If there is interest in the situation, it will continue to publish the letters. I also do not care what you say. Bad publicity is better than no publicity. Just spell my name right.

Most readers of the Post will not pay much attention. However, if we can recruit 50 or 500 readers to join our cause, it will be a success. The readers are all New York City area residents. Imagine 50 or 500 demonstrators in front of the U. S. Courthouse in Manhattan. It will drive the judges crazy.

## 2. LWRN Radio Broadcasts at www.lwrn.net

- November 13, 2010 : John Paff & Walter Leurs: NJLP Open Government Task Force
- November 20, 2010 : Alex Shalom: NJ Civil Liberties Union Legal Counsel
- November 27, 2010 : John McWhorter: Manhattan Institute Senior Fellow in Public Policy
- December 4, 2010 : James Babb, Organizer of TSA Scanner Protests; James Cox, FIJA coordinator for southern Florida

**Announcement** *(9)*

**News** *(2)*

**Podcast** *(23)*

**Progress Report** *(16)*

## TWITTER FEED



**tyrannyfighters**
**27 followers**

Podcast: 2011-02-26:
http://tinyurl.com/4sekqfp
*about 2 days ago*

Podcast: 2011-02-19:
http://tinyurl.com/48zwgk
*about 2 days ago*

Progress Report: 2011-02 -26:
http://tinyurl.com/4cm7fd
*about 2 days ago*

News: New York Post and Gothamist also report on Julian's jury tampering case:
http://tinyurl.com/4ncap9
*about 3 days ago*

## FACEBOOK

Progress Report: 2011-01-03

- December 11, 2010 : Michael Badnarik: Libertarian Party Candidate for President, 2004, and U. S. Constitution scholar
- December 18, 2010 : James Cox, FIJA Coordinator for southern Florida told more about the FIJA outreach in southern Florida; James Babb discussed the TSA Body Scanner Protest at U. S. Airports, December 23, 2010
- December 25, 2010 : Michael Benoit: LP candidate for US Congress in California's 52nd District, 2010, will discuss the U. S. income tax laws
- January 1, 2010 : John Kurtz discussed activism in southern Florida

Future programs:

- Jim Babb, Nick Hankoff, Scott Olver, and I will discuss the TSA body scanner protest of December 23, 2010, at various airports.
- Carlos Miller will discuss his activities as a freedom photographer in the Miami, FL, area.

Please visit www.lwrn.net to learn more about Liberty Works Radio Network's plan for spreading the message of limited government and individual liberty all across the country, and then help us by becoming a member of the LWRN Fellowship.

Jury nullification has born fruit in a recent case in Missoula, Montana due to the jurors' indications during voir dire that they would not convict a defendant of the entirely victimless act of possession of 1/16th of an ounce of marijuana. Several members of the jury pool expressed their disapproval of taxpayer dollars being wasted on such a matter in the first place. This led to a break in court proceedings during which the prosecutor offered the defendant a plea deal in which he didn't even have to admit guilt in the matter.

### 3. Year-end Summary report

Jury nullification has born fruit in a recent case in Missoula, Montana due to the jurors' indications during voir dire that they would not convict a defendant of the entirely victimless act of possession of 1/16th of an ounce of marijuana. Several members of the jury pool expressed their disapproval of taxpayer dollars being wasted on such a matter in the first place. This led to a break in court proceedings during which the prosecutor offered the defendant a plea deal in which he didn't even have to admit guilt in the matter.

The Transportation Security Administration plans to introduce total body scanners in all airports. Demonstrations initiated by Jim Babb and George Donnelly occurred at about 25 major airports on November 24 and at about 10 airports on December 23. As a result TSA is delaying the introduction of these scanners. Hopefully this will be an infinite delay.



Tyranny Fighters

"Brian Aitken, who was convicted of illegally possessing two handguns that he had legally purchased in Colorado, will be spending Christmas out of prison," NJ.com reports. Ad the result of a massive write-in campaign the Governor Chris Christie condemning the injustice, Gov. Chris Christie commuted Aitken's sentence, from seven years to time served, according to an order the governor signed today. He still has felony convictions, but at least will be out of jail soon.

John Paff was a winner of the Sunshine Troublemaker of the Week award for his vigilance, along with Walter Luers, of disclosing unlawful procedures and ordinances of county and municipal governments in NJ and having them rescinded. They have succeeded several times this year.

Other indicators of the recovery of freedom came from other sources. The TEA Party, whether you approve of it or not, won 2 U. S. Senate seats and several House of Representative seats in the 2010 election by infiltrating the Republican Party. This suggests that change may be on the way.

Last on my list is the action of the federal government to end don't ask don't tell for gays in the military.

**Losses**

We have lost some ground this year as well. We have increased our financial irresponsibility by further increasing the national debt to an unsustainable level.

The Department of Homeland Security is becoming more and more Gestapo like. It must be eliminated, or at least restrained.

We are continuing to see the complete collapse of our judicial system. The conviction of Brian Aitken for doing nothing illegal and sentencing him to along term in prison is appalling. Unfortunately, it is not an isolated example. The Innocence Project has estimated that 22,000 prisoners are innocent of the crime for which they have been convicted.

A New York Times editorial of December 28, 2010, reports that four dozen prisoners are being detained indefinitely because they are considered a potentially serious terrorist threat, but "cannot be tried because the evidence against them is classified or was improperly obtained, often through torture."

The war in Afghanistan is a disaster. For nine years, We have been sending our young men and women to that country to be killed and maimed for no gain. In addition the cost is bankrupting us. We should send overwhelming force and wipe them out or bring the troops home and write it off as a loss. This is one of those situations where I do not know if the right-wing or the left-wing view is correct. I do know that the centrist approach that we are taking is wrong.

I am preparing a report of gains and losses in the freedom movement for 2010. What I have just reported is an incomplete list, including only the situations of which I am familiar. If you have other gains or losses, or wish to amplify my comments, please send them to me, andI will incorporate them in my report.4. The Non-Trials

A new book by Julian Heicklen discusses his arrest at the Isaiah Wall in Manhattan, NY, in 2007 and the subsequent legal activity. It has been completed and sent to the publisher. It should be available for purchase next week at bookstores. I am planning on a book tour for 2011 and am available for book sales and/or speeches at any conventions. Let me know if your organization is interested.

### 4. Suggested Books

Michael Badnarik gives a course about the U. S. Constitution using his book "Good to be King."

Mike Benoit has written a book entitled "Sham and Shame of the Federal Income Tax." You can purchase it directly from him for five dollars, or you can obtain a free pdf copy from him upon request. His E-mail address is in the header of this E-mail.

### 5. Warning

You should know that the Federal Protective Service, and possibly the FBI, is intercepting my E-mails. Another violation of our civil liberties. Be prudent if you write to me. However a U. S. court recently has ruled that If the government wants to see your emails stored by an Internet service provider, they first will have to get a warrant. See:

http://www.allgov.com/Top_Stories/ViewNews/US_Court_Rules_Warrants_Nee

**THE PRICE OF FREEDOM IS ETERNAL VIGILANCE**

**THE PRICE OF JUSTICE IS ETERNAL PUBLICITY**

Yours in freedom—Julian

*New York Post*

*Share this post!*

**COMMENTS (0)        TRACKBACKS (1)        RELATED POSTS**

*NO COMMENTS YET.*