UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA                    :

          - v. -                                         :          **Opinion and Order**
                                                                      10 CR 1154 (KMW)
JULIAN HEICKLEN                                    :

               Defendant.          :

-------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

On November 18, 2010, a grand jury indicted Julian Heicklen, charging him with attempting to influence the actions or decisions of a juror of a United States Court, in violation of 18 U.S.C. § 1504, a federal jury tampering statute.  The Indictment states that, from October 2009 through May 2010, in front of the entrance to the United States Court for the Southern District of New York (the "Courthouse"), Heicklen distributed pamphlets that advocated jury nullification.  (Dkt. No. 1.)  Heicklen has chosen to exercise his constitutional right to represent himself, and the Court has appointed stand-by counsel to assist him.  Heicklen now moves to dismiss the Indictment on the ground that it is insufficient, because it fails to allege all the required elements of the crime, and on the ground that it is duplicitous, because it alleges multiple distinct crimes in one count.  Heicklen also moves to dismiss the Indictment on the ground that the statute, both on its face and as applied, is unconstitutionally overbroad in violation of the First Amendment and unconstitutionally vague in violation of the Fifth Amendment.  Heicklen also moves for a jury trial and a bill of particulars, in order to clarify the nature of the charges against him.

1

BACKGROUND

Heicklen advocates passionately for the right of jurors to determine the law as well as the facts. The Government states that, in advocating these views, Heicklen has on several occasions stood outside the entrance to the Courthouse, holding a sign reading "Jury Info" and distributing pamphlets from the Fully Informed Jury Association ("FIJA"). (Government's Memorandum of Law in Opposition to Defendant's Motions ("Govt.'s Mem.") at 1.) The pamphlets state that a juror has not just the responsibility to determine the facts of a case before her on the basis of the evidence presented, but also the power to determine the law according to her conscience.[1] (Govt.'s Mem., Ex. A.)

In opposition to Heicklen's motion, the Government quotes an excerpt of a transcript of a recorded conversation that it alleges Heicklen had with an undercover agent from the Federal Bureau of Investigation ("FBI"), in which the agent specifically identified herself as a juror; the agent was not actually a juror.[2] (Govt.'s Mem. at 2.) The Government alleges that Heicklen

---

[1] The right of a jury to render a verdict on the basis of the law as well as the facts has been discussed by courts at least since *Bushell's Case*, [1670] 124 Eng. Rep. 1006 (C.P.) (granting habeas corpus relief to Edward Bushell, one of the members of the jury that acquitted William Penn and William Mead of preaching to a Quaker meeting, and who was then charged with contempt of court for failing to return a guilty verdict); *see also Jones v. United States,* 526 U.S. 227, 244-48 (1999); *Sparf v. United States*, 156 U.S. 51, 64-106 (1895); *United States  v. Polouizzi*, 564 F.3d 142, 161-63 (2d Cir. 2009); *United States v. Carr*, 424 F.3d 213, 219-21 (2d Cir. 2005); *United States v. Pabon-Cruz*, 391 F.3d 86, 89-91 (2d Cir. 2004); *United States. v. Thomas*, 116 F.3d 606, 612-19 (2d Cir. 1997); *United States v. Dougherty*, 473 F.2d 1113, 1130-37 (D.C. Cir. 1972); James Alexander, *A Brief Narration of the Case and Trial of John Peter Zenger* (1963).

[2] The excerpt from the conversation that the Government alleges Heicklen had with the FBI agent reads as follows:
      Heicklen: Would you like jury information?  Find out what you [inaudible]
      Agent: I'm a juror, I got picked yesterday.
      Heicklen: Oh good, that'll be good for you to know.  Take it home and read this.  Thank you very much.
      Agent: What's nullification?
      Heicklen:  The jury has the right to judge the law as well as the facts.  The judge will tell you otherwise, but there are several Supreme Court decisions which said that was true.  In other words, if you think the law is unjust you can find a person innocent.  In fact, that's how we got freedom of religion.  William Penn was the first guy, he was a Quaker in England and he used to practice his religion openly and that was a crime in England, in the Church of England, he was tried, the jurors found him – the judge instructed the jurors to find him guilty – the jurors found him not guilty, then the judge locked the jurors up for three weeks 'til a higher court let them go.  William Penn of course left England and came to the United States and founded the state of Pennsylvania, which was only one of two colonies that had freedom of religion.  In this country, the first case was a guy named John Peter Zenger, who published a newspaper and he criticized the Governor of New York – this was before were the United States, we

handed that "juror" a FIJA pamphlet and a single-sided, typewritten handout.  (Govt.'s Mem., Ex. A.)  The handout states in relevant part that "[i]t is not the duty of the jury to uphold the law. It is the jury's duty to see that justice is done." [3]  (*Id.*)  The FIJA pamphlet is entitled "A Primer for Prospective Jurors" and contains 13 questions and answers for jurors regarding what FIJA characterizes as jurors' rights and responsibilities.[4]  (*Id.*)

In considering a motion to dismiss, the Court relies on the Indictment and accepts the allegations of the Indictment as true.  *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).  In full, the Indictment charges that:

> From at least in or about October 2009 up to and including in or about May 2010, in the Southern District of New York, Julian Heicklen, the defendant, attempted to influence the actions and decisions of a grand and petit juror of a court of the United States, to wit, the United States District Court for the Southern District of New York, upon an issue and matter pending before such juror, and before a jury of which he was a member, and pertaining to his duties, by writing and sending to him a written communication in relation to such issue or matter, to wit, Heicklen

---

were the colonies.  It was a crime to criticize any of the King's appointees and he was tried and the jury acquitted him and that's how we got freedom of the press. So you serve a very important function.  I'm not telling you to find anybody not guilty, there should be a reason for it.  But, if there is a law you think is wrong then you should do that. And you will be in very good company.  Our very first Supreme Court Justice, Chief Justice John Jay, instructed the jury that they had that right, and several justices since. . . .  And in fact, it's in here [the pamphlet], and you can get a lot of information, there is a website, if you are interested in more. . . .  In the end, it's the citizens of the country who are the only ones who can protect democracy and this is the mechanism by which they can do it.  In this case, instead of having to worry about 300 million other people and a lot of legislators, you [inaudible] it only takes one juror to disagree to hang the jury.  If you are one you are Queen.  You are a Queen for this trial.

    Agent:  Ok.

    Heicklen:  Take advantage of it.

    Agent:  Ok. Thank you.

[3] In full, the handout states that:

> The judge will instruct the jury that it must uphold the law as he gives it.  He will be lying.  The jury must judge the law as well as the facts.  Juries were instituted to protect citizens from the tyranny of government.  It is not the duty of the jury to uphold the law.  It is the jury's duty to see that justice is done.

(Gov't Mem. Ex. A.)

[4] The pamphlet states that FIJA's "goal is to restore the true function of the jury and inform all Americans of their authority and responsibilities as jurors."  The general thrust of the pamphlet is to encourage jurors to "vote on the verdict according to your conscience," and it states that "[y]ou may choose to vote to acquit, even when the evidence proves that the defendant 'did it', if your conscience so dictates."  It also tells jurors that, when asked questions during jury selection about their ability to follow the law as given, it is "your moral choice" whether to "give answers that are likely to get you excused from serving, or say whatever it takes to be selected, so you can do your part to see that justice is served."  Discussing the jurors' oath to uphold the law, the pamphlet states that "[t]he whole point of having a jury system is for a group of ordinary citizens to decide upon a verdict or damage award independent of outside influences, including government influence."  (Gov't Mem., Ex. A.)

distributed pamphlets urging jury nullification, immediately in front of an entrance to the United States District Court for the Southern District of New York, located at 500 Pearl Street, New York, New York.

**DISCUSSION**

I.   **The Sufficiency of the Indictment**

Heicklen argues that the Indictment does not charge all of the elements of the crime defined in 18 U.S.C. § 1504 and must be dismissed.

A.   **The Legal Standard for a Motion to Dismiss an Indictment**

The Sixth Amendment guarantees a defendant's right "to be informed of the nature and cause of the accusation" against him.  U.S. Const., amend. VI.  This guarantee is given effect, in part, by Rule 7 of the Federal Rules of Criminal Procedure, which requires the prosecution to present to a grand jury an indictment that is "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  The two requirements of an indictment are that it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and that it "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Resendiz–Ponce*, 549 U.S. 102, 108 (2007) (internal quotations omitted); *In re Terrorist Bombings of U.S. Embassies in E. Africa,* 552 F.3d 93, 150 (2d Cir. 2008) (internal quotations omitted).

An indictment "must be read to include facts which are necessarily implied by the specific allegations made."  *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotations omitted).  Generally, a facially valid indictment returned by a duly constituted grand jury suffices to call for a trial on the merits of the charges set forth therein, so long as the indictment provides sufficient detail to permit the preparation of a defense and to protect the

4

defendant against double jeopardy.  *See Costello v. United States*, 350 U.S. 359, 363 (1956).

Thus, "[u]nless the government has made what can fairly be described as a full proffer of the

evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately

addressed on a pretrial motion to dismiss an indictment."  *United States v. Perez*, 575 F.3d 164,

166-67 (2d Cir. 2009) (internal quotation marks omitted; alteration in original).  Accordingly, an

indictment that alleges the essential elements of the crime and states specific facts indicating at

least the time and the place of the alleged offense is generally sufficient.  *LaSpina*, 299 F.3d at

177.

        In this case, however, the basis for the motion to dismiss the Indictment is neither a

pretrial challenge to the evidence nor a claim that the indictment is not pled with sufficient

specificity, but rather is an argument that the facts alleged do not constitute an offense as a

matter of law.  Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by

pretrial motion any defense, objection, or request that the court can determine without a trial of

the issue."  Fed. R. Crim. P. 12(b); *see also United States v. Covington*, 395 U.S. 57, 60-61

(1969) (holding that where determinative questions of law were decided in his favor, defendant

was entitled to dismissal of indictment); *United States v. Bodmer*, 342 F. Supp. 2d 176, 189

(S.D.N.Y. 2004) (Scheindlin, J.) (dismissing indictment on the ground that statute contravened

the constitutional fair notice requirement).  Because federal crimes are "solely creatures of

statute," *Dowling v. United States*, 473 U.S. 207, 213 (1985) (internal quotation marks omitted),

"a federal indictment can be challenged on the ground that it fails to allege a crime within the

terms of the applicable statute."  *United States v. Aleynikov*, --- F.3d ---, 2012 WL 1193611 at *3

(2d Cir. 2012).  "The sufficiency of an indictment and the interpretation of a federal statute are

5

both matters of law."[5] *Id.* A "claim that an indictment does not charge an offense may be raised at any time, and may be considered by a court *sua sponte*." *United States v. Crowley*, 236 F.3d 104, 108 n.6 (2d Cir. 2000).

In considering the Indictment, the Court accepts all pertinent allegations as true. *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). As the Government points out, "[t]here is little, if any, dispute about the factual background of this matter." (Govt.'s Mem. at 1.) The Indictment states that Heicklen "attempted to influence the actions and decisions" of a juror of a United States Court on "an issue or matter pending before such juror," in that, from October of 2009 through May of 2010, Heicklen "distributed pamphlets urging jury nullification, immediately in front of an entrance to the United States District Court for the Southern District of New York." (¶ 1.)

The Indictment thus identifies the relevant time period, states the specific location of the alleged crime, and provides a general description of Heicklen's activities. The Indictment is stated with sufficient specificity.

The question remaining is whether Heicklen's alleged activities, accepted as true, are prohibited by the statute. Whether or not the Indictment charges an offense squarely presents an issue of law determinable before trial. *Cf. Crowley*, 236 F.3d at 108. In order to answer this question, the Court must first determine what the statute proscribes.

---

[5] When a motion to dismiss an indictment is made solely upon an issue of law, consideration of the motion is appropriate. *United States v. Was*, 684 F. Supp. 350, 351 (D. Conn. 1988) (Dorsey, J.); *see also United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) ("If a question of law is involved, then consideration of the motion [to dismiss the Indictment] is generally proper") (internal quotations omitted); *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976) (motions to dismiss an indictment "are capable of determination before trial if they raise questions of law rather than fact."). Indeed, it would be a waste of judicial resources to conduct a trial, only to rule on a post-trial motion that the government's theory of criminal liability fails, no matter what facts it was able to establish at trial. *United States v. Bongiorno*, No. 05 CR 390, 2006 WL 1140864 at *4 (S.D.N.Y. May 1, 2006) (Stein, J.); see also *United States v. Mowad*, 641 F.2d 1067, 1069, 1071-72 (2d Cir. 1981) (concluding that a charge should not have been submitted to the jury because the statute did not apply to defendant's conduct as a matter of law).

### B.  Standards of Statutory Construction

"Statutory construction . . . is a holistic endeavor."  *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) (internal quotation marks omitted; alteration in original). When interpreting statutes, courts read statutory terms in light of the surrounding language and framework of the statute.  *Id.*

In construing a statute, courts "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (internal quotation marks omitted); *Hess v. Cohen & Slamowitz LLP*, 637 F.3d 117, 125 (2d Cir. 2011).  "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (internal quotation marks omitted); *United States v. Am. Soc. of Composers, Authors, Publishers*, 627 F.3d 64, 72 (2d Cir. 2010).  "[I]f the language of a statute is 'unambiguous,' no further inquiry is required."  *Phong Thanh Nguyen v. Chertoff*, 501 F.3d 107, 112 (2d Cir. 2007).

However, "where statutory language is ambiguous a court may resort to the canons of statutory interpretation and to the statute's legislative history to resolve the ambiguity."  *Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*, 335 F.3d 52, 57 (2d Cir. 2003); *see United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008).  Determining the scope of 18 U.S.C. § 1504 requires the Court to construe the statute in light of its text and construction, its legislative history, and any constitutional considerations it may raise.

7

### C.  18 U.S.C. § 1504

1.  <u>The Text of the Statute</u>

As with any exercise in statutory construction, the Court begins with the text of the statute and draws inferences about its meaning from its composition and structure.  *United States v. Gray*, 642 F.3d 371, 377 (2d Cir. 2011).  The federal statute prohibiting influencing a juror by writing provides that:

> Whoever attempts to influence the action or decision of any grand or petit juror of any court of the United States upon any issue or matter pending before such juror, or before the jury of which he is a member, or pertaining to his duties, by writing or sending to him any written communication, in relation to such issue or matter, shall be fined under this title or imprisoned not more than six months, or both. Nothing in this section shall be construed to prohibit the communication of a request to appear before the grand jury.

18 U.S.C. § 1504.

The Court understands the statute to contain three elements:[6]

(1) that the defendant knowingly attempted to influence the action or decision of a juror of a United States court;

(2) that the defendant knowingly attempted to influence that juror (a) upon an issue or matter pending before that juror, or pending before the jury of which that juror is a member; or (b) pertaining to that juror's duties; and

(3) that the defendant knowingly attempted to influence that juror by writing or sending to that juror a written communication in relation to such issue or matter.

---

[6] The implied mens rea "knowingly" must be read into each element of the statute, because, as the Supreme Court held in *Pettibone v. United States*, 148 U.S. 197, 203-07 (1893), in cases involving interference with the administration of justice, knowledge that the defendant is interfering with the judicial process "is an essential ingredient of the offense." *Id.* at 205.

The second element is most logically understood as containing two parallel adjectival phrases describing the type of "action or decision" of a juror that cannot be influenced – 1) an action or decision of a juror upon any issue or matter pending before that juror, or before the jury of which he is a member; and 2) an action or decision of a juror pertaining to his duties. Determining the scope of the statute initially requires determining what constitutes an "issue or matter" pending before a juror and what falls within a "juror's duties."

Black's Law Dictionary defines "*issue*" as a "point in dispute between two or more parties." (9th ed. 2009).

Black's Law Dictionary defines "*matter*" as either "[a] subject under consideration, esp. involving a dispute or litigation; case" or "[s]omething that is to be tried or proved; an allegation forming the basis of a claim or defense." (*Id.*).

The canon of construction known as *noscitur a sociis* (or "it is known by its associates") instructs that the meaning of a word may be determined by the words surrounding it and that courts should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (internal quotation marks omitted); *Aleynikov*, 2012 WL 1193611 at *7. Indeed, in interpreting a statute, courts "must give effect to every word of a statute wherever possible." *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004). Thus "matter" should be interpreted in such a way that it neither duplicates nor encompasses "issue." A "point in dispute between two or more parties" and "[s]omething that is to be tried or proved" convey essentially the same meaning, and a broad understanding of "subject under consideration" would encompass "a point in dispute" and render "issue" superfluous. Since "issue" means a "point in dispute

9

between two or more parties," in order for neither "issue" nor "matter" to be surplusage, it would make the most sense for "matter" to mean "case."

Similarly, the fact that the statute separately prohibits influencing the action or decision of a juror "upon an issue or matter pending before that juror" and "pertaining to his duties" means that "pertaining to his duties" must have a distinct meaning from "issue or matter pending before that juror."

Black's Law Dictionary defines "duty" as a "legal obligation that is owed or due to another and that needs to be satisfied; an obligation for which somebody else has a corresponding right." (9th ed. 2009). The particular legal obligation that jurors undertake is summarized in the oath that they swear before being impaneled, stating that "you do solemnly swear that you shall well and truly try this issue now on trial and a true verdict give according to the law and the evidence." The core of a juror's duties, then, is a commitment with regard to *how* a juror renders a verdict – an obligation to give a verdict according to the law and the evidence.[7]

The statute's separate listing of "issue or matter" and "juror's duties" thus prohibits attempts to influence the action or decision of a juror with regard to both the *substantive* questions before a juror ("issue or matter") and pertaining to the *procedural* obligations of a juror ("juror's

---

[7] The commonsensical proposition that the core of a juror's duties is found in the juror's oath is also supported by the Supreme Court's holdings with regard to the proper standard for discharging a juror for cause, which is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980) ("[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."); *see also United States v. Thomas*, 116 F.3d 606, 608 (2d Cir. 1997) ("We conclude, *inter alia*, that – as an obvious violation of a juror's oath and duty – a refusal to apply the law as set forth by the court constitutes grounds for dismissal under Rule 23(b).")). Another frequently discussed aspect of a juror's duty is the duty to confer with fellow jurors and to maintain an open mind. *United States v. Tellier*, 255 F.2d 441, 450 (2d Cir. 1958) ("An individual juror has a duty not only to confer with his fellow jurors and to discuss the evidence with them, but also to approach the jury deliberations with a willingness to recognize the validity of each juror's opinion.").

duties").  It does not, however, treat influencing the substantive and procedural points as the same.

A defendant's actions are encompassed within the requirements of the statute's second element if he attempts to influence a juror's actions or decisions on an *issue or matter* pending before that juror *or* if he attempts to influence a juror's actions or decisions *pertaining to that juror's duties*.  However, the third element of the statute requires that the influence be exerted through a written communication in relation to such *issue or matter*.  No mention is made of a juror's duties, and "such issue or matter" cannot be understood to include a "juror's duties" because they are presented as two distinct objects in the previous phrase.[8]  "Where Congress includes particular language in one section of statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Nken v. Holder*, 556 U.S. 418, 430 (2009); *Aleynikov*, 2012 WL 1193611 at *7.  This principle has even more force, where, as here, Congress includes particular language in one element, but omits it in another element defining the very same crime.

The statute thus prohibits a defendant from trying to influence a juror upon any case or point in dispute before that juror by means of a written communication in relation to that case or that point in dispute.[9]  It also prohibits a defendant from trying to influence a juror's actions or decisions pertaining to that juror's duties, but only *if* the defendant made that communication in

_____

[8] At oral argument counsel for the Government conceded that were the Court to adopt the Government's interpretation of the statute, the third element of the statute would be rendered essentially superfluous.  (Motion to Dismiss Hr'g Tr. 5:22-25, 6:1-5 Mar. 21, 2012 ("I think the statute is drafted inartfully.  That being said, I think that when it says that it has to – when you have to influence the juror about his duties "in relation to an issue or matter" pending before him, that the reason that that language is superfluous – although it does modify his duties – is that, in essence, any attempt to influence a juror about his duties is going to be in connection to what's pending before the juror."))  The Court must give effect to every clause and word of the statute where possible, and accordingly declines to modify the plain text of the statute in a way that renders one of its elements meaningless.  *Tablie v. Gonzales*, 471 F.3d 60, 64 (2d Cir. 2006).

[9] The relevant part of 18 U.S.C. § 1504 states that: "Whoever attempts to influence the action or decision of any grand or petit juror . . . upon any issue or matter pending before such juror . . ., by writing or sending to him any written communication, in relation to such issue or matter, shall be fined under this title or imprisoned not more than six months, or both."

relation to a case or point in dispute before that juror.[10]  The statute therefore squarely criminalizes efforts to influence the outcome of a case, but exempts the broad categories of journalistic, academic, political, and other writings that discuss the roles and responsibilities of jurors in general, as well as innocent notes from friends and spouses encouraging jurors to arrive on time or to rush home, to listen closely or to deliberate carefully, but with no relation to the outcome of a particular case.

Accordingly, the Court reads the plain text of the statute to require that a defendant must have sought to influence a juror through a written communication in relation either to a specific case before that juror or to a substantive point in dispute between two or more parties before that juror.  Given the potential ambiguity in both the second and third elements of the statute, however, the Court looks to the statute's legislative history and judicial interpretation to ascertain whether this construction would conflict with the intentions of Congress.

2.  Legislative History and Contemporaneous Interpretation

The federal statute prohibiting influencing a juror by writing was originally passed by Congress on June 10, 1872 as "An Act to prevent and punish the Obstruction of the Administration of Justice in the Courts of the United States" (the "Act").[11]  17 Stat. 378.  The

---

[10] The relevant part of 18 U.S.C. § 1504 states that: "Whoever attempts to influence the action or decision of any grand or petit juror . . . pertaining to his duties, by writing or sending to him any written communication, in relation to such issue or matter, shall be fined under this title or imprisoned not more than six months, or both."

[11] Congress first addressed jury tampering in "An Act declaratory of the law concerning contempts of court" (the "1831 Act"), passed on March 2, 1831.  Ch. 99, 4 Stat. 487.
 Section 2 of the 1831 Act provided:
> That if any person or persons shall, corruptly, or by threats or force, endeavour to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall, corruptly, or by threats or force, obstruct, or impede, or endeavour to obstruct or impede, the due administration of justice therein, every person or persons, so offending, shall be liable to prosecution therefor. . . .
Ch. 99, 4 Stat. 487.
The catalyst for the 1831 Act was concern about judicial overreaching and its effects on free speech, arising out of a contempt of court order issued by Judge James H. Peck of the United States District Court for Missouri.  *See* Arthur J. Stansbury, *Report of the Trial of James H. Peck, Judge of the United States District Court for the District of Missouri, Before the Senate of the United States, on an Impeachment*

very limited legislative history of the Act provides little direction in interpreting the statute. [12]

*See* S. Journal, 42nd Cong., 2d Sess. 564 (1872); Cong. Globe, 42nd Cong., 2d Sess. 2525

(1872); *id.* at 4319; *id.* at 4500.

---

*Preferred by the House of Representatives Against Him for High Misdemeanors in Office* (1833).  Luke Lawless, a Missouri attorney, had written an article, signed only as "A Citizen" and published in the Missouri Advocate on April 8, 1826, criticizing a prior ruling by Judge Peck in a case that Lawless had argued.  *Id.*  Judge Peck then charged the editor of the Missouri Advocate with contempt of court for publishing a "false statement, tending to bring odium on the court."  *Id.*  In court, Lawless identified himself as the author, and Judge Peck found Lawless guilty of contempt, sentenced him to one day in jail, and suspended his law license.  *Id.*  Lawless petitioned Congress for an investigation.  The House of Representatives voted to impeach, and the Senate, after extensive hearings, acquitted Judge Peck on January 31, 1831.  *Id.*  In response to Judge Peck's acquittal, Representative Buchanan introduced the 1831 Act, which limited the contempt powers of the federal judiciary and transferred the power to punish certain contempt crimes, such as jury tampering, to the executive branch.  4 Stat. 487.  *See  Bridges v. State of California*, 314 U.S. 252, 266-67 (1941); *Nye v. United States*, 313 U.S. 33, 45-48 (1941).

[12] Senator William M. Stewart of Nevada introduced the Act on April 18, 1872.  S. 993 42d Cong., 2nd Sess. (1872); *see also* H.R. 1017, 42nd Cong., 2d Sess. (1872).   It was passed on June 10, 1872 and provides:

>That if any person or persons shall corruptly, or by threats of force, or by threatening letters, or any threatening communications, endeavor to influence, intimidate, or impede any grand or petit jury or juror of any court of the United States in the discharge of his or their duty, or shall corruptly, or by threats or force, or by threatening letters, or any threatening communications, influence, obstruct, or impede, or endeavor to influence, obstruct, or impede the due administration of justice therein, such person or persons so offending shall be liable to prosecution therefor by indictment, and shall, on conviction thereof, be punished by fine not exceeding three thousand dollars, or by imprisonment not exceeding three years, or by both, according to the aggravation of the offense.  And if any person or persons shall attempt to influence the action or decision of any grand or petit juror upon any issue or matter pending before such juror, or before the jury of which he is a member, or pertaining to his or their duties, by writing or sending to him any letter or letters, or any communication in print or writing in relation to such issue or matter, without the order previously obtained of the court before which the said juror is summoned, such person or persons so offending shall be deemed guilty of a misdemeanor, and shall be liable to prosecution therefor by indictment or information, and shall, on conviction thereof, be punished by a fine not exceeding one thousand dollars, or by imprisonment not exceeding six months, or by both such fine and imprisonment, according to the aggravation of the offense.

17 Stat. 378

The act has been little changed since.  In the Revised Statutes, enacted by Congress in 1874 as a comprehensive official codification of existing federal law at the time, the 1872 Act was split into two sections, with the first sentence forming section 5404, prohibiting influencing or injuring an officer or juror generally, and the second sentence forming section 5405, prohibiting influencing a juror by writing.  Rev. Stat. sec. 5404-5, p. 1047.  In 1909, section 5405 of the Revised Statutes became Section 137 of the Criminal Code, and the phrase "without the order previously obtained of the court before which the said juror is summoned" was deleted.  Act of March 4, 1909, ch. 321, § 137, 35 Stat. 1113; *see also* S. Rep. No. 10, 60th Cong., 2d Sess. 19 (1909).   When the United States Code was reorganized, Section 137 became Section 243 of Title 18 and the paragraph "[n]othing in this section shall be construed to prohibit the communication of a request to appear before the grand jury" was added at the end in order to remove the possibility that a proper request to appear before a grand jury might be construed as a technical violation of the statute.  June 25, 1948, ch. 645, 62 Stat. 770.  In 1994, the statute was renumbered Section 1504 of Title 18.  Sept. 13, 1994, Pub.L. 103-322, Title XXXIII, § 330016(1)(H), 108 Stat. 2147.

An illuminating commentary on the Act, however, can be found in instructions that Justice

Field gave to a grand jury in San Francisco, just two months after the Act was passed.  Among

other things, Field describes the events precipitating the Act's passage:

> We have been led, gentlemen, to give these instructions upon the nature of your duties and the limits to the sphere of your investigations, because an impression widely prevails that the institution of the grand jury has outlived its usefulness, an impression which has been created from a disregard of those limits, and the facility with which it has, unfortunately, often been used as an instrument for the gratification of private malice.
>
>  There has hardly been a session of the grand jury of this court for years, at which instances have not occurred of personal solicitation to some of its members to obtain or prevent the presentment or indictment of parties.  And communications to that end have frequently been addressed to the grand jury filled with malignant and scandalous imputations upon the conduct and acts of those against whom the writers entertained hostility, and against the conduct and acts of former and present officers of this court, and of previous grand juries of this district . . . .
>
> . . . .
>
> At its last session congress passed a stringent act to prevent the continuance of this pernicious practice. . . .

*Charge to Grand Jury*, 30 F. Cas. 992, 994-95 (C.D. Cal. 1872) (Field, J.)

 Justice Field's jury instruction identifies the impetus for the Act's passage as the

manipulation of the grand jury into "an instrument for the gratification of private malice."

*Id.*  He characterizes the Act as having been passed primarily to prevent the manipulation

of grand juries through the personal solicitation of jurors in order to secure or to prevent

the indictment of particular parties.[13]

   This Court's interpretation of the text of 18 U.S.C. § 1504 as requiring that the

prohibited written communication be made with regard to a particular case or point in

dispute before the juror, is thus reinforced by Justice Field's contemporaneous account of

---

[13] Justice Field also describes the Act as having been passed "to prevent any attempt to influence the administration of justice corruptly or by the intimidation of jurors."  *Charge to Grand Jury*, 30 F. Cas. 992, 995 (C.D. Cal. 1872). This objective is a clear reference to the first sentence of the Act, now codified as 18 U.S.C. § 1503, which prohibits "corruptly" endeavoring "to influence, intimidate, or impede any grand or petit juror" in the discharge of his or her duties.  *Id.* at 995; *see also* 18 U.S.C. § 1503.

Congress's desire to prevent personal solicitation of jurors with regard to specific parties or cases before them.

### 3. Judicial Interpretation

Federal courts have had few opportunities to consider 18 U.S.C. § 1504.[14] Indeed, this Court is aware of only one published opinion in a case involving a prosecution under the statute. In *Duke v. United States*, the Fourth Circuit considered a situation in which an individual handed a letter to the foreperson of a grand jury, communicating facts that the individual wished the grand jury to consider in relation to an indictment it was considering against him.[15] 90 F.2d 840 (1937). The court in *Duke*

---

[14] The Court has identified the following published opinions not directly involving 18 U.S.C. § 1504 but referencing the statute: *Wood v. Georgia*, 370 U.S. 375, 397-98 (1962) (Harlan J., dissenting) (citing 18 U.S.C. § 1504 as evidence of Congress's recognition of "the need for safeguarding the deliberations of federal grand juries"); *In re New York Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 410 (2d Cir. 2009) (considering a motion to unseal and produce wiretap applications and citing 18 U.S.C. § 1504 as an example of a limitation on public access to court proceedings); *United States v. Lang*, 364 F.3d 1210, 1212 (10th Cir. 2004) (citing 18 U.S.C. § 1504 when considering an appeal from conviction under 18 U.S.C. § 1505); *United States v. Faudman*, 640 F.2d 20, 22 (rejecting defendant's argument that he should have been charged under 18 U.S.C. § 1504 instead of 18 U.S.C. § 1503, which allows for more substantial sanctions); *United States v. Forrest*, 620 F.2d 446, 458-59 (5th Cir. 1980) (remanding for a hearing to evaluate prejudicial impact of contact between juror and relative who was a friend of the defendant, and citing 18 U.S.C. § 1504 as an example of the penalties for jury tampering); *United States v. Bukowski*, 435 F.2d 1094, 1104 (7th Cir. 1970) (rejecting assertion that the Government had improperly charged the defendant with criminal contempt in order to avoid the limits on punishment contained in 18 U.S.C. § 1504); *Glenn v. Ciccone*, 370 F.2d 361, 361 (8th Cir. 1966) (discussing finding that defendant was not mentally competent to stand trial on jury tampering charges brought pursuant to 18 U.S.C. § 1504); *Margoles v. United States*, 402 F.2d 450, (7th Cir. 1968) (citing 18 U.S.C. § 1504 when considering appeal from conviction under 18 U.S.C. § 206 and 18 U.S.C. § 1503); *Cammer v. United States*, 223 F.2d 322, 329-30 (D.C. Cir. 1955) (considering order adjudging attorney guilty of criminal contempt for sending survey to grand jurors, and discussing the holding in *Duke v. United States*, *supra*); *In re Grand Jury Application*, 617 F.Supp. 199, 205 (S.D.N.Y. 1985) (distinguishing 18 U.S.C. § 1504 from 18 U.S.C. 3324(c) in a suit in which plaintiffs sought a writ of mandamus to compel the United States Attorney to present alleged criminal wrongdoing of named defendants to a grand jury); *United States v. Miller*, 284 F.Supp. 220, 225 (D.Conn. 1968) (considering a motion to enjoin a defendant from interviewing, after the verdict, jury members concerning communication to some jurors during trial, and describing the role of 18 U.S.C. § 1504 in protecting juries from outside interference); *United States v. Smyth*, 104 F.Supp. 283, 299 (N.D. Cal. 1952) (discussing the history of the grand jury and finding that "[t]he purpose of 18 U.S.C.A. § 1504 was to prevent anyone from attempting to bring pressure upon or intimidate a grand juror by a written communication with that intent"); *Matter of Gerber*, 643 N.Y.S.2d 817 (N.Y. App. Div. 1996) (sanctioning attorney who pleaded guilty to violation of 18 U.S.C. § 1504).

[15] In *Duke*, the Fourth Circuit also certified two questions to the Supreme Court: "1. May a misdemeanor, for which no infamous punishment is prescribed, be prosecuted by information, where the punishment therefor may exceed $500 fine or six months' imprisonment, without hard labor, or both? 2. May an offense under section 137 of the Criminal Code (18 U.S.C. § 243) be prosecuted by information?" *Duke v. United States*, 301 U.S. 492, 493 (1937).

held that a person whose conduct is being investigated by a grand jury has no right to petition the grand jury or to appear before it. *Id.* at 841. The court found that the letter "was intended to accomplish one of the very things which it was the purpose of the statute to prevent, viz., to get before the grand jury the contentions and unsworn statements of one whose conduct was being investigated." *Id.*

The statute has also been referenced by private plaintiffs attempting to present information directly to a grand jury in order to obtain an indictment.[16] Considering this issue, a court in this circuit held that individuals do not have the right to appear before or present information to a grand jury absent the approval of a prosecutor or judge, or a request directly from the grand jury itself. *In re New Haven Grand Jury*, 604 F. Supp 453, 464 (D. Conn. 1985).[17] Any other ruling, the court concluded, would be "an invitation to anyone interested in trying to persuade a majority of the grand jury, by hook or by crook, to conduct investigations that a prosecutor has determined to be inappropriate or unavailing." *Id.* at 459.

All of the published cases involving 18 U.S.C. § 1504 involve parties attempting to influence grand juries with regard either to particular cases being brought against them or with regard to particular cases they would like the grand jury to bring – exactly the

---

The Court answered both questions in the affirmative and did not consider the jury tampering statute further. *Id.* at 495.

[16] *See, e.g.*, *Baranoski v. U. S. Att'y's Office*, No. 05-5014, 2006 WL 166495, at *2 (D.N.J. Jan. 20, 2006) (dismissing complaint alleging that defendant had denied plaintiff the right to present evidence of a federal crime to a grand jury); *In re Wright*, No. 97–236, 1997 WL 805250, at *1 (E.D. Pa. Dec. 19, 1997) (denying plaintiffs' motion to present a private petition to a grand jury); *see also Ryan v. Bilby*, 764 F.2d 1325, 1327 (9th Cir. 1985) (upholding dismissal of civil complaint seeking mandamus relief based on the assertion that the judge presiding over the trial at which plaintiff had previously been convicted had tampered with the jury).

[17] Judge Cabranes discussed the statute at length in considering a case in which a private individual, Anthony Martin-Trigona, submitted a letter to the Clerk of the Court instructing the Clerk to present this "confidential communication for the Grand Jury sitting in New Haven . . . . *outside the presence of anyone from the U.S. Attorney's office.*" *Id.* at 455 n.2 (emphasis in original). Martin-Trigona was at that time a potential target of the New Haven grand jury, although it was unclear for what purpose he sought to present the sealed letter to the grand jury. The court surmised that Martin-Trigona may have sought to communicate with the grand jury as a complainant. *Id.*

types of situations Justice Field described the statute as being intended to prevent.  These situations all differ fundamentally from the case before the Court, in which Heicklen is charged with jury tampering despite having no inkling of what type of case was before the juror who approached him and no intent to affect the outcome of a specific case.

4.  Constitutional Considerations

To the extent any ambiguity remains in the statute's interpretation, the statute should be construed narrowly if the statute, construed broadly, would potentially violate the Constitution. "When a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction."  *New York v. Ferber*, 458 U.S. 747, 769, n.24 (1982); *see Skilling v. United States*, 130 S. Ct. 2896, 2930 (2010); *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 516 (2009); *Crowell v. Benson*, 285 U.S. 22, 62 (1932).

When a statute's language is ambiguous, "[i]t is well settled that federal courts have the power to adopt narrowing constructions of federal legislation.  Indeed, the federal courts have the duty to avoid constitutional difficulties by doing so if such a construction is fairly possible." *Boos v. Barry*, 485 U.S. 312, 330-31 (1988) (internal citations omitted); *see also United States v. Thirty-seven Photographs*, 402 U.S. 363, 368-70 (1971).  "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Const. Trades Council*, 485 U.S. 568, 575 (1988); *Empire HealthChoice Assur., Inc. v. McVeigh*, 396 F.3d 136, 144 (2d Cir. 2005).

As discussed below, the holdings of federal cases brought under similar statutes indicate that a broad reading of 18 U.S.C. § 1504 could raise First Amendment problems because of its potential to chill speech about judicial proceedings.  The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."[18]  U.S. Const., amend. I. The Supreme Court has emphasized that "the First Amendment does not speak equivocally. . . . It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow."  *Richmond Newspapers, Inc. v. Virginia*. 448 U.S. 555, 576 (1980) (internal quotations omitted).

Although "political speech by its nature will sometimes have unpalatable consequences, . . . in general, our society accords greater weight to the value of free speech than to the dangers of its misuse."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).  The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *Snyder v. Phelps*, 131 S.Ct. 1207, 1215 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).  "Indeed, the Amendment exists so that this debate can occur—robust, forceful, and contested.  It is the theory of the Free Speech Clause that 'falsehood and fallacies' are exposed through 'discussion,' 'education,' and 'more speech.'"  *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S.Ct. 2806, 2835 (2011) (Kagan, J., dissenting) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).  That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government."  *Snyder*,131 S.Ct. at 1215 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)).

---

[18] In full, the First Amendment reads as follows:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const., amend. I.

Federal courts have had few opportunities to consider the constitutionality of 18 U.S.C. § 1504 because jury tampering is generally prosecuted under the statute prohibiting influencing a juror generally, 18 U.S.C. § 1503, or through contempt statutes.  But, in two cases arising under state contempt statutes, the Supreme Court has addressed in more detail the tension that Heicklen highlights between the protections of the First Amendment and the need to ensure the fair and impartial administration of justice.

In *Bridges v. State of California*, 314 U.S. 252 (1941), the Supreme Court addressed a situation in which petitioners had been found guilty of contempt by the Superior Court of Los Angeles County for letters pertaining to pending litigation that they had published in local newspapers.  Finding that the "unqualified prohibitions laid down by the framers [in the First Amendment] were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society," the Supreme Court determined that the First Amendment protected out-of-court publications pertaining to a pending case just as much as it protected any other type of speech.  *Id.* at 268.  Given the significant impact of the contempt convictions on freedom of expression, the Court held that the convictions could be justified only in reference to a "clear and present danger" to the administration of justice, and it found that the facts of the case did not constitute such a danger.[19]  *Id.* at 263-305.

In *Wood v. Georgia*, 370 U.S. 375 (1962), the Supreme Court considered again "the scope of the constitutional protection to be enjoyed by persons when the publication

---

[19] The *Bridges* Court described the clear and present danger standard as "a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." 370 U.S. at 263; *see also Craig v. Harney*, 331 U.S. 367, 376 (1947) (in order to justify sanctions infringing on protected expression, "[t]he fires which [the expression] kindles must constitute an imminent, not merely a likely, threat to the administration of justice.  The danger must not be remote or even probable; it must immediately imperil."); *Pennekamp v. Florida*, 328 U.S. 331, 334 (1946) (the "essential right of the courts to be free of intimidation and coercion . . . [is] consonant with a recognition that freedom of the press must be allowed in the broadest scope compatible with the supremacy of order").

of their thoughts and opinions is alleged to be in conflict with the fair administration of justice." *Id.* at 376.  In that case, a judge of the Bibb County Superior Court issued a charge to a grand jury to investigate public corruption.  Wood, the elected sheriff in Bibb County, issued a press release attacking the judge's charge.  Wood then distributed to the grand jury a letter implying that the allegations in the charge were false and urging the jury to investigate instead the Bibb County Democratic Executive.  *Id.* at 380.  Wood was convicted of contempt.  *Id.* at 380-81.  Starting with the premise that "the right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government," the Court nevertheless found that when the contempt power is used to punish speech, especially speech outside the presence of the court, the contempt power is limited by the First Amendment.  *Id.* at 383.  The Court held that the facts in *Wood* did not constitute a clear and present danger to the administration of justice, and that, to the contrary, Wood's speech was the very type of activity envisioned by the First Amendment as supplying "the public need for information and education with respect to the significant issues of the times."[20]  *Id.* at 388.

Decisions applying the clear and present danger test articulated in *Bridges* and *Wood* have consistently held that speech may be restricted only if that speech "is directed to inciting or producing" a threat to the administration of justice that is both "imminent" and likely to materialize.  *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Turney v. Pugh*, 400 F. 3d 1197, 1202 (9th Cir. 2005); *see also Locurto v. Giuliani*, 447 F.3d 159,

---

[20] The Court also pointed out that its task was made easier by the fact that it was dealing with a grand jury proceeding as opposed to a trial and that "the limitations on free speech assume a different proportion when expression is directed toward a trial."  *Id.* at 390.  This view is consistent with the clear and present danger test, in that the risk of imminent danger to the administration of justice may be higher when speech is made to a petit juror.

179 (2d Cir. 2006) (reiterating the salience of the "clear and present danger test" in a different First Amendment context).

*Bridges* and *Wood* establish the principal that in order to be restricted, speech about judicial proceedings must present a clear and present danger to the administration of justice.[21]  In *Turney v. Pugh*, the Ninth Circuit considered a prosecution under Alaska's jury tampering statute and identified speech to jurors that did present a clear and present danger.[22]  400 F. 3d 1197 (9th Cir. 2005).

In that case, a friend of Frank Turney's was on trial for violation of a state criminal statute prohibiting a felon from possessing a firearm.  Turney approached three members of the venire of that case, while they were inside the courthouse wearing badges identifying themselves as jurors, and he instructed them to call FIJA's toll-free number, which greeted callers with a recorded message informing them about their "rights as jurors" and allowed them to leave their addresses in order to receive more information by mail.  *Turney v. State*, 936 P.2d 533, 536-37 (Alaska 1997).  In addition to focusing on the case because it involved his personal friend, Turney was also interested because he was a critic of that particular state statute, having himself been previously convicted

---

[21] Although, as previously discussed, published opinions in prosecutions pursuant to 18 U.S.C. § 1504 are rare, the constitutionality of *state* jury tampering laws similar to the federal statute has been considered several times by state and federal courts.  *See, e.g.*, *Doss v. Lindsley*, 53 F. Supp. 427, 432-33 (E.D. Ill. 1944) (applying the test articulated in *Bridges* to a prosecution under Illinois's jury tampering statute, and finding that, in giving publications to grand jurors in an effort to influence them not to indict him but instead to indict his personal enemies, the habeas petitioner had interfered with the administration of justice and therefore his speech was not entitled to the protection of the First Amendment); *State of South Dakota v. Springer-Ertl*, 610 N.W.2d 768 (S.D. 2000) (finding that South Dakota's jury tampering statute does not reach situations where a person intends to inform the public or express a public opinion, as opposed to improperly attempting to specifically influence jurors, and holding that defendant was entitled to a jury instruction distinguishing between charged offense and protected expression).

[22] Alaska Statute 11.56.590(a) provides that:
    (a) A person commits the crime of jury tampering if the person directly or indirectly communicates with a juror other than as permitted by the rules governing the official proceeding with the intent to
        (1) influence the juror's vote, opinion, decision, or other action as a juror; or
        (2) otherwise affect the outcome of the official proceeding.

under a similar statute in another state. *Id.* Two of the members of the venire that Turney approached were selected for the petit jury, and one of them announced to the other deliberating jurors that he had called FIJA's toll-free number and that he was changing his vote in the case as a result. *Id.* at 537. The jury could not reach a decision and was excused. *Id.*

Prior to his trial for jury tampering, Turney raised an interlocutory appeal challenging the state jury tampering statute as unconstitutionally overbroad and void for vagueness. Turney argued that the statute did not link the crime of jury tampering to communications intended to influence a juror's actions *with regard to a particular case* and that therefore the statute had a "reach so wide that virtually *any* communication to a juror may be criminal." *Id.* at 539 (internal quotation omitted; emphasis in original). Agreeing that there could be constitutional problems with such a far-reaching statute, the Alaska Supreme Court held that the statute was not overbroad because it required "a specific intention to influence how jurors decide a *particular* case" as well as knowledge that he or she is communicating with a juror. *Id*. at 541 (emphasis added). Turney was subsequently convicted at trial of three counts of jury tampering.

Turney's habeas petition was denied. On appeal, the Ninth Circuit held that "the First Amendment, while generally quite protective of speech concerning judicial proceedings, does not shield the narrow but significant category of communications to jurors made outside of the auspices of the official proceeding and aimed at improperly influencing the outcome of a particular case." *Turney*, 400 F.3d at 1203. Accordingly, the court held that the Alaska Supreme Court's conclusion that the jury tampering statute

was constitutional was not "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 1205.

The relevant cases establish that the First Amendment squarely protects speech concerning judicial proceedings and public debate regarding the functioning of the judicial system, so long as that speech does not interfere with the fair and impartial administration of justice. In *Wood*, the Supreme Court held that even speech to a grand juror may be protected by the First Amendment if it does not present a clear and present danger to the functioning of the courts. 370 U.S. at 395. At the same time, the First Amendment does not create a right to influence juries outside of official proceedings, *Pennekamp v. Florida*, 328 U.S. 331, 366 (1946) (Frankfurter, J. concurring), because "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). Consistent with this interpetation, the court in *Turney* found that the narrow category of speech knowingly made to jurors outside of an official proceeding and "*with the intent to influence the outcome of a specific case*" was not protected by the First Amendment. 400 F.3d at 1201 (emphasis in original).

A broad construction of 18 U.S.C. § 1504 that encompassed speech to a juror on any subject that could be considered by a juror would arguably chill protected speech because it could sweep within its prohibitions speech that was not made with the intent of influencing the outcome of a particular case and that did not pose a clear and present danger to the administration of justice. [23]

---

[23] The Government's argument suggests that if Heicklen's speech were found to be protected by the First Amendment, that speech must still give way because of the danger that jurors who receive a pamphlet like Heicklen's will disregard a judge's instructions to render a verdict according to the evidence introduced before them and the law as presented by the court. The Court notes that our judicial system rests, in part, on the belief that jurors

Based upon the plain meaning of the text of 18 U.S.C. § 1504, reinforced by relevant judicial interpretations and the doctrine of constitutional avoidance, the Court holds that a person violates the statute only when he knowingly attempts to influence the action or decision of a juror upon an issue or matter pending before that juror or pertaining to that juror's duties by means of written communication made in relation to *a specific case pending before that juror* or in relation to *a point in dispute between the parties before that juror*.

### D.  The Sufficiency of the Indictment as a Matter of Law

Heicklen's alleged actions do not violate 18 U.S.C. § 1504.  The Indictment alleges that Heicklen "distributed pamphlets urging jury nullification, immediately in front of an entrance to the United States District Court of the Southern District of New York."  (¶ 1.)  Both pamphlets discuss the role of juries in society and urge jurors to follow their consciences regardless of instructions on the law.

Heicklen's pamphlets self-evidently pertain to a "juror's duties," satisfying the requirements for liability under the second element of 18 U.S.C. § 1504.  To satisfy the requirements for liability under the third element of 18 U.S.C. § 1504, however, the pamphlets must have been written or distributed in relation to an "issue or matter" pending before that juror.  The two pamphlets do not relate to an "issue" pending before a juror, because a juror's duties are not a point in dispute between the parties to a suit.

---

every day follow much more difficult instructions, for instance, instructions to disregard eyewitness testimony that they just heard and ignore evidence that they just saw.  It is just as reasonable to trust that jurors will follow a judge's instruction to accept the law as explained by the judge and disregard the contents of a pamphlet handed to them by a leafletter outside the courthouse.  The essence of the First Amendment is that falsehood and fallacies are exposed more effectively through discussion than through suppression, and that public debate affords adequate protection against the dissemination of "noxious doctrine."  *Whitney v. California*, 274 U. S. 357 (1927) (Brandeis, J. concurring); *see also Abrams v. United States*, 250 U.S. 616, 630-631 (1919) (Holmes, J., dissenting) ("[T]he ultimate good desired is better reached by free trade in ideas . . . the  best test of truth is the power of the thought to get itself accepted in the competition of the market. . . .").

Understanding "matter" to mean "case," the pamphlets could trigger liability under the statute's third element if they were distributed in relation to a particular case pending before a juror. But unlike in *Turney*, there is no allegation that Heicklen distributed the pamphlets in relation to a specific case. Indeed, the Government concedes that it "does not allege that the defendant targeted a particular jury or a particular issue." (Govt.'s Mem. at 28.)

The Government agrees that the pamphlets pertain to a juror's duties but argues that they also relate to "an issue or matter" because they could encourage a juror to follow her conscience instead of the law, thus affecting the outcome of a case. Every aspect of how a juror renders a verdict has the potential to influence the outcome of a case, however, and thus any communication pertaining to a juror's duties would also relate to an issue or matter. Such an expansive interpretation of "issue or matter" would render completely meaningless the distinction that the statute draws between "issue or matter" and "a juror's duties."[24] "[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009); *Aleynikov*, 2012 WL 1193611 at *8. Indeed, it is possible to give effect to every word of 18 U.S.C. § 1504, by finding that influencing the actions or decisions of a juror "pertaining to his duties" means something distinct from influencing the actions or decisions of a juror "upon any issue or matter before such juror" and that both types of influence must have been made by means of a written

---

[24] Counsel for the Government stated at oral argument that, "I don't know that saying that 'pertaining to their duties' is modified by the language 'in relation to an issue or matter' has any particular meaning, because, by definition, anything that influences a juror about his or her duties is in connection with what is pending before that juror." (Motion to Dismiss Hr'g Tr. 3:22-25, 4:1-2 Mar. 21, 2012.)

communication in relation to a specific case or point in dispute before that juror in order to be punishable.

Because the Indictment does not allege that Heicklen attempted to influence a juror through a written communication made in relation to a specific case before a juror or in relation to a point in dispute before a juror, the Court finds that the Indictment fails to state all of the elements of the offense described in 18 U.S.C. § 1504 and must be dismissed as legally insufficient.

Even if the Court were to conclude that the second and third elements were susceptible to a broader reading, that reading would at most render 18 U.S.C. § 1504 facially ambiguous. *See Aleynikov*, 2012 WL 1193611 at *9. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Rewis v. United States*, 401 U.S. 808, 812 (1971), and courts should construe an ambiguous criminal statute so as to apply it only to conduct that is clearly covered. *Callanan v. United States*, 364 U.S. 587, 596 (1961); *Lanier*, 520 U.S. at 266 (1997). Given the ambiguity in the statute, Heicklen could not have known that his actions would violate 18 U.S.C. § 1504.

The Court's holding merely maintains the existing balance that federal courts have found between freedom of speech and the administration of justice. Attempts to tamper with a jury in order to influence the outcome of a trial or a grand jury proceeding are still clearly prohibited under 18 U.S.C. § 1503 and 18 U.S.C. § 1504. Efforts to distribute leaflets to jurors in the immediate vicinity of courthouses may still be sanctioned through reasonable time, place, and manner restrictions such as those promulgated pursuant to 40 U.S.C. § 1315 and 41 C.F.R. § 102-74.415(c). The Court declines to stretch the interpretation of the existing statute prohibiting communications with a juror in order to

cover speech that is not meant to influence the actions of a juror with regard to a point in dispute before that juror or the outcome of a specific case before that juror.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss the Indictment is GRANTED.  The Defendant's other motions are now moot and are dismissed.


SO ORDERED.

**The Clerk of Court is directed to close this case.  Any pending motions are moot.**


DATED:   New York, New York
             April 7, 2012


_Kimba M. Wood_
KIMBA M. WOOD
United States District Judge